95 Cal.Rptr.2d 377 (2000)
22 Cal.4th 900
997 P.2d 1044
The PEOPLE, Plaintiff and Respondent,
v.
Daniel Steven JENKINS, Defendant and Appellant.
No. S007522.
Supreme Court of California.
May 4, 2000.
As Modified on Denial of Rehearing June 28, 2000.
*401 Michael R. Snedeker, Portland, OR, and James F. Smith, under appointments by the Supreme Court, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, *402 John R. Gorey, Robert S. Henry and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.
GEORGE, C.J.
Following the guilt phase of a capital trial, in which defendant was represented by two defense counsel, a jury found defendant Daniel Steven Jenkins guilty, among other charges, of the first degree murder of and conspiracy to murder Thomas Williams (Pen.Code, §§ 182, 187),[1] and of the attempted murder of George Carpenter (§§ 187, 664). The jury found true the special circumstance allegation that Williams was a peace officer who was killed intentionally in retaliation for the performance of his official duties. (§ 190.2, subd. (a)(7).) At the penalty phase, in which defendant primarily represented himself, the jury fixed the penalty at death. The trial court denied defendant's motion for new trial and for modification of the verdict, and imposed a sentence of death.
This appeal is automatic. (Cal. Const., art. VI, § 11; Pen.Code § 1239, subd. (b).) We conclude that the judgment should be affirmed in its entirety.

I. FACTS

A. Guilt Phase Evidence

1. Prosecution case

The prosecution's evidence demonstrated that defendant planned and committed the crimes at issue in this proceeding, involving the attempted murder of George Carpenter and the conspiracy to murder and actual murder of Los Angeles Police Department Detective Thomas Williams, because in a trial for robbery Carpenter (as the robbery victim) was the principal prosecution witness against defendant and Williams was the investigating officer.
The robbery of Carpenter occurred in North Hollywood in October 1984, while Carpenter and another man were en route to deposit the day's business receipts. Carpenter supplied the police with a license number of the automobile in which the two men who had robbed him were driving, and that vehicle was traced to defendant. Defendant admitted his involvement to one of his criminal cohorts but declared his innocence to Detective Williams. Carpenter positively identified defendant, both to Williams and again at the preliminary hearing, as one of the two assailants.

a. Attempted murder of George Carpenter
Defendant made two attempts to have Carpenter killed. First, he hired Jeffrey Bryant and Todd Shaw to kill Carpenter, but called off the attempt when Shaw failed to follow his precise instructions. Jeffrey Bryant, testifying under a grant of immunity, recounted that defendant commented, "no witness, no case." On July 4, 1985, at defendant's behest, Anthony Bryant shot Carpenter, while defendant and Jeffrey Bryant established an alibi for defendant. The prosecution's evidence established that Carpenter was dining in a restaurant when a man shot him in the head, torso, and legs. After multiple surgeries, Carpenter was released from the hospital and fled the area. Jeffrey testified that he had heard Anthony admit shooting Carpenter. Jeffrey also testified that he observed defendant pay Anthony for the shooting, that he, Jeffrey, had disposed of the stolen automobile used in the shooting, and that defendant had disposed of the weapon given by defendant to Anthony to perform the shooting. Another witness, an acquaintance of defendant's named Elihue Broomfield, testified that defendant told him he had hired men to shoot Carpenter in a Hollywood bar, but that despite multiple gunshot wounds, Carpenter had survived. The prosecution also introduced telephone company records establishing contact between defendant, *403 Shaw, and Anthony and Jeffrey Bryant prior to the shooting.

b. Murder of Detective Williams
Detective Williams was killed in a spray of gunfire in front of his son's daycare center in the early evening of October 31, 1985. Defendant (along with codefendants Duane Moody, Ruben Moss, Voltaire Williams, David Bentley, and Reecy Cooper) was charged with the murder of Detective Williams and with conspiracy to murder Williams.[2]
The evidence regarding defendant's involvement in the conspiracy and the murder of Detective Williams came primarily from the testimony of immunized witnesses  David Bentley, Jeffrey Bryant, Aladron Hunter, and Tyrone Hicks. Their testimony, in addition to testimony from persons who witnessed the shooting, or to whom defendant made incriminating statements, or who were involved in the disposal of the murder weapon, as well as ballistics evidence and telephone records, established that defendant directed various plans for others to kill Williams, and ultimately that defendant himself killed Williams.
Defendant solicited Jeffrey Bryant to murder Williams, telling him that he wished to prevent Williams's testimony at the Carpenter robbery trial. Defendant engaged in some planning activity with Bryant, but when Bryant found out Williams was not a security guard, as defendant had declared, but instead was a police officer, Bryant announced he would not participate.
On October 24, 1985, codefendant Voltaire Williams solicited Aladron Hunter to perform the murder, for the announced purpose of preventing the detective's testimony in court. On October 25, 1985, Voltaire drove with Hunter to defendant's home. Voltaire entered the residence and returned with a weapon. Voltaire got into an automobile identified by a witness to the shooting of the detective as being similar to the vehicle from which the shots were fired. Hunter followed Voltaire to a location a few blocks past a school and was instructed by Voltaire to wait for an orange-and-white Toyota pickup truck with a camper shell on the back. Voltaire instructed Hunter to drive by the pickup truck and shoot the intended victim in the head after the latter, whom he described, had picked up his child from the school. Voltaire stated he needed to get instructions from defendant regarding when the victim would arrive. Voltaire then retrieved the weapon from his automobile and gave it to Hunter.
Hunter found himself unable to shoot the victim when he arrived. Hunter met Voltaire later in the evening, informing him that he had not carried out the shooting and observing that he thought the intended victim was a police officer and not a security guard.
Two persons who lived near the Faith Baptist Church School in Canoga Park, where the shooting of Detective Williams occurred, testified that on October 25, 1985, they observed codefendants Moody and Moss in an automobile parked near the school. A third man seated in the rear of the vehicle may have been defendant.
Defendant also approached David Bentley two or three weeks before Halloween in 1985, for assistance in finding a contract killer. Bentley solicited Tyrone Hicks, who conferred with Moss, Bentley, and defendant regarding terms. Defendant directed Hicks to come to his home.
Two or three days before Halloween in 1985, Moss, Cooper, and Bentley picked up Hicks, informing him they were going to show him what he was supposed to do. When the men arrived at defendant's home, Hicks was introduced to defendant as the driver.
*404 Defendant went with Bentley to a lookout point and instructed him to look for a small orange Toyota or Datsun truck with a camper shell on it, stating that the man in the truck was the person he wanted to have killed, and that Bentley was to contact Moss when Bentley saw the truck and inform him of the direction the truck was headed.
Bentley waited 20 minutes, did not see the truck, and received no response when he activated Moss's pager.
In the meantime, Moss had driven Hicks and Cooper to the church school, where he gave them instructions regarding the murder. While they waited, Moss stated that previous attempts on the victim's life had failed, in one case because the gunman had lost his nerve.
Hicks observed the orange-and-white truck arrive at the school, but it departed before the plan could be executed. Defendant later berated Moss, and complained that now the victim would be able to testify against him the following day. Moss assured him they would kill the victim before then.
On the way home, Bentley informed Hicks that it was improbable that defendant would pay him more than a few hundred dollars for his participation in the crime. Hicks announced his reluctance to participate further.
An acquaintance of Hicks's recalled that Hicks had said to him that he was part of a plan to shoot a person near a school, that (as Hicks had testified) he had been picked up in a limousine and had seen the victim and the cars that were to be used, but that he had gotten scared. Additionally, Hicks's girlfriend recalled that Hicks had told her the plan was to kill a police officer, and that he had been shown where the officer picked up his son after school. Hicks told her he was supposed to be the driver, but that when the victim arrived from an unexpected direction, they abandoned the plan.
Telephone records disclosed prolific telephone contact between the homes, residences, and pager numbers of Bentley, Moss, Cooper, Moody, and Voltaire Williams in the week preceding October 31, 1985. When defendant's briefcase subsequently was seized from his sister's home, it contained notations of the names and telephone numbers of Hicks, Moody, and Moss, as well as Voltaire Williams's telephone number and the names Tyrone and Reecy.
The prosecution's evidence established that defendant ultimately took matters into his own hands. As noted, in October 1985, defendant was on trial for the robbery of Carpenter, and Detective Williams, as investigating officer, sat at counsel table during the trial. Defendant paid his friend Steve Ballow a nominal sum to testify in his behalf on October 30, 1985, and to provide defendant with a false alibi at the trial. Defendant explained to Ballow that he had not committed the robbery but had lent his car to a cousin who had committed the offense. He was upset about the trial and said he wished the police officer were dead. Ballow observed that Cooper, Moody, and Moss accompanied defendant to and from court, and Moody and Moss were detailed to drive Ballow home.
Elihue Broomfield, an acquaintance of defendant's from many years before, was at the courthouse on October 31, 1985, and happened to observe defendant's trial. Defendant approached him and invited him to go home with him during the lunch break. Defendant told Broomfield that he had not committed the robbery and that he had been set up by Detective Williams and Carpenter, but that defendant's car had been used in the robbery. Defendant stated he would not tolerate being set up by a police officer and would not incur a conviction without securing revenge. Defendant said he would "get" the officer and would have someone armed with a weapon "get" Detective Williams that evening. He said he had had Williams followed and knew his routine. He showed Broomfield *405 a weapon that appeared to be an Uzi and said it fired 10 to 20 rounds per second in rapid succession. He said he had more than one contract killer to do the job. Broomfield subsequently identified the murder weapon as similar to the gun that defendant showed him.
While they were at defendant's home, defendant made a telephone call, during which Broomfield overheard defendant say that everybody had to be together at 1600 hours or "it" would not work. Over lunch, defendant said he could not bear to be in jail while the man who had set him up would be at a picnic enjoying life. He said he would eliminate him. Upon their return to the San Fernando courthouse, Broomfield overheard defendant on the phone complaining that someone could not be located, and stating that he and others had to be at his home at a certain time and that "it" had to occur about 4:00 o'clock. Broomfield went to testify in another case around 3:00 or 3:30 that afternoon, and then he and defendant left the courthouse together. Telephone records corroborated Broomfield's testimony regarding defendant's telephone contacts.
Detective Williams signed his son out of the Faith Baptist Church School at 5:40 p.m. and was gunned down as he and his son approached their parked vehicle  an orange pickup truck with a camper shell. Williams was hit by eight bullets, two of which proved fatal. His truck also was riddled with bullets, as were nearby walls and even the interior of the school structure.
A woman who was present picking up her son from the school shortly before 6:00 p.m. on October 31, 1985, heard the gunfire. The boy reported that it sounded like a machine gun. The mother and child took cover, but eventually emerged to see Detective Williams slumped against his vehicle with his son weeping nearby. Other witnesses heard the gunfire and observed the victim's body slumped against the truck. The police received the first call reporting the killing at 5:44 p.m.
Various witnesses saw a grayish automobile go up and down the street in front of the school several times at approximately 5:30 p.m. that evening. One of these witnesses heard the gunfire and saw the same vehicle come up the street and rapidly accelerate to 60 or 65 miles per hour. The brother of this witness approached the vehicle to advise the driver that his headlights were not on. The witness was not certain whether the driver  apparently the sole occupant  was African-American, Hispanic, or White, though he reported to the police that the driver was White.
A person on the grounds of the Faith Baptist School on the evening of the murder heard what he thought were firecrackers exploding and saw an Oldsmobile, possibly white, speeding down the street in front of the property with its lights off. A husband and wife driving near the school after 5:30 p.m. on October 31 saw a light-colored full-size automobile, possibly a Chevrolet or Oldsmobile, speeding away at between 45 and 60 miles per hour. When they arrived at the school, they observed Detective Williams slumped against his truck, dead. The woman thought the vehicle she had seen speeding away resembled a photograph of the automobile identified as the one defendant had been using with Broomfield that same day. This automobile was a two-door blue-and-white Oldsmobile that had been stolen in Sepulveda on October 22, 1985. The automobile had been parked for an extended period before October 31, 1985, in a residential neighborhood in Canoga Park. A resident noted the license number and testified that the automobile was parked on the street on the morning of the murder, but that when she returned from work around 5:00 p.m., it was gone. When the automobile was recovered (after a tip from codefendant Moody) on November 7, 1985, the ledge of the driver's door was covered in gunshot residue of the type that the murder weapon emitted profusely. The front part of the automobile also contained nine expended shell casings.
*406 Further evidence recovered in the period following the crime was offered to prove defendant's culpability for the shooting. Defendant announced to David Bentley on the evening of October 31, 1985, that he "got down hisself and ... took care of that ass hisself [sic]." When Bentley asked what he meant, defendant said Bentley would see it on the news that evening.
At defendant's request, Bentley went to defendant's home about 8:00 p.m. Defendant appeared excited and repeated that he had "taken care of that ass." While Bentley worked to repair Moody's automobile, he heard defendant tell Moody he was surprised at how many shots the Uzi had fired with one light pull of the trigger. Defendant stated he had test-fired the Uzi in his backyard earlier that day. Defendant repeated that he "got that ass myself. I had to do it. I mean. I had to do it myself. Guys won't take care of business. I had to take care of this ... myself."
Ali Woodson received a telephone call from his friend Moody between 6:00 p.m. and 8:00 p.m. on October 31, 1985. A couple of hours later, Moody arrived at Woodson's apartment. He seemed disturbed and said he wanted to drop off some skates. He was carrying a large green duffel bag, which Woodson directed him to place in the closet. This testimony was confirmed by Mrs. Woodson. A few days later, Moody's girlfriend telephoned Ali Woodson and told him to take everything out of the duffel bag except the Uzi and that the police were on the way. Woodson examined the duffel bag, which contained several weapons, including a modified Mac M-10 assault pistol and a clip for the pistol. He turned the duffel bag and gun over to the police. Ballistics evidence indicated that the pistol was the murder weapon.
Arvie Carroll, who had been convicted of burglary and escape, became acquainted with defendant while both men were incarcerated in the Los Angeles County jail. Defendant told him that he had shot Detective Williams several times and then sped away to a Kmart store and talked to a salesperson in order to establish an alibi. Defendant told Carroll that he then returned home, where he gave Moody the murder weapon. Defendant announced that he was going to place the blame for the shooting on Moody. Defendant explained that he had shot Detective Williams because Williams had arrested him. He described the details of the shooting, noting how the body had jerked while he fired, and stating that his car stalled while he was trying to get away, so he "pumped some more bullets into his white ass," knowing that the officer already was dead. He also stated he would have killed the officer's son if he had come into the line of fire, because the child probably would grow up to be a police officer like his father. Carroll stated that defendant smiled and laughed as he related his story.
David Bentley testified that he spoke with Reecy Cooper about the crime while they were incarcerated together, and that Cooper said that he was in the car and at the house, because he was supposed to be the shooter, but that he became frightened and did not want to do the shooting.
In anticipation of a possible alibi defense mentioned by several witnesses, involving defendant's presence at a Kmart store soon after the shooting, a police officer testified that he had driven the route from the San Fernando courthouse, to defendant's home on Cantara street, to the Faith Baptist Church School in Canoga Park, and found that defendant could have committed the murder and still arrived at the Kmart at the time indicated by potential alibi witnesses.
Telephone records confirmed that there was telephone contact between the telephone numbers of defendant, Moss, Cooper, Bentley, Hicks, and Moody during the afternoon and evening of October 31, 1985. The briefcase seized from defendant's sister's *407 home contained a piece of paper bearing Elihue Broomfield's telephone number.

2. Defense case

Defendant presented evidence to support his claim that codefendant Moody had killed Detective Williams. Moody was implicated in the Carpenter robbery and also had been under investigation by Detective Williams in connection with another crime. Prosecution evidence tied Moody to the murder weapon, and defense evidence suggested that police investigation had focused on Moody. A person who met Moody in October 1985 stated that Moody had said at the time that he was an alibi witness in a friend's robbery trial, that an officer was a key witness in the case, and that Moody had expressed his own resolve to "get" the officer. Another witness testified that Moody had stated he had committed the Carpenter robbery, and that defendant had not been involved. The defense also presented evidence indicating that Moody would have been able to get to the murder scene on October 31, 1985, in time to commit the murder.
Defendant also presented evidence suggesting that because he was aware of police surveillance during the period leading up to the homicide, and because he was resigned to going to prison for the Carpenter robbery and was aware that Detective Williams was not a significant witness in the Carpenter robbery trial, he would not have undertaken to murder Detective Williams. Police records indicated defendant was under surveillance from late August 1985 until September 19, 1985, and that surveillance resumed on October 31, 1985, after the homicide. Defendant presented evidence that police records were faulty and that the surveillance may have continued between September 19, 1995, and the time of the homicide. In addition, many friends, neighbors, and relatives of defendant's related either that they observed apparent surveillance of defendant or that defendant had expressed awareness of and great concern regarding police surveillance that continued until the time of the homicide.
The lawyer who represented defendant in the Carpenter robbery trial testified that he did not anticipate that Detective Williams would testify against his client; that although defendant denied responsibility for the robbery, he seemed resigned to being convicted and going to prison for it; and that defendant appeared surprised when counsel informed defendant that Detective Williams had been killed.
Defendant also presented alibi evidence. Although David Bentley was called as a prosecution witness, his testimony included a recollection that he and defendant had gone to a gas station on the evening of October 31, 1985, to work on Moody's automobile. He recalled that he and gas station employees amused themselves by "burning rubber" with their automobiles at the rear of the station. Defendant called other witnesses to confirm the event, although they were not precise about the date it had occurred.
Defendant also presented evidence in support of the theory that the police had acted dishonestly in preparing the case against him. There were discrepancies in police records regarding when and where the police surveillance of defendant had taken place. Defendant noted that statements and descriptions offered by witnesses changed in some respects after contact with police interviewers. Canale, a witness relied upon by the prosecution early in the case  but not at trial  added incriminating details to his account of inculpatory statements made by Moody after various contacts with law enforcement officers. Canale also made inconsistent statements about whether he had warned the police about Moody's statements regarding the forthcoming crime before the crime occurred. Telephone records indicated Canale had telephoned the Norwalk sheriffs station twice on October 24, remaining on the telephone for 12 and 21 minutes, respectively. The officers named by Canale denied being informed by Canale *408 about his conversation with Moody. Canale was a regular informant who was interested in receiving a reward or other benefit in return for his information.
In addition, three of the witnesses who testified that they had seen an automobile, such as the one used by the shooter, near the scene of the crime immediately before and after the shooting, originally told the police that the driver involved in the shooting was White or Hispanic. Defendant is African-American. A dermatologist testified that he was unaware of any ointment or solution that could be applied to an African-American person's face to make it appear light or whiter.
Further evidence called into question the reliability of certain prosecution witnesses. Sidney Woodson testified he had known Jeffrey Bryant for years, that Bryant was a cocaine dealer, and that Woodson had seen Bryant use cocaine five to 10 times a day. Bryant also was charged with several robberies in 1987, and his probation officer was of the opinion he should be sentenced to state prison if found guilty. The probation officer recalled that Bryant had denied responsibility for the 1987 robberies, but Bryant testified that he believed he had admitted responsibility for one robbery. Elihue Broomfield's brother-in-law testified that Broomfield had an extremely poor reputation for honesty in the community. Broomfield had been on probation for felony hit and run in 1979, and had substantially delayed paying the restitution ordered in that case. Prosecution witness Steven Ballow made inconsistent statements to the police concerning his ride to the courthouse with defendant on the morning of October 31, 1985. Bentley admitted being a drug dealer who sold controlled substances to Hicks. Hicks admitted extensive drug abuse around the time of the crimes.
Hunter admitted being an alcoholic and using cocaine during the relevant period. Hunter, Hicks, Bentley, and Bryant all faced sentencing for criminal offenses when they testified for the prosecution.
Defendant presented evidence that prosecution witness Arvie Carroll may have had a motive to injure defendant. Defendant's brother testified that during defendant's pretrial incarceration in the county jail, someone with a name like Carroll telephoned him to say that defendant wanted the brother to bring $200 to the jail and put it in Carroll's jail account. Defendant told his brother he had never made any such request. Another witness, an inmate in the county jail, testified that Arvie Carroll told him that he was going to try to get defendant's brother to put money in Carroll's jail account. The witness later heard defendant and Carroll in a heated argument regarding Carroll's efforts to get money from defendant's brother.
Defendant presented the testimony of an expert that called into question the reliability of eyewitness identification testimony in general. He also presented evidence that cast doubt on details of the prosecution case, such as evidence that although a prosecution expert believed the shooter had held the automatic pistol in his right hand, defendant was left-handed.
The jury found defendant guilty of murder and found true an allegation that in the commission of the crime, a principal was armed with a firearm. (§ 12022, subd. (a).) The jury also found true the special circumstance allegation that Williams was a peace officer who intentionally was killed in retaliation for the performance of his official duties. (§ 190.2, subd. (a)(7).) The jury found not true the allegations that Williams was a witness to a crime who was intentionally killed in retaliation for his testimony (§ 190.2, subd. (a)(10)), and that defendant intentionally killed the victim while lying in wait. (§ 190.2, subd. (a)(15).)
The jury also found defendant guilty of conspiracy to commit the murder of Thomas Williams. (§§ 182, 187.) The jury also found defendant guilty of the attempted *409 murder of George Carpenter. (§§ 187, 664.)

B. Penalty Phase Evidence

1. Prosecution case

The prosecution presented evidence that defendant had been convicted of two counts of receiving stolen property and was placed on probation on condition he spend one year in the county jail. Defendant also had been convicted of assault by means of force likely to produce great bodily injury on Horace Monroe, Jr. Defendant pleaded guilty to this offense and was placed on probation, on condition he spend one year in the county jail, to be served concurrently with the term for receiving stolen property.
The prosecution presented evidence regarding the circumstances surrounding the assault conviction. Horace Monroe, Jr., testified that he was entering his automobile on November 22, 1978, when defendant approached the automobile in the company of a man whom the witness knew as Ali. Defendant and Ali were armed. Defendant told Monroe to get out of the vehicle and told Ali to shoot him. Defendant and Ali beat Monroe, causing injuries requiring 30 stitches to his forehead.
It was disclosed on cross-examination that defendant earlier had interrupted Monroe while the latter was removing the wheels from defendant's Corvette. Monroe desisted when the police arrived, and defendant conferred with the officers. Monroe also was impeached with inconsistent statements he made at an earlier proceeding regarding whether defendant had been armed during the assault.
Horace Monroe, Sr., testified that on the day following the assault on his son, Horace Monroe, Jr., he was told that defendant was across the street from the older man's home, armed. When Mr. Monroe, Sr., approached his truck intending to retrieve a shovel with which to defend himself, defendant opened fire on Mr. Monroe, Sr., shooting him in the shoulder. Horace Monroe, Jr., and Mrs. Monroe, Sr., confirmed seeing defendant and a companion, whom they knew as Ali, firing on Mr. Monroe, Sr. Although the witnesses stated the attack was unprovoked and that they had had no contact with defendant before he began firing, they were impeached with inconsistent testimony at earlier proceedings in which they stated that they had exchanged harsh words with defendant before the assault. There was also evidence of inconsistencies regarding which of the assailants was armed, how many assailants there were, and whether they fired repeatedly after hitting Mr. Monroe, Sr. There was also evidence that defendant's companion, Ali Bryant, was known as a violent person.

2. Defense case

Defendant presented evidence in mitigation to demonstrate his background and his reputation in the community. He was born in Kansas and was separated from his siblings when his mother brought him to Los Angeles to live with her. His mother had severe mental health problems. When she gave birth to a daughter, defendant's mother was unable to care for him as a consequence of her mental disability, and defendant was placed in foster care for a period of years. Defendant was a loving son. He was unaware of the identity of his father.
When he left foster care, defendant's grandmother cared for him and for his mother. Defendant worshipped his grandmother and was emotionally devastated when she died. He had offered to donate his liver to her, but it was too late. Her death occurred one month before the murder of Detective Williams.
Many witnesses testified regarding defendant's excellent reputation as a kind and responsible father and as a friend to children in his neighborhood and community. He was a godfather to a friend's child, and showed great concern when he visited the child in the hospital at birth and during *410 an illness. Witnesses related additional acts of kindness to other persons.
Defendant was an entrepreneur, a responsible businessman who established a candy store with a video arcade and a limousine business.
A friend of defendant's testified that on two occasions defendant acted as a Good Samaritan, once by stopping to offer assistance to a person injured in an automobile accident, and once by stopping to assist a person who had been shot.
The jury returned a verdict of death.

II. DISCUSSION

A. GUILT PHASE ISSUES

1. Claim of error in denying motion for change of venue

Before trial, defendant moved for a change of venue on the ground that his constitutional right to a fair trial had been prejudiced by pervasive pretrial publicity. In support of the motion, he offered copies of 93 newspaper articles describing the crimes, his arrest, the victim's funeral, comments by the local police chief regarding the crimes, and developments in the police investigation of the case. He also referred to ongoing radio and television coverage of the case, without specifying whether or to what extent this coverage was prejudicial. The trial court denied the motion, stating "the bulk of the clippings that you allude to were in the papers in the very beginning ... or right immediately thereafter. I would agree that now we will be seeing some more in the papers about the case. [¶] However, I don't think that from what you have submitted that it rises to a reasonable likelihood that the defendants cannot receive a fair and impartial trial in Van Nuys. I don't think simply the showing of the publications rises to that level. [¶] Obviously, during the course of jury selection the defense is free to renew this type of a motion if we see that in fact we are not able to obtain a fair and impartial jury. [¶] So the motion at this time will be denied." The motion was not renewed at the time of jury selection.
Defendant contends on appeal that the denial of his motion for change of venue constituted a denial of his state and federal constitutional rights to a fair trial and to be tried by a fair and impartial jury. He relies in large part upon the evidence of negative pretrial newspaper publicity that was the basis for his motion in the trial court. He also contends, without citation to the record, that 61 of 152 potential jurors stated they had prior knowledge of the case. He also asserts that three persons selected for jury service stated on their juror questionnaires that they had some familiarity with the case. He states that only one of these was questioned by defense counsel regarding her exposure to publicity.
We do not find any error in the trial court's order denying the motion for change of venue.
Section 1033, subdivision (a), requires a trial court to grant a motion for change of venue if "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." We have explained that "[t]he phrase `reasonable likelihood' in this context `means something less than "more probable than not,"' and `something more than merely "possible."' [Citation.] In ruling on such a motion, as to which defendant bears the burden of proof, the trial court considers as factors the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused." (People v. Proctor (1992) 4 Cal.4th 499, 523, 15 Cal.Rptr.2d 340, 842 P.2d 1100.)
On appeal, "`the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was *411 not in fact had.'" (People v. Proctor, supra, 4 Cal.4th at p. 523, 15 Cal.Rptr.2d 340, 842 P.2d 1100, italics in the original.) On appeal, we undertake a de novo review of the five controlling factors noted above (as demonstrated by the evidence before the trial court at the time of the motion), in order to resolve the first question whether the trial court erred. Further, "[w]ith regard to the second part of the showing, in order to determine whether pretrial publicity had a prejudicial effect on the jury, we also examine the voir dire of the jurors." (Id. at p. 524, 15 Cal. Rptr.2d 340, 842 P.2d 1100.)
The crime was of the gravest order, involving the murder of a police officer, and although this circumstance weighs in favor of a change of venue (People v. Daniels (1991) 52 Cal.3d 815, 852, 277 Cal.Rptr. 122, 802 P.2d 906), it does not by itself require a change of venue. (See People v. Cummings (1993) 4 Cal.4th 1233, 1276, 18 Cal.Rptr.2d 796, 850 P.2d 1.) Defendant's motion for change of venue was made upon the basis of assertedly prejudicial and extensive publicity. Although his motion and argument to the court referred to television and radio coverage, all the examples of prejudicial publicity to which he refers on appeal were disseminated through the print medium. He alludes to articles extolling the victim and explaining that he was murdered in connection with the prosecution of another of defendant's crimes, and to articles sympathetically depicting the victim's family at the victim's funeral, relating the opinion of investigating officers that defendant was the leader of a conspiracy to kill the victim and that he had made attempts to commit the crime before accomplishing it, references to confessions of codefendants, and former Los Angeles Police Chief Gates's comment that defendant was a heartless' killer. He also contends his race was made obvious through photographs.
Although extensive and sometimes editorial, the bulk of this coverage dated from the time the crime was committed, some two years before the hearing on the motion for change of venue, and all the articles dated from at least 10 months prior to the motion. Such a lapse of time weighs against a change of venue. (People v. Proctor, supra, 4 Cal.4th at p. 525, 15 Cal.Rptr.2d 340, 842 P.2d 1100, and cases cited; see also People v. Pride (1992) 3 Cal.4th 195, 225, 10 Cal.Rptr.2d 636, 833 P.2d 643 [the "passage of time weighs heavily against a change of venue"].) The trial occurred in Van Nuys in Los Angeles County, an exceptionally populous area. (See People v. Cummings, supra, 4 Cal.4th at p. 1276, 18 Cal.Rptr.2d 796, 850 P.2d 1 [involving a trial held in Los Angeles County's San Fernando Valley for the murder of a police officer]; see also People v. Jennings (1991) 53 Cal.3d 334, 363, 279 Cal.Rptr. 780, 807 P.2d 1009 ["`The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness.'"].) Although the victim was a police officer, apart from that status neither the victim nor defendant was prominent  or notorious  in the community. (See People v. Cummings, supra, 4 Cal.4th at p. 1276, 18 Cal.Rptr.2d 796, 850 P.2d 1 [similar facts].) The density of the population in the area, the lapse of time between the conclusion of the publicity and the hearing on the motion, and the lack of prominence of the victim and defendant lead us to conclude that the trial court did not err in denying the motion for change of venue.
In addition, with respect to the issue of prejudice, the record does not establish a reasonable likelihood that defendant did not in fact receive a fair trial. There was no indication that the pretrial publicity had a prejudicial impact upon the jurors' ability to remain fair and impartial. Only three jurors who served on defendant's jury indicated in their juror questionnaires that they had heard of the case prior to trial. The first had no information other than that the names of the defendants were recognizable, that he had no idea of *412 the source of this information, and that he knew so little about the case that the publicity would have no effect on his views regarding the matter. The second juror was aware that the case involved a police officer who had been killed as he picked up his son from school, but the juror believed this information would have no effect on his views regarding the case. The third juror was uncertain whether she had heard of the case, because it had been so long since her exposure to any publicity, but she believed it involved a man picking up his son from school. She also stated the publicity would have no effect on her view of the case. On voir dire, this juror also stated that she vaguely recalled reading in a newspaper at the time of the crime that it involved a man who was shot while picking up his child from school. She did not recall any other facts and stated that the publicity would have no impact upon her deliberations. According to defendant, no other seated juror was questioned on voir dire regarding publicity.
We recall that there is "no presumption of a deprivation of due process of law aris[ing] from juror exposure to publicity concerning the case." (People v. Proctor, supra, 4 Cal.4th at p. 527, 15 Cal.Rptr.2d 340, 842 P.2d 1100.) Defendant fails to point to any evidence establishing that the three jurors noted above who served on his case were exposed to or recalled any prejudicial element of the pretrial publicity. Their exposure to publicity was minimal and harmless. As we have observed: "Vague recollections of news reports by a few jurors do not compel a change of venue." (People v. Howard (1992) 1 Cal.4th 1132, 1169, 5 Cal. Rptr.2d 268, 824 P.2d 1315.) Minimal exposure well before the commencement of trial, by a small number of jurors who reliably report that their exposure will not color their view of the case (see People v. Proctor, supra, 4 Cal.4th at p. 527, 15 Cal.Rptr.2d 340, 842 P.2d 1100), does not establish a reasonable likelihood that defendant did not in fact receive a fair trial.
Defendant also contends it was error to transfer the case from downtown Los Angeles to the San Fernando Valley and to retain it for trial there. The case initially was assigned to a downtown court, and over defendant's objection was transferred for trial to Van Nuys, where the crime had occurred. When he moved for change of venue, defendant also made an alternative request that the matter be returned for trial to a downtown court.
Defendant contends on appeal that he was less likely to receive a fair trial in the San Fernando Valley, where the crime occurred, the population density was less than it was downtown, and fewer members of the community shared his ethnic background. The same considerations apply to an intracounty transfer as apply to a motion for change of venue to another county, and because we have found no error in the trial court's denial of the motion for change of venue, we find no error in the assignment of the case for trial in Van Nuys. (People v. Cummings, supra, 4 Cal.4th at p. 1276, fn. 17, 18 Cal.Rptr.2d 796, 850 P.2d 1.)[3]
Defendant appears to contend that the trial court should have granted his motion for change of venue because of certain developments during voir dire. He alleges that during voir dire "there was much discussion of appellant's case, and dissemination of false and damaging rumors. The spread and impact of such rumors, and the trial court's refusal to adequately voir dire concerning those rumors *413 ... provides further evidence that the community of Van Nuys was itself tainted by both pretrial publicity and more informal sources of prejudicial `information,' and that a change of venue was required."
Any claim that such a motion should have been granted based upon developments at voir dire was waived by defendant. The trial court denied the motion for change of venue before the commencement of jury selection based upon proffered evidence of pretrial publicity, subject to renewal of the motion in the event voir dire established any further basis for questioning whether defendant would receive a fair trial in the county. Trial counsel did not renew the motion. Because trial counsel failed to cite occurrences at voir dire as the basis for a renewed motion for change of venue, he afforded the trial court no opportunity to grant the relief that defendant now contends should have been accorded him. Thus we conclude that defendant's claim has been waived to the extent it is based upon occurrences at voir dire. (See People v. Bolin (1998) 18 Cal.4th 297, 312, 75 Cal.Rptr.2d 412, 956 P.2d 374.)[4]

2. Severance of trials

Defendant contends that the prosecutor obtained a severance of defendant's (and codefendant Moss's) trial from that of codefendants Duane Moody, Voltaire Williams, and Reecy Cooper for the impermissible purpose of obtaining a jury composed of White persons. Defendant contends the prosecutor's improper purpose is demonstrated by the prosecutor's statement that he wanted the trial to be conducted in Van Nuys, and not in Central Los Angeles, in the context of the court's indication that a transfer to Van Nuys was possible only if the case was broken into "more manageable units." Defendant concedes he did not oppose the prosecutor's severance motion on the ground asserted on appeal. In fact, defense counsel agreed prior to trial that severance was appropriate, although counsel stated he would oppose any transfer of the case to Van Nuys. The court agreed with defense counsel that the question of the transfer to the Van Nuys court was a separate matter that would be heard on another date. Similarly, at trial defense counsel conceded that severance was appropriate and that the question of the transfer of the trial to Van Nuys was not at issue in the context of the severance motion. Accordingly, any claim regarding the prosecutor's motivation in moving for severance was waived. (See People v. Williams (1997) 16 Cal.4th 153, 254, 66 Cal.Rptr.2d 123, 940 P.2d 710 [claim of prosecutorial misconduct generally is waived if defendant does not object below]; People v. Hawkins (1995) 10 Cal.4th 920, 940, 42 Cal.Rptr.2d 636, 897 P.2d 574 [defendant who fails to move to sever counts waives claim on appeal]; People v. Mitcham (1992) 1 Cal.4th 1027, 1048, 5 Cal. Rptr.2d 230, 824 P.2d 1277 [defendant waives claim that court erred in denying codefendant's severance motion when defendant did not join in the motion].) In any event, the record discloses that the prosecutor was motivated by a desire to sever the case in which the prosecution sought the death penalty (involving defendant and Moss) from the case in which the death penalty was not being sought (involving the other defendants) and to avoid an unmanageable trial involving too many defendants, that the prosecutor wanted to try both cases in Van Nuys because this was the location in which the crime was committed, and that he disavowed any ulterior purpose.

3. Severance of counts

Defendant contends the trial court erred in denying his motion to sever the trial of count 3, alleging the attempted murder of George Carpenter, from the trial of counts *414 1 and 2, alleging murder and conspiracy to murder Detective Thomas Williams.
All of these offenses belonged to the same class of crimes, so that joinder was appropriate pursuant to section 954 unless a clear showing of potential prejudice was made. (People v. Bradford (1997) 15 Cal.4th 1229, 1315, 65 Cal.Rptr.2d 145, 939 P.2d 259.) We review the trial court's ruling for abuse of discretion, which will be found "when the trial court's ruling `"falls outside the bounds of reason."'" (Ibid.) Depending upon the particular circumstances of each case, a "`[r]efusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spill-over" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.'" (Ibid.)[5] Not all of these considerations are of equal weight: "`[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.' [Citations.] Cross-admissibility suffices to negate prejudice, but it is not essential for that purpose." (People v. Bradford, supra, at pp. 1315-1316, 65 Cal. Rptr.2d 145, 939 P.2d 259; see also People v. Memro (1995) 11 Cal.4th 786, 850-851, 47 Cal.Rptr.2d 219, 905 P.2d 1305 [denial of severance should be sustained if other crimes evidence is cross-admissible, with possible exception if joinder is so grossly unfair as to deny defendant due process].)
Evidence that defendant attempted to hire a hit man to kill George Carpenter prior to Carpenter's anticipated testimony against defendant at his ongoing trial for robbing Carpenter would have been admissible at a separate trial charging defendant with conspiracy to murder Detective Williams to prevent Williams from testifying at the same trial. Evidence in each case supported the inference that defendant acted for the same motive and with the same intent as in the other case  to kill witnesses in order to prevent them from testifying against defendant at the ongoing robbery trial. (See People v. Arias (1996) 13 Cal.4th 92, 127-128, 51 Cal.Rptr.2d 770, 913 P.2d 980 [evidence defendant kidnapped and robbed one victim in order to obtain the means of avoiding arrest for a prior murder was cross-admissible; evidence regarding the murder supplied evidence of motive for the robbery kidnapping, which in turn indicated consciousness of guilt for committing the murder]; People v. Cummings, supra, 4 Cal.4th at p. 1284, 18 Cal.Rptr.2d 796, 850 P.2d 1 [no error in denying severance; evidence regarding robberies was cross-admissible to show motive for murder, because the motive (avoiding arrest) was circumstantial evidence of premeditation and deliberation, both of which were elements of the murder charge]; People v. Price (1991) 1 Cal.4th 324, 388, 3 Cal. Rptr.2d 106, 821 P.2d 610 [no error in denying severance; evidence that one of the victims was killed on the orders of a prison gang to which the defendant belonged, and that the other victim was killed in an attempt to acquire firearms to carry out gang activities, was cross-admissible to show motive]; People v. Daly (1992) 8 Cal.App.4th 47, 56, 10 Cal.Rptr.2d 21 [no error in denying severance; evidence of robberies was relevant to show motive and intent with respect to attempted murder, because the evidence showed *415 the attempted murder was committed to avoid the defendant's return to prison for robberies he had committed, and evidence of attempted murders was cross-admissible to establish consciousness of guilt as to the robberies].) There is no support in the record for defendant's contention that the charge that defendant attempted to murder George Carpenter was not brought in good faith, but was filed merely to "shore up" the capital charges. In addition, defendant has not demonstrated that the evidence underlying one of the offenses was significantly more inflammatory than the evidence in the other, or that evidence of guilt was so much stronger in one than the other that joinder was grossly unfair. (See People v. Memro, supra, 11 Cal.4th at p. 851, 47 Cal.Rptr.2d 219, 905 P.2d 1305.)
Contrary to defendant's contention, the denial of defendant's severance motion did not constitute a violation of the Eighth or Fourteenth Amendment to the United States Constitution; no ground exists to suppose the denial of severance deprived defendant of a reliable determination of guilt or caused a trial that was fundamentally unfair.
We reject defendant's contention that he was deprived of the ability to demonstrate at the hearing on the severance motion that the evidence of the common motive for the attempted murder of Carpenter and the conspiracy to murder Detective Williams was very weak because of the prosecutor's failure to provide timely discovery regarding witness Broomfield at the preliminary hearing. The hearing on severance occurred 10 months after the preliminary hearing, and defendant had ample time to discover evidence sufficient to demonstrate that the evidence of common motive was unreliable, or that the evidence of defendant's responsibility for the attempted murder of Carpenter was weak. In any event, defendant did not make this claim at the hearing on the severance motion; in fact he stated he would not attack the credibility of Broomfield. He suggested that it would have been poor defense tactics to attempt to impeach the witness at the preliminary hearing, and that he preferred to reserve the defense for trial. Thus this claim is waived on appeal. (See People v. Memro, supra, 11 Cal.4th 786, 851, 47 Cal.Rptr.2d 219, 905 P.2d 1305.)
Defendant also contends that "there was a due process violation based on [prosecutorial] misconduct in fabricating evidence to support an otherwise unavailable joinder of cases." This claim is based upon the contention that the police had fabricated a police report from one Donald Sutton relating defendant's plan to murder Carpenter, and offered it at the preliminary hearing. The weakness of the Sutton evidence  which was not presented by the People at trial  was brought to the trial court's attention at the hearing on the severance motion. The circumstance that this particular evidence was weak did not make joinder unavailable, and the claim that the police fabricated the evidence is unconvincing. (See claim No. 17, post; see also claim No. 5, post.)

4. Delay in discovery

Defendant contends that the trial court erred in refusing to set aside the information, exclude the testimony of Arvie Carroll, or impose any other effective sanction for the prosecution's failure to disclose to the defense before the preliminary hearing that the prosecution possessed evidence that defendant had made inculpatory statements to jailhouse informant Arvie Carroll.
Before the preliminary hearing, Carroll, a person incarcerated with defendant in the county jail, informed the prosecution that defendant had admitted to Carroll that defendant had killed Detective Williams. The prosecution did not inform the defense of this statement until approximately two months after the preliminary hearing. Defendant made an unsuccessful motion to set aside the information or bar the testimony of Carroll at trial, or for some other appropriate sanction against *416 the prosecution for its delay in complying with the trial court's discovery order. Defendant contends that the trial court's refusal to impose a sanction constituted a violation of his Sixth and Fourteenth Amendment rights to due process of law and to confront the witnesses against him. He asserts a violation of parallel provisions of the California Constitution.
As we have stated, "[i]t is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm." (People v. Pinholster (1992) 1 Cal.4th 865, 941, 4 Cal. Rptr.2d 765, 824 P.2d 571.) Defendant fails to demonstrate prejudice. He contends he was prejudiced because he was unable to examine Carroll at the preliminary hearing or to interview witnesses regarding the credibility of Carroll's statement. He contends the prosecution gained a tactical advantage by shielding Carroll from examination at the preliminary hearing regarding defendant's inculpatory statement and Carroll's possible status as a government agent. He contends he thereby was deprived of an opportunity to develop an affirmative defense.
The contention is unpersuasive. Defendant had ample time  one and a half years  after learning of Carroll's statement to the prosecution to prepare to challenge the evidence and develop any affirmative defense. Defendant's claim that had he known of Carroll's statement prior to the preliminary hearing, he would have called Carroll as a witness at that hearing and obtained evidence to discredit him and to support a defense that defendant was being framed is entirely speculative. In any event, as noted, defendant had ample opportunity in the extended period between the disclosure of Carroll's statement and the trial to gather evidence in support of such a claim.[6]
Defendant's contention also is premised upon the assumption that a limitation on a defendant's ability to discover evidence and to develop a defense at the preliminary hearing necessarily is reversible error. Such error, however, at the preliminary hearing is not reversible on appeal in the absence of a showing of prejudice at trial. (People v. Pompa-Ortiz (1980) 27 Cal.3d 519, 529, 165 Cal.Rptr. 851, 612 P.2d 941 [holding that irregularities at the preliminary hearing that "are not jurisdictional in the fundamental sense" require reversal on appeal only if the defendant can demonstrate that he or she "was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination"].) At trial, defendant was able to confront and cross-examine Carroll, having had ample opportunity to investigate the basis for the witness's testimony and any affirmative defense suggested by it. The delay in disclosure did not implicate defendant's due process right to be informed of material evidence favorable to the accused (see Brady v. Maryland (1963) 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215; see also United States v. Bagley (1985) 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481); he was informed of the evidence and had ample time to investigate before trial. Moreover, the evidence in the prosecution's possession was not favorable to the accused.
Finally, defendant fails to support his contention that the trial court was required to impose the sanctions of dismissal or exclusion of evidence, or at least impose a special jury instruction, because *417 the prosecution allegedly had committed a willful violation of a discovery order. The cases cited by defendant recognize that courts have broad discretion in determining the appropriate sanction for discovery abuse, and recognize that sanctions ranging from dismissal to the giving of special jury instructions may be required in order to ensure that the defendant receives a fair trial, particularly when potentially favorable evidence has been suppressed. (See, e.g., People v. Zamora (1980) 28 Cal.3d 88, 99, 167 Cal.Rptr. 573, 615 P.2d 1361; People v. Caldwell (1991) 282 Cal.Rptr. 272, 230 Cal.App.3d Supp. 1, 5 [reversing an order dismissing a complaint for discovery violations in the absence of a showing of prejudice].) Defendant cites no case, and our research has disclosed none, establishing that the prosecutor's pretrial delay  whether willful or not  in disclosing inculpatory evidence to the defendant requires a particular sanction as a matter of due process, or that failure to impose a sanction for a period of delay that occurred long before trial requires reversal of a conviction in the absence of prejudice to the defendant at trial. We note that the record does not support defendant's contention that the trial court did nothing to protect him from violation of the court's discovery order. At the hearing on the motion to set aside the information, at which the prosecutor asserted that concern for Carroll's safety led to the delay in disclosure, the trial court determined that defendant had not been prejudiced by the delay in discovery, but warned the prosecutor not to make any further unilateral decisions regarding compliance with the court's discovery order and threatened sanctions if the court's warning were not heeded. In sum, no constitutional violation or other error has been shown.

5. Failure to disclose evidence

Defendant contends the prosecution violated his right to due process of law by failing to disclose information regarding an alleged informant system in the Los Angeles County jail that assertedly encouraged inmates to seek or fabricate confessions from defendants in notorious cases such as his. Defendant relies upon the rule that due process of law requires that the prosecution disclose material exculpatory evidence to an accused (see Brady v. Maryland supra, 373 U.S. at p. 87, 83 S.Ct. 1194; see also United States v. Bagley, supra, 473 U.S. at p. 678, 105 S.Ct. 3375), including "`favorable evidence known to ... others acting on the government's behalf...."' (In re Brown (1998) 17 Cal.4th 873, 879, 72 Cal.Rptr.2d 698, 952 P.2d 715.) He contends the undisclosed evidence was material and exculpatory because it would have provided a strong basis for impeachment of prosecution witnesses.
Defendant's contention is premised upon his assertion that such a system existed at the time of his incarceration in the Los Angeles County jail. In support, defendant offers a Los Angeles Grand Jury Report from 1989-1990. This report is not part of the record on appeal, however, and "[a]s we have emphasized in the past, our review on direct appeal is limited to the appellate record." (People v. Barnett (1998) 17 Cal.4th 1044, 1183, 74 Cal.Rptr.2d 121, 954 P.2d 384.) As we have done in the past, "[b]ecause defendant's claim is dependent upon evidence and matters not reflected in the record on appeal, we decline to consider it at this juncture." (Ibid.)
Defendant asks that we take judicial notice of the grand jury report. We deny the request, because it is "in contravention of the general rule that an appellate court generally is not the forum in which to develop an additional factual record ...." (People v. Peevy (1998) 17 Cal.4th 1184, 1207, 73 Cal.Rptr.2d 865, 953 P.2d 1212; see also People v. Stoll (1989) 49 Cal.3d 1136, 1144, fn. 5, 265 Cal.Rptr. 111, 783 P.2d 698.) The circumstance that we granted a request to take judicial notice of the same report in People v. Gonzalez (1990) 51 Cal.3d 1179, 275 Cal.Rptr. 729, 800 P.2d 1159 is unavailing. *418 (See id. at p. 1259, fn. 54, 275 Cal.Rptr. 729, 800 P.2d 1159.) In that case we granted judicial notice in connection with the defendant's petition for writ of habeas corpus. A habeas corpus proceeding, of course, appropriately may develop a record beyond the record on appeal. (See People v. Pope (1979) 23 Cal.3d 412, 426, 152 Cal.Rptr. 732, 590 P.2d 859.)
Defendant asserts, based upon the record on appeal, that the informants who testified against him offered unreliable testimony, that details of their statements could have been garnered from news reports and additional sources other than defendant, and that defendant complained during trial that he was subject to harassment by jail officials during his pretrial custody. These claims, even if accepted as true, do not demonstrate that there was a system within the Los Angeles County jail of encouraging inmates to recount fabricated confessions or that defendant was the victim of such a system. Defendant is incorrect in suggesting that the record on appeal demonstrates that detectives investigating the crime purposefully placed inmate informants near defendant in an effort to secure incriminating statements; defendant's own citations to the record reveal no such evidence. Under these circumstances, defendant has failed to establish that the prosecution was in possession of material exculpatory evidence that it failed to disclose to the defense, and we must reject his claim.

6. Discovery related to police activities

Defendant contends that the trial court erred in refusing to grant discovery of certain evidence, and that the prosecution erred in failing to disclose it. He contends this error deprived him of his constitutional right to due process of law.
The defendant generally is entitled to discovery of information that will assist in his defense or be useful for impeachment or cross-examination of adverse witnesses. (People v. Memro (1985) 38 Cal.3d 658, 677, 214 Cal.Rptr. 832, 700 P.2d 446.) A motion for discovery must describe the information sought with some specificity and provide a plausible justification for disclosure. (People v. McPeters (1992) 2 Cal.4th 1148, 1171, 9 Cal.Rptr.2d 834, 832 P.2d 146.) The court's ruling on a discovery motion is subject to review for abuse of discretion. (People v. Ashmus (1991) 54 Cal.3d 932, 979, 2 Cal.Rptr.2d 112, 820 P.2d 214.)
Under the due process clause of the federal Constitution, the government has the obligation to disclose to the defendant evidence in its possession that is favorable to the accused and material to the issues of guilt or punishment. (Strickler v. Greene (1999) 527 U.S. 263, 280-282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286; Pennsylvania v. Ritchie (1987) 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 [applying due process analysis in the context of court's denial of discovery]; People v. Marshall (1996) 13 Cal.4th 799, 840-843, 55 Cal.Rptr.2d 347, 919 P.2d 1280 [same].) Evidence is material if a reasonable probability exists that a different result would have occurred in the proceeding had the evidence been disclosed to the defense. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. (Pennsylvania v. Ritchie, supra, 480 U.S. at p. 57, 107 S.Ct. 989; In re Sassounian (1995) 9 Cal.4th 535, 543-544, & fn. 5, 37 Cal. Rptr.2d 446, 887 P.2d 527, overruling broader statement of the standard in People v. Morris (1988) 46 Cal.3d 1, 30, fn. 14, 249 Cal.Rptr. 119, 756 P.2d 843, upon which defendant relies.)
Defendant complains that the trial court refused to grant discovery of photographs of police officers who were involved in surveilling him prior to October 31, 1985, and of photographs of the vehicles used in the police surveillance. He asserts that such photographs could have been shown to neighbors of defendant and other witnesses for the purpose of identification. *419 Defendant sought to demonstrate that police surveillance lasted longer than the police had admitted, thereby suggesting defendant would not have engaged in the charged crimes while he knew he was under surveillance.
As respondent points out, the prosecution offered to make the surveillance officers available so that witnesses could view them in person. Thus, defendant had no further need for photographs of the officers.
The court also acted within its discretion in determining that defendant had not shown sufficient cause to warrant discovery of photographs of the surveillance vehicles. As the court stated, the defense witnesses who testified in support of the discovery motion regarding the surveillance of defendant had little or no independent recollection of the vehicles defendant had told them were following him, so the utility of photographs of the surveillance vehicles for defendant's purposes was doubtful. The court also observed that it might be unduly suggestive to show photographs of the vehicles to witnesses who had no independent recollection of them. Further, we note that the court denied the discovery motion without prejudice, stating that if defendant had additional evidence, the court would reconsider the matter. Defense counsel stated he probably would put defendant on the stand to supply the needed foundation for the discovery request, but he never did so.
Finally, the evidence was not material, such that its loss deprived defendant of due process of law. Defendant has not demonstrated that the prosecution had in its possession evidence that was favorable to him and material to the issues of guilt or punishment. (See Pennsylvania v. Ritchie, supra, 480 U.S. at p. 57, 107 S.Ct. 989.) There is no reasonable probability a different result would have occurred in the proceeding had the evidence been disclosed to the defense (ibid.)the evidence was not such as "`could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (Strickler v. Greene, supra, 527 U.S. at p. 290, 119 S.Ct at p. 1952.) Defendant was able to introduce evidence in support of his theory that the police surveillance had extended until the time of the Williams murder, and it would be entirely speculative to conclude that photographs of surveillance vehicles would have affected the verdict either by corroborating defense witnesses or by leading to potential exculpatory evidence.
Defendant also contends the trial court erred in denying his request for discovery of memoranda written by Los Angeles Police Chief Gates and a lieutenant in the police department regarding an internal affairs investigation of Officers Pesante, Slack, and Riscens in connection with the alleged statement of Donald Sutton to Officer Pesante that defendant intended to kill Carpenter. As respondent notes, the People did provide defendant with the police department's written report on the internal affairs investigation that was the basis upon which Chief Gates and the lieutenant based their memoranda. The trial court properly reviewed the disputed memoranda in camera to weigh the People's claim of privilege against defendant's asserted need for the information (see People v. Webb (1993) 6 Cal.4th 494, 518, 24 Cal.Rptr.2d 779, 862 P.2d 779), and determined that nothing contained in the memoranda would be material to the defense. Our review of the documents confirms the court's conclusion. The court's refusal to grant discovery was within its discretion, and no due process violation has been shown.
Defendant next contends the trial court erred in quashing a subpoena duces tecum for copies of manuals or other records concerning the operation of the county jail module in which defendant was confined. He sought these records to rebut the prosecutor's contention that its delay in disclosing jailhouse informant Carroll's statement implicating defendant *420 until after the preliminary hearing, was reasonable because of concerns that defendant would retaliate against Carroll as long as Carroll was housed in the county jail. We observe that although the court quashed the subpoena, it examined the module itself and concluded that the prosecution's security concerns were reasonable. Without examining the merits of the court's decision with respect to discovery, we conclude that any error in denying discovery was harmless because the requested evidence went to the issue of delay in disclosing Carroll's statement. (See People v. Clark (1992) 3 Cal.4th 41, 134, 10 Cal.Rptr.2d 554, 833 P.2d 561 [defendant must demonstrate prejudice to prevail on claim of discovery error].) We have determined that the delay was nonprejudicial. No due process violation appears, because the evidence was not material; there is no reasonable probability a different result would have occurred in the proceeding, had the evidence been disclosed to the defense.
Defendant also contends the court erred in denying his request for discovery of all cases that Detective Williams had investigated, or in which he had made an arrest, in the year before he was murdered. We observe that the trial court granted the request to the extent that it ordered disclosure of the names of persons who had made threats against Williams.
Defendant's theory was that a person investigated or arrested by Williams may have borne a grudge against the officer and thus been responsible for the murder of the officer. Defendant noted that some eyewitnesses to the shooting of Detective Williams had described the assailant as White or Hispanic, whereas defendant is African-American. He contended that evidence of a White or Hispanic suspect in one of Williams's cases who bore a grudge against the officer  if such a person existed  would add weight to his defense.
At the hearing, the prosecution, through the Los Angeles City Attorney, resisted discovery on the grounds that defendant had made an inadequate showing and that the request would impose an inordinate burden on the police department to sift through its records to determine what arrests or investigations Williams had been involved in during the year preceding his death. The city attorney offered: "[t]o the extent that we're aware and can discover if any individuals which Detective Williams had been involved with made any kind of threat or which the department suspected may present a threat to Detective Williams, a serious threat of bodily injury or death, we will search our files and dig up that information to the extent that we can; to the extent that anyone is aware of that type of factor." The trial court concluded defendant had not given sufficient justification for the discovery, and denied the motion except "insofar as any information that's been obtained by the Police Department that perhaps other individuals may have made threats against officer Williams."
Defendant speculates that some person under investigation by Detective Williams, but who had not, to the knowledge of the prosecution, made any threat against the officer, may have been responsible for murdering the officer. The court acted within its discretion in denying defendant's request to the extent the request was not focused on evidence of threats to Detective Williams. (See People v. Kaurish (1990) 52 Cal.3d 648, 686-687, 276 Cal.Rptr. 788, 802 P.2d 278.) We are supported in reaching this conclusion by the circumstance that the information requested was subject to the official information privilege (Evid.Code, § 1040; In re David W. (1976) 62 Cal.App.3d 840, 846-847, 133 Cal.Rptr. 342; see also Craig v. Municipal Court (1979) 100 Cal.App.3d 69, 76-78, 161 Cal.Rptr. 19 [recognizing the need to keep confidential the arrest records of third parties]), at least to the extent the "necessity for preserving the confidentiality of the information ... out-weighs the necessity for disclosure in the interest of justice...." (Evid.Code, *421 § 1040, subd. (b)(2).) As we have observed, "[although policy may favor granting liberal discovery to criminal defendants, courts may nevertheless refuse to grant discovery if the burdens placed on government and on third parties substantially outweigh the demonstrated need for discovery." (People v. Kaurish, supra, 52 Cal.3d at p. 686, 276 Cal.Rptr. 788, 802 P.2d 278.) There is a significant interest in preserving the confidentiality of an individual citizen's arrest records (ibid.; Westbrook v. County of Los Angeles (1994) 27 Cal.App.4th 157, 165-166, 32 Cal.Rptr.2d 382; Craig v. Municipal Court, supra, 100 Cal.App.3d at pp. 76-78, 161 Cal.Rptr. 19), and defendant's showing of need for those records was based upon speculation and constituted the proverbial fishing expedition. No abuse of discretion is shown. We also reject defendant's due process claim with respect to this evidence, on the ground defendant is unable to demonstrate the existence of exculpatory material evidence in the possession of the prosecution.[7]

7. Denial of continuance before the preliminary hearing

After numerous continuances obtained by or concurred in by the defense, defendant's preliminary hearing was scheduled approximately five months after his arrest. At that time he moved for continuance of the preliminary hearing on the ground that the prosecution had not yet provided specified items of discovery and other items had been provided very recently, and on the further ground that the recently filed complaint charging two additional codefendants with conspiracy to commit murder would require substantially more preparation. The court denied the motion. Defendant sought writ review of this decision in the Court of Appeal without avail, and this court denied his petition for review. Defendant filed a motion to set aside the information on the ground the denial of a continuance deprived him of various constitutional rights, including the right to the effective assistance of counsel, but the trial court denied the motion on the ground that defense counsel appeared to be very prepared for the preliminary hearing and conducted "superb" examination of the witnesses. The court also noted that defense counsel had called 52 witnesses at the preliminary hearing while the prosecution had called 33. Defendant again unsuccessfully sought to overturn this ruling by way of a petition for writ of mandate or prohibition.
Defendant contends the denial of a continuance deprived him of a meaningful preliminary hearing, in violation of what he characterizes as a federal constitutional right to the evenhanded application of state law. He also appears to contend that denial of his motion for a continuance deprived him of the right to the effective assistance of counsel, to confront and cross-examine witnesses, and to present an affirmative defense. He contends his claim cannot be rejected on the ground that counsel conducted the preliminary hearing in a competent manner, because the crux of his claim is that counsel was deprived of crucial evidence and time to prepare in the face of matters that developed shortly before the preliminary hearing.
Defendant may prevail in this claim only if he can demonstrate that the denial of a continuance before the preliminary hearing resulted in the denial of a fair trial or otherwise affected the ultimate judgment. (People v. Pompa-Ortiz, supra, 27 Cal.3d at p. 529-530, 165 Cal.Rptr. 851, 612 P.2d 941; see also People v. Crandell (1988) 46 Cal.3d 833, 855, 251 Cal. Rptr. 227, 760 P.2d 423.) Defendant is unable to demonstrate that failure to grant him a continuance before the preliminary hearing had any effect on the trial or the judgment. He is unpersuasive in contending that the requested continuance would *422 have afforded him time and ability to develop information regarding his defense that the case against him was "invented" by the police. One year and nine months elapsed between the preliminary hearing and the evidentiary portion of the trial, allowing defendant ample time to investigate, to examine the discovered material that had been provided by the prosecution, and to prepare to meet the case against him. His inability to secure the dismissal of the charge that he attempted to murder George Carpenter, even in the unlikely event the failure to grant him a pre-preliminary-hearing continuance was the cause, is not a basis for reversal of the ensuing conviction as long as the denial of a continuance did not deprive him of a fair trial on that charge or otherwise affect the ultimate judgment. Defendant has made no showing that the denial of a continuance had such an effect as to any of the charges, or that the denial of a continuance had any impact at subsequent trial proceedings on his rights to counsel, to confront the witnesses against him, or to present a defense. Accordingly, we reject these claims.

8. Faretta motions

Defendant contends the trial court denied him the right to represent himself at the guilt phase of the trial in violation of the Sixth and Fourteenth Amendments of the federal Constitution. He asserts that the trial court violated this right in two respects: first, by coercing him to withdraw his pretrial motion to represent himself, and second, by denying the motion for self-representation that he renewed on the eve of trial.
A defendant who knowingly and intelligently waives the right to counsel possesses a right under the Sixth Amendment of the federal Constitution to conduct his or her own defense. (Faretta v. California (1975) 422 U.S. 806, 835-836, 95 S.Ct. 2525, 45 L.Ed.2d 562.) When the defendant moves to dismiss counsel and undertake his or her own defense, he or she "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.'" (Id. at p. 835, 95 S.Ct. 2525; see also People v. Pinholster, supra, 1 Cal.4th at pp. 928-929, 4 Cal. Rptr.2d 765, 824 P.2d 571.) Further, as we have explained, "although in a criminal trial a defendant has a federal constitutional, unconditional right of self-representation, in order to invoke that right, he or she must make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial. [Citations.] When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion." (People v. Bradford, supra, 15 Cal.4th at p. 1365, 65 Cal.Rptr.2d 145, 939 P.2d 259.) In exercising this discretion, the trial court should consider factors such as "`the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.'" (People v. Burton (1989) 48 Cal.3d 843, 853, 258 Cal.Rptr. 184, 771 P.2d 1270, quoting People v. Windham (1977) 19 Cal.3d 121, 128, 137 Cal.Rptr. 8, 560 P.2d 1187.)
The record reflects that on October 8, 1987, during hearings on pretrial motions to be resolved before the commencement of jury selection, defendant, who already had been granted status as cocounsel, moved to dismiss counsel and undertake his defense alone. Counsel explained on defendant's behalf that defendant felt such status would improve his treatment in the county jail. In addition, counsel explained that defendant viewed both of the two attorneys appointed to represent him as incompetent in being unprepared for the penalty phase. Defendant believed that at a recent hearing, defense counsel had *423 seemed unprepared for the prosecution's planned introduction of certain evidence at the penalty phase, but stated that no continuance was necessary.
The trial court explained that defendant's concern over his counsel's preparation was unfounded, and that counsel clearly would be prepared even during the guilt phase of the trial to meet the evidence referred to. In addition, the court informed defendant that the case involved an overwhelming amount of work even for the two lawyers who had been appointed to represent him, that the court was aware how much time counsel were spending on investigation and preparation of the case, and that in the court's view, the task would be truly overwhelming for an individual in custody and without legal training. Although the court acknowledged the right of defendant to represent himself, it stated: "I cringe at that thought in this case because it is one of the most serious cases that this county has had in a long time." The court acknowledged that defendant was bright, but warned him that his lack of legal training would stand in his way in conducting his own defense. The court stated: "I could not advise you strongly enough of what an impossible situation that would be for you." The court urged defendant not to "decide lightly." With regard to defense counsel's preparation for the penalty phase, the court reminded defendant that any penalty phase was unlikely to commence for two or three months, and that "even then, if time is needed to prepare for a penalty phase, very often courts do recess for several weeks between the guilt phase and the penalty phase...." The court stated it would "feel better" if it knew defendant had what it considered to be the best representation available, and that otherwise "that would really trouble me. That would really upset me ... if the death penalty is imposed, then I'm going to feel more able to live with that if each [defendant] was given all the procedural rights that you were entitled to. And that includes the best representation you could get."
Immediately following this statement, one of the defense counsel suggested that he would visit defendant in the county jail the next day, to "talk about this further. And maybe we can re[s]olve this without actually requesting to go pro. per. Do you want to think about this a little bit?" Defendant responded: "Okay." The court agreed, noting that although it was not concerned regarding defendant's conduct and that it might even be convenient for the court if defendant were to represent himself because the trial might go faster, this was not the court's concern. Defendant reiterated that his counsel's delay in preparation for the penalty phase concerned him, because witnesses might disappear if counsel waited until after the guilt phase to complete the investigation. The court noted that counsel would have time to complete the investigation during jury selection, and "we can take a recess at the end of the guilt phase before the penalty phase. And normally that is done for at least a couple weeks." Defendant stated he would speak to counsel the following day, "but I still want the record to show that I'm still thinking about 80 percent of my mind of just taking this whole case pro. per. And I haven't completed that decision yet until I speak with Mr. Price and see what he has to say tomorrow."
After counsel discussed the matter with defendant, counsel secured from the court a brief continuance in order to complete the investigation that defendant felt should be conducted in advance of the trial, and represented that this would satisfy defendant's concerns. Defendant stated that under these circumstances he would proceed represented by counsel.
Defendant contends that he made a motion for self-representation well in advance of the commencement of trial and accordingly was entitled to represent himself, but that the trial court coerced him into withdrawing the motion by making false assurances that there would be ample time to complete investigation between the *424 guilt and penalty phases of the trial, and by impressing upon defendant that it would cause the court distress if he were to represent himself. He contends this coercion constituted a denial of the right to due process of law.
The record establishes, however, that the court did not coerce defendant into withdrawing his motion. Rather, the court properly advised defendant of the pitfalls of self-representation. Contrary to defendant's contention, the court did not suggest that if defendant persisted in representing himself, he would face a hostile court. Although defendant's motion for self-representation was based in part upon a concern that defense counsel had failed to investigate certain proposed penalty phase evidence, we are unpersuaded that the court coerced defendant into withdrawing the motion by making a false promise that a continuance would be granted between the guilt and penalty phases. The record establishes that defendant was satisfied that a continuance before jury selection commenced would provide adequate time for investigation. Also, as the court predicted, there was an approximately two-week hiatus between the verdict at the guilt phase and the commencement of the penalty phase. Finally, it is evident that it was defendant's consultation with defense counsel rather than the court's comments that persuaded defendant to withdraw his motion for self-representation.
With respect to defendant's second motion to represent himself, the matter was left to the trial court's sound discretion, because the motion was made after the jury had been selected and the prosecution had delivered its opening statement. (People v. Burnett, supra, 17 Cal.4th at pp. 1104-1105, 74 Cal.Rptr.2d 121, 954 P.2d 384.)
The record establishes that defendant moved to represent himself on this second occasion without explaining the basis for his request. He did not request a continuance. The trial court declared that, guided by the factors enumerated in People v. Windham, supra, 19 Cal.3d 121, 137 Cal.Rptr. 8, 560 P.2d 1187, it was exercising its discretion to deny the motion. The court stated: "First of all, you have to realize this is not his first request to go pro. per. It's his second one in front of me .... There clearly is a proclivity of some kind to seek to substitute counsel or remove counsel when Mr. Jenkins is unhappy with the way the proceedings are going." The court recounted at length the excellence of the representation that had been afforded to defendant.
The court also referred to the potential for disruption, noting defendant's manner and demeanor, and his written threat to disrupt the trial and to tell jurors of matters that the court had withheld from them.[8] The court, observing that defendant appeared to lack stability and emotional maturity, stated: "I feel that he has demonstrated during these proceedings in his failure to come out, his threats to the court, a lack of control over his emotions and his behavior." Far from engaging in baseless "amateur psychology," as alleged by defendant, the court carefully recounted defendant's recent conduct in refusing to appear in court when he was annoyed *425 with the court's rulings on motions. The court stated defendant had written the court a letter in which he stated his intention  later apparently retracted  to disrupt the proceedings. The court commented: "I can't take the risk of having him refuse to show up during trial should I rule against him." The court also noted defendant's proclivity for arguing at length with the court after the court had informed him that no further argument was in order, and questioned whether he could restrain himself from persisting in this practice if he were his own counsel. Although defendant assured the court he would appear on each day of trial if accorded pro se status, the court evidently did not credit this assurance.
The court also noted the advanced stage of the proceedings, and stated that the only factor in defendant's favor was that he did not request a continuance.
Defendant fails to establish that the trial court abused its discretion in denying this motion for self-representation. The court reasonably could conclude that defendant was well represented by counsel, that he had some proclivity to vacillate with respect to representation by counsel, and that the granting of the motion would disrupt the orderly conduct of the trial.
Defendant contends there was no risk he would disrupt the proceedings, but the court reasonably concluded otherwise. The court was aware that defendant had attempted to influence the court to change a ruling during jury selection by absenting himself from the proceedings, and that, similarly, defendant had refused to appear for the prosecutor's and his own counsel's opening statements. This conduct, in addition to the written threat to disrupt the proceedings, demonstrated a likelihood (not evident at the time of the pretrial Faretta motion) that the proceedings would be disrupted in the event defendant were permitted to represent himself.
Defendant's contention that the court's ruling was the result of resentment on the part of the court is not supported by the record. He does not support with authority his contention that the court lacked discretion to deny the motion on the ground, in part, that his refusal to participate in the proceedings when disappointed with the court's rulings was predictive of disruptive behavior during trial. Defendant relies upon authority, applicable to a timely motion for self-representation, that is not apposite when the motion is made after the commencement of trial and is directed to the court's discretion. (See People v. Superior Court (George) (1994) 24 Cal.App.4th 350, 29 Cal.Rptr.2d 305 [holding that the trial court erred in denying a Faretta motion made in advance of trial, when defendant's right to self-representation was almost absolute, on the basis of a determination that the defendant presented a security and escape risk]; see also United States v. Flewitt (9th Cir.1989) 874 F.2d 669, 674 [defendants who had been granted pro se status in advance of trial could not be deprived of that status because of their failure to prepare properly for trial, especially when a failure to obey a court order or an act of contempt was not alleged; defendants'"[p]retrial activity is relevant only if it affords a strong indication that the defendants will disrupt the proceedings in the courtroom"].)
Contrary to defendant's contention, the court exercised its discretion and found that, considering the relevant factors, the motion for self-representation should be denied. The circumstance that defendant did not seek a continuance is not determinative. (People v. Barnett, supra, 17 Cal.4th at p. 1106, 74 Cal.Rptr.2d 121, 954 P.2d 384.) No abuse of discretion appears.

9. Pretrial motions to suppress evidence

a. Evidence obtained as a result of interrogation of Duane Moody
Defendant contends the trial court erred in permitting the introduction of evidence the police obtained as the result of statements made by Duane Moody  statements *426 the trial court determined were involuntary. Defendant contends that the murder weapon, evidence relating to the automobile thought to have been used in the shooting of Detective Williams, and the testimony of Ali and Cathy Woodson should have been excluded as the fruit of Moody's involuntary statements. Accordingly, defendant contends the trial court violated his right to due process of law as guaranteed by the state and federal Constitutions. He also contends this evidence should have been excluded as the fruit of a violation of Moody's Fifth Amendment privilege against self-incrimination.
In pretrial proceedings, before their cases were severed, defendant joined in codefendant Moody's motion to suppress evidence pursuant to section 1538.5. Defendant contended he had standing to claim that Moody's arrest violated the Fourth Amendment, because the warrantless arrest of Moody constituted outrageous government conduct in violation of the constitutional guarantee of due process. He maintained that Moody's statement to the police and all evidence obtained as the fruit of the statement should be suppressed. Defendant also joined in codefendant Moody's motion to suppress the statements on the ground that they were involuntary because they were obtained as the result of offers of leniency and other physical and psychological coercion preceding and during interrogation. Defendant asserted that he had standing to raise the claim that Moody's statements were involuntary under Fifth Amendment principles, also asserting an independent due process right under the state and federal Constitutions not to have his conviction based upon the involuntary confession or statement of another. He moved to suppress Moody's statements and all tangible and intangible evidence obtained by the exploitation of the involuntary statements and their fruits.
Evidence presented at the hearing on the motion to suppress indicated that in a November 4, 1985, interrogation, Moody informed the police where he had secreted the murder weapon. The weapon was discovered at the location indicated  the Woodsons' house. In a November 6, 1985, statement, Moody said the vehicle that had been used in the shooting of Detective Williams was a sky-blue Oldsmobile with a white top, and he described its location. The vehicle was found at that location.
The trial court heard numerous witnesses, and concluded that: Moody's arrest was supported by probable cause; Moody's claim that the police physically mistreated him was not supported by the record; statements Moody made to the police prior to November 4, 1985, were voluntary, but that Moody's statements to the police on November 4, 1985, were involuntary and inadmissible, apparently on the ground that they were the product of offers of leniency. In addition, the court found Moody's statement to the police on November 6, 1985, inadmissible as a fruit of the earlier coerced statement. Nonetheless, the court held that the murder weapon, the vehicle connected with the murder, and the testimony of Ali and Cathy Woodson were admissible because inevitably they would have been discovered during the course of a lawfully conducted investigation.
On appeal, defendant contends that the trial court erred in admitting into evidence the murder weapon, evidence concerning the vehicle from which the fatal shots appeared to have been fired, and certain shell casings discovered in the vehicle. Defendant also claims that the trial court erred in permitting the testimony of the Woodsons regarding codefendant Moody's action in storing the murder weapon at their home on the night of the murder. He maintains that this evidence was the fruit of Moody's involuntary statements, and that the trial court erred in determining that the evidence inevitably would have been discovered in the course of a lawfully conducted investigation even without Moody's statements. In his reply brief, defendant also contends that he has standing *427 to raise this claim because violation of Moody's privilege against self-incrimination constituted a violation of his own due process rights. The coercion applied to Moody, he contends, caused Moody to disclose the whereabouts of the weapon and the vehicle, and to disclose the identity of the Woodsons. Without a rule requiring suppression of the challenged evidence, he alleges, police misconduct would be encouraged rather than deterred.
Respondent contends that the trial court erred in determining that Moody's statements were involuntary, that defendant lacks standing to complain of any violation of Moody's Fifth Amendment rights, and that the trial court correctly determined that the challenged evidence inevitably would have been discovered in the course of a lawfully conducted investigation. Respondent claims, finally, that the introduction of the evidence, even if obtained as a result of an involuntary statement, did not violate defendant's due process right to a fair trial. As we shall explain, we need not and do not determine whether the statements were voluntary or whether the evidence inevitably would have been discovered, because we agree with respondent's final contention that, in any event, the introduction of this evidence did not violate defendant's due process rights.
As an initial matter, we agree with respondent that defendant lacks standing to raise the claim that in conducting their interrogation, police officers violated Moody's privilege against self-incrimination. A defendant lacks standing to complain of the violation of a third party's Fifth Amendment privilege against self-incrimination. (People v. Badgett (1995) 10 Cal.4th 330, 343, 41 Cal.Rptr.2d 635, 895 P.2d 877; People v. Douglas (1990) 50 Cal.3d 468, 501, 268 Cal.Rptr. 126, 788 P.2d 640, disapproved on another point in People v. Marshall (1990) 50 Cal.3d 907, 933, fn. 4, 269 Cal.Rptr. 269, 790 P.2d 676.)
Defendant does have standing, however, to assert that his own due process right to a fair trial was violated as a consequence of the asserted violation of Moody's Fifth Amendment rights. (People v. Badgett, supra, 10 Cal.4th at p. 344, 41 Cal.Rptr.2d 635, 895 P.2d 877; People v. Douglas, supra, 50 Cal.3d at p. 501, 268 Cal.Rptr. 126, 788 P.2d 640.) As we have recognized, the "`admission at trial of improperly obtained statements [of a third party] which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial.'" (People v. Douglas, supra, 50 Cal.3d at p. 499, 268 Cal.Rptr. 126, 788 P.2d 640.)
The violation of a third party's privilege against self-incrimination may deprive a defendant of his or her due process rights if such action adversely affects the reliability of testimony offered against the defendant at trial. As we have said: "[W]hen the evidence produced at trial is subject to coercion ... defendant's due process rights [are] implicated and the exclusionary rule ... [is] applied. When a defendant seeks to exclude evidence on this ground, the defendant must allege that the trial testimony is coerced [citation], and that its admission will deprive him of a fair trial [citation]." (People v. Badgett, supra, 10 Cal.4th at p. 344, 41 Cal.Rptr.2d 635, 895 P.2d 877, italics in original.)
Defendant does not contend that testimony presented at trial was the result of coercion. Moody did not testify at defendant's trial. Rather, defendant contends that the fruits of Moody's involuntary statements were inadmissible under the exclusionary rule applicable in cases of violation of the Fifth Amendment privilege against self-incrimination. He maintains that police misconduct must be deterred, and that if the fruit of police coercion of a third party could be admitted against a defendant, "the police ... would have little incentive ... to refrain from taking extreme and illegal measures to obtain evidence from one codefendant to use against another."
*428 Our opinion in People v. Badgett, supra, 10 Cal.4th 330, 41 Cal.Rptr.2d 635, 895 P.2d 877, however, establishes that a defendant may not prevail simply by alleging that the challenged evidence was the fruit of an assertedly involuntary statement of a third person. In that case, we determined specifically that a defendant may not secure the exclusion of the trial testimony of a third party simply on the ground that it was the fruit of the third party's involuntary statement. (Id. at pp. 346, 348-350, 41 Cal.Rptr.2d 635, 895 P.2d 877.) We explained that when the defendant's claim is based upon the involuntariness of a third party's statement, the exclusionary rule applicable to a claimed violation of the privilege against self-incrimination does not apply. (Id. at p. 346, 41 Cal.Rptr.2d 635, 895 P.2d 877.) Rather, the defendant may prevail only by demonstrating fundamental unfairness at trial, normally by establishing that evidence to be produced at trial was made unreliable by coercion. (Id. at pp. 347-348, 41 Cal.Rptr.2d 635, 895 P.2d 877.)
As we observed in the Badgett case, "the primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings ...." (People v. Badgett, supra, 10 Cal.4th at p. 347, 41 Cal.Rptr.2d 635, 895 P.2d 877.) In addition, "[t]he purpose of exclusion of evidence pursuant to a due process claim ... is adequately served by focusing on the evidence to be presented at trial, and asking whether that evidence is made unreliable by ongoing coercion...." (Id. at pp. 347-348, 41 Cal.Rptr.2d 635, 895 P.2d 877, italics in original.)
Defendant's assertion that the challenged evidence should have been excluded in order to deter police misconduct is inconsistent with the primary justification for recognizing the accused's limited standing to complain of the violation of another individual's privilege against self-incrimination  a concern to provide fundamental fairness at trial by ensuring the reliability of the evidence presented at that proceeding. Defendant's assertion that the goal of deterring police misconduct in all criminal investigations requires the exclusion of the ensuing evidence would result in the adoption of a Fifth Amendment exclusionary rule in such cases, affording defendants unlimited standing to complain of the violation of a third person's privilege against self-incrimination, without the necessity of demonstrating any fundamental unfairness in the trial itself. The law provides, however, that it is only the defendant's own right to fundamental fairness that is at stake in such circumstances, and that the exclusionary rule applicable to violations of the privilege against self-incrimination does not apply.
When in the past we have considered due process claims such as defendant's, the trial evidence sought to be excluded was the testimony of the third party who assertedly had been subject to coercion. (See People v. Badgett, supra, 10 Cal.4th at p. 342, 41 Cal.Rptr.2d 635, 895 P.2d 877; People v. Douglas, supra, 50 Cal.3d at pp. 498-499, 268 Cal.Rptr. 126, 788 P.2d 640.) In the present case, defendant did not seek to exclude statements of the third party. Moody did not testify, nor was evidence of his involuntary statements to the police presented in evidence. Rather, at trial defendant sought to exclude demonstrative evidence he claims was discovered as a product of the coercion of Moody  the murder weapon and evidence relating to the vehicle from which it was asserted the fatal shots were fired  as well as the testimony of the Woodsons, in whose home Moody stored the murder weapon. We see no reason, however, to conclude that demonstrative evidence should be subject to a broader exclusionary rule under these circumstances than is applicable to testimonial evidence  quite the reverse, since coercion of a statement is far less likely to render physical evidence unreliable than it is likely to affect the reliability of trial testimony.
We detect no connection between the asserted coercion of Moody  apparently *429 arising out of offers of leniency in return for his cooperation with the investigating officers  and the reliability of the Woodsons' testimony at trial, or of the murder weapon or the vehicle, as evidence of defendant's guilt. Indeed, defendant has not contended that there is such a connection. Assuming, without deciding, that in some circumstances physical evidence might be excluded as unreliable as a consequence of the coercion of a third party, we observe that defendant makes no claim that the physical evidence he sought to exclude was unreliable, or that its reliability was in some way affected by any police coercion of Moody. We reject defendant's contention because he fails to carry the burden of demonstrating any fundamental unfairness at trial. (See People v. Badgett, supra, 10 Cal.4th at p. 348, 41 Cal.Rptr.2d 635, 895 P.2d 877.)
We have acknowledged that in some instances, "courts analyzing claims of third party coercion have expressed some concern to assure the integrity of the judicial system" by vindicating a due process right of the defendant in this context. (People v. Badgett, supra, 10 Cal.4th at p. 347, 41 Cal.Rptr.2d 635, 895 P.2d 877, citing United States v. Chiavola (7th Cir.1984) 744 F.2d 1271, 1273; United States v. Fredericks (5th Cir.1978) 586 F.2d 470, 481, & fn. 14; LaFrance v. Bohlinger (1st Cir.1974) 499 F.2d 29, 32-34.) A recent decision of the Tenth Circuit Court of Appeals, for example, recognizes that the unreliability of a coerced confession of a third person is not the sole reason for its exclusion from evidence: "`It is unthinkable that a statement obtained by torture or by other conduct belonging only in a police state should be admitted at the government's behest in order to bolster its case.... Yet methods offensive when used against an accused do not magically become any less so when exerted against a witness.'" (Clanton v. Cooper (10th Cir.1997) 129 F.3d 1147, 1158.)
In the present case, no "`statement obtained by torture or by other conduct belonging only in a police state'" (Clanton v. Cooper, supra, 129 F.3d at p. 1158) was admitted at trial. The trial court determined that the police did not coerce Moody physically, and the assertedly coerced statement was not admitted at all. Accordingly, we are not called upon to decide whether evidence produced by outrageous police misconduct, but not otherwise shown to be unreliable or subject to the ongoing effects of coercion, should be excluded in order to vindicate the integrity of the judicial system.[9]
Defendant fails to demonstrate that his right to a fair trial was undermined by the introduction of physical evidence whose reliability is not questioned, or by the introduction of the testimony of witnesses who were not shown to be subject to any police coercion before or during trial. Under these circumstances, the trial court did not err in admitting the challenged evidence, and we reject defendant's due process claim.

b. Seizure of defendant's briefcase
In a motion to suppress evidence brought pursuant to section 1538.5, defendant contended that the seizure of his briefcase and its contents from his sister's home violated his right under the Fourth Amendment to be free from unreasonable searches and seizures. The trial court denied the motion, finding that a warrant authorizing the search of defendant's Jeep, which had contained the briefcase until it was removed by defendant's sister, authorized the search of the briefcase; that defendant's sister consented to the seizure of the briefcase; that the contents of the briefcase inevitably would have been discovered, *430 because a warrant would have issued to authorize the search; and finally, that exigent circumstances justified the search of the briefcase. Defendant contends the trial court erred as to each ground stated in denying the motion to suppress. He also contends that to the extent it found his sister, Diane Jenkins, had consented to the search, the court erred in determining that her consent was voluntary. Respondent contends defendant lacked a reasonable expectation of privacy in his briefcase, and that the trial court correctly determined that the search was reasonable on the grounds of consent, inevitable discovery, and exigent circumstances. In addition, respondent contends any error in admitting the evidence was harmless beyond a reasonable doubt.
For the reasons that follow, we conclude that the court properly denied the motion to suppress because the search was consensual. In reviewing the trial court's denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence. (People v. Alvarez (1996) 14 Cal.4th 155, 182, 58 Cal.Rptr.2d 385, 926 P.2d 365; People v. Miranda (1993) 17 Cal.App.4th 917, 922, 21 Cal.Rptr.2d 785.) We independently review the trial court's application of the law to the facts. (People v. Alvarez, supra, 14 Cal.4th at p. 182, 58 Cal.Rptr.2d 385, 926 P.2d 365.)
The hearing on the motion to suppress produced the following evidence. Detective Holder of the Los Angeles Police Department served a search warrant at defendant's residence on November 2, 1985. A neighbor informed him that on the previous evening, some persons had removed property from the residence. The neighbor supplied Holder with the license number of the vehicle used to remove the property. On the following day, Holder, along with several other officers, went to the address where the vehicle was registered. Holder testified that the occupant, Diane Jenkins, who informed Officer Holder that the residence was hers, permitted him to enter when he told her he was conducting an investigation of a murder of a police officer and asked whether he and other officers could come in and look around. He did not have a warrant. Ms. Jenkins consented verbally to the search, and she signed a written form indicating her consent and also noting that she paid the rent on the premises. When Holder asked whether there were weapons in the house, she affirmed that there were, leading him to her bedroom and disclosing the location of two guns she asserted belonged to her boyfriend. Almost simultaneously with his request to conduct the search, Holder asked whether there was any property belonging to her brother, defendant, in the home. Holder believed that she understood he was there to investigate a murder in which her brother might be involved. When Holder asked whether the residence contained any property belonging to her brother, Ms. Jenkins responded that there was a briefcase belonging to him. When she handed the unlocked briefcase to him in her bedroom, he opened it to determine whether it contained firearms, in particular the murder weapon, which to his knowledge had not been recovered. He also examined the contents of the briefcase to aid in identifying additional suspects, finding that it contained a binder with the name Dan on it, various papers, some with names, addresses, and telephone numbers on them, photographs, and a vehicle license. He took the briefcase with him when he left the premises after concluding the search. Ms. Jenkins indicated in writing that the property seized during the search, specifically including the briefcase and its contents, was "given to Detective Holder by me freely without threat or promise."
Detective Thies testified that he received the briefcase from Holder and examined its contents. It contained a license plate, a phone message retrieval apparatus, a combination knife, brass knuckles, a *431 book containing defendant's limousine listings, phone bills, a telephone and address book with notations in defendant's handwriting, another telephone and address book bearing another person's handwriting, and a business card. In addition, there was a piece of paper bearing Elihue Broomfield's telephone number. The materials found in the briefcase also contained the telephone numbers of Reecy Cooper and Tyrone Hicks, and the address and telephone number of Anthony Bryant.
Diane Jenkins testified at the hearing on the motion to suppress that she had learned of defendant's arrest on November 1, 1985, from a person whose identity she could not recall. She did not talk to defendant on that date. At her mother's request, she picked up defendant's unlocked Jeep at the San Fernando courthouse, finding the keys under the floor mat. She removed the briefcase from the Jeep and placed it in her residence. She spent the night at defendant's home, fearing it might be subject to a break-in in his absence. She testified that when Holder arrived at her home on November 2, 1985, she asked whether he had a search warrant, and he responded that he did not, but that unless she consented to a search, he would arrest her on an outstanding traffic warrant and search the premises anyway. She stated that Holder observed the briefcase in her bedroom, seized it, and examined its contents. She testified that she was under duress when she signed the form indicating her consent to the search and the removal of property from her residence.
The trial court stated that it believed several exceptions to the search warrant requirement applied. First, it declared that the officers possessed a warrant to search defendant's Jeep, and stated its belief that "there is a good argument that that briefcase had been in the car; that the search warrant authorized a search of the car and authorized a search of Mr. Jenkins's property inside the house; that there actually was a search warrant to cover it." The court added, "I think the other theory is possibly a consent theory, although I somewhat agree [with defense counsel's argument] that consent to turn it over or turning it over doesn't necessarily give consent to open it and to search, in and of itself." Other theories the court found "possibly applicable" were inevitable discovery and exigent circumstances. With respect to the first, the court explained: "there had been a search warrant for the car and the property. It would not have taken long for them [the police] to have gotten a search warrant and opened the briefcase." With respect to the second, it explained: "I really do think that the emergency exception, the exigent circumstances exception, applies when you have a nine-millimeter weapon outstanding that has yet to be found. And based on the information in the affidavit, there was a very good chance that it might have been found within the briefcase."
The Fourth Amendment protects an individual's reasonable expectation of privacy against unreasonable intrusion on the part of the government. A warrant is required unless certain exceptions apply, including the exception that permits consensual searches. (Florida v. Jimeno (1991) 500 U.S. 248, 250-251, 111 S.Ct. 1801, 114 L.Ed.2d 297; In re Tyrell J. (1994) 8 Cal.4th 68, 79, 32 Cal.Rptr.2d 33, 876 P.2d 519.)
As the high court has explained: "The touchstone of the Fourth Amendment is reasonableness. [Citation.] The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." (Florida v. Jimeno, supra, 500 U.S. at p. 250, 111 S.Ct. 1801.) A warrantless search may be reasonable not only if the defendant consents to the search, but also if a person other than the defendant with authority over the premises voluntarily consents to the search. (United States v. Matlock (1974) 415 U.S. 164, 170-171, 94 S.Ct. 988, 39 L.Ed.2d 242 [person sharing a bedroom with defendant had authority to consent to a search of *432 the premises and diaper bag found therein]; see also Frazier v. Cupp (1969) 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 [cousin had authority to consent to search of the defendant's duffel bag, which both men used and which had been left in the cousin's home].)
Further, the United States Supreme Court has stated that "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one which has `a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" (Minnesota v. Carter (1998) 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373, quoting Rakas v. Illinois (1978) 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387.) The defendant must assert a reasonable expectation of privacy in "`the particular area searched or thing seized in order to bring a Fourth Amendment challenge.'" (People v. McPeters, supra, 2 Cal.4th at p. 1171, 9 Cal.Rptr.2d 834, 832 P.2d 146, italics in original.)
A defendant has the burden at trial of establishing a legitimate expectation of privacy in the place searched or the thing seized. (See Rakas v. Illinois, supra, 439 U.S. at pp. 130-131, fn. 1, 134, 99 S.Ct. 421; see also People v. McPeters, supra, 2 Cal.4th at p. 1172, 9 Cal.Rptr.2d 834, 832 P.2d 146.) The prosecution has the burden of establishing the reasonableness of a warrantless search. (See People v. Williams (1988) 45 Cal.3d 1268, 1300, 248 Cal.Rptr. 834, 756 P.2d 221; see also United States v. Matlock, supra, 415 U.S. at pp. 171, 177, 94 S.Ct. 988.) The state may carry its burden of demonstrating the reasonableness of a search by demonstrating that the officer conducting the search had a reasonable belief that the person consenting to the search had authority to do so; it is not required that the state establish that the person consenting to the search had actual authority to consent. (Illinois v. Rodriguez (1990) 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148; see also People v. Jacobs (1987) 43 Cal.3d 472, 481, 233 Cal.Rptr. 323, 729 P.2d 757; People v. Bishop (1996) 44 Cal.App.4th 220, 236, 51 Cal.Rptr.2d 629.)
Defendant failed to assert that he had any possessory interest or legitimate expectation of privacy in his sister's home, so he failed to establish that the search of the home itself violated his own constitutional rights.
Defendant did, however, assert that he had a reasonable expectation of privacy in his briefcase, and we assume for the purpose of this appeal that he carried his burden of showing a legitimate expectation of privacy in that object.[10] Nonetheless, we conclude that the search of the briefcase was reasonable by virtue of defendant's sister's voluntary consent to the search.
At the outset, defendant contends that his sister's consent to search her home and the briefcase was not voluntary. (See Schneckloth v. Bustamonte (1973) 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 [whether consent was voluntary or was the product of coercion on the part of searching officers is a question of fact to be determined from the totality of the circumstances].) The evidence at the hearing on the motion to suppress was in sharp conflict on this point. Detective Holder testified *433 that defendant's sister was friendly and cooperative, and readily consented to the search without the application of any pressure on the part of the police. He denied threatening her with arrest. She memorialized her consent in writing, stating that it was freely given. Ms. Jenkins testified, however, that her consent to the search was coerced by a threat to arrest her on an outstanding warrant if she refused to supply her consent. We view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence. (See People v. Alvarez, supra, 14 Cal.4th at p. 182, 58 Cal.Rptr.2d 385, 926 P.2d 365; People v. Miranda, supra, 17 Cal.App.4th at pp. 921-922, 21 Cal.Rptr.2d 785.) It is evident from the trial court's reliance upon consent as a justification for the search that the trial court resolved in favor of the prosecution the factual dispute regarding the circumstances under which Ms. Jenkins granted her consent, and did not credit her testimony that her consent was the product of a threat to arrest her. We defer to this implied factual determination, which is supported by substantial evidence. Consequently, we reject defendant's contention that Ms. Jenkins's consent to the search was involuntary.
We next turn to the question whether the voluntary consent given by Ms. Jenkins established the search as reasonable. Ms. Jenkins clearly had authority to consent to a search of her own apartment  a place in which defendant had no possessory interest. In some circumstances, however, the consent to a search given by a person with authority to consent to a search of the premises does not necessarily supply consent to search personal property found within the premises. As Justice O'Connor explained in her concurring opinion in United States v. Karo (1984) 468 U.S. 705, 725, 104 S.Ct. 3296, 82 L.Ed.2d 530, "[a] privacy interest in a home itself need not be coextensive with a privacy interest in the contents ... of everything situated inside the home. This has been recognized before in connection with third-party consent to searches. A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home. Consent to search a container or a place is effective only when given by one with `common authority over or other sufficient relationship to the premises or effects sought to be inspected.' United States v. Matlock, 415 U.S., at 171 [94 S.Ct. 988]. `Common authority ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes....' Id., at 171, n. 7 [94 S.Ct. 988]."
As this language indicates, at least two questions are presented when the state seeks to justify a warrantless search by relying upon the consent of a third party who is the occupant of the premises searched: whether the third party had authority to consent to the search, and whether the scope of the consent given included the object or container that was searched. In the resolution of these questions, as noted, the state may carry its burden by demonstrating that it was objectively reasonable for the searching officer to believe that the person giving consent had authority to do so, and to believe that the scope of the consent given encompassed the item searched. (Florida v. Jimeno, supra, 500 U.S. at p. 251, 111 S.Ct. 1801 [scope of consent may be established by showing that the searching officers had an objectively reasonable basis to believe the consent included the item searched]; Illinois v. Rodriguez, supra, 497 U.S. at p. 186, 110 S.Ct. 2793 [search may be reasonable if officer had an objectively reasonable belief that the person consenting to the search had authority to do so].)
In Florida v. Jimeno, supra, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297, the high court explained that the scope of consent usually is defined by the expressed object of the search. (Id. at p. 251, 111 *434 S.Ct. 1801.) In that case, where a police officer stopped a vehicle, informing the occupant of the officer's suspicion that the vehicle contained narcotics, the driver's consent to a search of the vehicle reasonably could be understood to include within its scope the search of a closed paper bag discovered within the vehicle. The standard for measuring the scope of consent, the court said, is to ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect." (Ibid.) The court pointed out that in granting permission to search the vehicle, the defendant "did not place any explicit limitation on the scope of the search." (Ibid.) The officer had informed the defendant he believed the defendant was carrying narcotics, and that the officer would be looking for narcotics. The court concluded: "We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container.... The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor." (Ibid.)
Although the court cautioned that the defendant's consent probably would not extend to a locked briefcase in the trunk of the car, the court rejected the defendant's contention that the police must request separate permission to search each container in the area to be searched. (Florida v. Jimeno, supra, 500 U.S. at pp. 251-252, 111 S.Ct. 1801.) The court found no basis for adding such a requirement, observing that although a suspect may limit the scope of consent, if consent reasonably would be understood to extend to a container, no further authorization is required. (Id. at p. 252, 111 S.Ct. 1801.) The court relied upon the public's interest in permitting consensual searches, stating that "`[t]he community has a real interest in encouraging consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongly charged with a criminal offense.'" (Ibid.)
Other courts and commentators have observed that open-ended consent to search normally does not suggest that the person consenting would expect the search to be limited in any way, and that a general consent to search includes consent to pursue the stated object of the search by opening closed containers. (See People v. $48,715 United States Currency (1997) 58 Cal.App.4th 1507, 1515, 68 Cal.Rptr.2d 829 [consent to search vehicle for drugs included seed bags and suitcases, or any area of the vehicle that might contain drugs]; United States v. Stewart (5th Cir.1996) 93 F.3d 189, 192 [consent to "look at" medicine bottle includes consent to examine contents]; United States v. Snow (2d Cir. 1995) 44 F.3d 133, 135 [consent to search vehicle for drugs includes consent to open and search a duffel bag inside the vehicle]; United States v. Zapata (1st Cir.1994) 18 F.3d 971, 977 [consent to search vehicle includes consent to search duffel bag found in trunk]; 3 LaFave, Search and Seizure (3d ed. 1996) § 8.1(c), p. 613 [general consent ordinarily may be understood to extend to an examination  in furtherance of the object of the search  of closed containers found in the area, "particularly if the police have indicated they are searching for a small object which might be concealed in such a container"]; see also Erwin et al, Cal. Criminal Defense Practice (1998 ed.) § 22.02[6], pp. 22-31 to 22-32 [consent to search generally implies consent to a complete search, unless a limitation is expressed]; but see United States v. Infante-Ruiz (1st Cir.1994) 13 F.3d 498, 504-505 [when third party consent to search a vehicle and trunk is qualified by a warning that the briefcase belonged to another, officers could not assume *435 without further inquiry that the consent extended to the briefcase].)[11]
Under the circumstances of the present case, the officers had an objectively reasonable basis to conclude that the scope of Diane Jenkins's consent included the briefcase. Detective Holder explained to Ms. Jenkins that he was investigating the murder of a police officer  an investigation that reasonably would be understood as involving an intensive search for such objects as weapons. When she granted open-ended consent to the search of her home, she had been informed that the officer was seeking evidence concerning her brother. In addition, having supplied consent to search, when asked whether any of her brother's belongings were in her home, she handed the officer her brother's briefcase. (See, e.g., People v. Fierro (1991) 1 Cal.4th 173, 217, fn. 14, 3 Cal.Rptr.2d 426, 821 P.2d 1302 [third party's consent to search her own purse, with statement that wallet contained therein was defendant's, arguably extends the scope of consent to include the wallet].) Her written consent indicated express consent to search her home, and included a statement that the briefcase had been given to Holder freely, without threat or promise. As noted, Holder was not required to seek separate consent for each container searched, providing the search otherwise was reasonable. (Florida v. Jimeno, supra, 500 U.S. at pp. 251-252, 111 S.Ct. 1801.)
A briefcase obviously is a container that readily may contain incriminating evidence, including weapons. Because the announced object of the search was evidence connected with the murder of a police officer  thus including weapons that could be hidden in a briefcase  and involving her brother, Ms. Jenkins's consent to search her home and her action in disclosing the location of the briefcase, identifying it as her brother's, and handing it to the police officer would be understood by a reasonable person to include consent to search the briefcase.
As for Ms. Jenkins's authority to consent to the search of defendant's briefcase, it is settled that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." (United States v. Matlock, supra, 415 U.S. at p. 170, 94 S.Ct. 988.) For example, in the Matlock case, the high court determined that the consent of a tenant who shared a bedroom with the defendant and was told that the police were searching for stolen currency was effective to justify a search of the bedroom, including a diaper bag found in a closet. (Id. at pp. 166-167, 94 S.Ct. 988.) The court explained that the consent of a third party may be valid if that party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (Id. at p. 171, 94 S.Ct. 988; see also People v. Clark (1993) 5 Cal.4th 950, 979, 22 Cal. Rptr.2d 689, 857 P.2d 1099; People v. Jacobs, supra, 43 Cal.3d at p. 481, 233 Cal. Rptr. 323, 729 P.2d 757.)
Applying these rules, courts have determined in various circumstances that third parties were authorized to consent to a search of luggage, bags, or other personal belongings of a defendant. (United States v. Davis (2d Cir.1992) 967 F.2d 84, 85, 86-87 [tenant has authority to consent to search of footlocker shared with defendant and of containers belonging to defendant found within the footlocker]; United States v. Falcon (10th Cir.1985) 766 F.2d *436 1469, 1474 [brother's consent to examination of defendant's audiotape marked "confidential" was authorized because the tape was discovered in a room occupied solely by the brother, and the brother had exclusive control over its contents]; United States v. Miroff (7th Cir.1979) 606 F.2d 777, 778-779 ["dominant" occupant of premises authorized to consent to search of defendant guests' personal belongings found in area subject to common use, especially because guests assumed the risk of inspection by assuring occupant there was nothing illicit therein]; State v. Schad (1981) 129 Ariz. 557, 633 P.2d 366, 372 [girlfriend authorized to consent to search of defendant's wallet, on ground that defendant assumed the risk she would permit inspection when he gave it to her]; Johnson v. State (Fla.Dist.Ct.App.1988) 519 So.2d 713, 714 [third party in whose possession defendant had left a suitcase had authority to consent to a search of the suitcase he identified as belonging to defendant]; United States v. Salinas-Cano (10th Cir.1992) 959 F.2d 861, 865 [not reasonable for officer to believe defendant's girlfriend had authority to consent to search of defendant's luggage found in her home when there was no evidence of mutual use or joint interest and control over the suitcase]; Owens v. State (1991) 322 Md. 616, 589 A.2d 59, 66-67 [officers could not reasonably believe occupant of apartment had authority to consent to search of luggage left behind by visitor, because there was no evidence of common authority over the bag].)
The question before us is whether the "facts available to the officer at the moment ... [would] `warrant a man of reasonable caution in the belief that the consenting party had authority" over the property as to which consent is given. (Illinois v. Rodriguez, supra, 497 U.S. at p. 188, 110 S.Ct. 2793.) Under the circumstances of the present case, it was objectively reasonable to conclude Diane Jenkins had authority to consent to the search of defendant's briefcase, because it was reasonable for the officers to believe she had exercised control over the briefcase and had not only joint, but at the time of the search, exclusive access to it and control over it. It is reasonable to conclude that a family member who officers believe has retrieved a brother's belongings from his premises and stored such belongings in her own bedroom has at the very least joint access to and control over the belongings. Under the circumstances known to the officers at the time of the search  that shortly after defendant's arrest, items were removed in a vehicle registered to Diane Jenkins from the area named in a search warrant directed at defendant's residence and vehicles, and that the only item belonging to him remaining in her home was the briefcase  it was reasonable for the officers to conclude that Diane Jenkins had secured the briefcase at her brother's behest. Such a request, of course, would impose upon defendant the risk that Diane Jenkins might consent to a search of the briefcase. (See, e.g., Frazier v. Cupp, supra, 394 U.S. at p. 740, 89 S.Ct. 1420 [defendant, in permitting third party to use a duffel bag and in leaving the bag at the home of the third party, "assumed the risk that [the third party] would allow someone else to look inside"]; see also United States v. Matlock, supra, 415 U.S. at p. 171, fn. 7, 94 S.Ct. 988; People v. Jacobs, supra, 43 Cal.3d at p. 481, 233 Cal.Rptr. 323, 729 P.2d 757; United States v. Davis, supra, 967 F.2d at p. 88.)
Some lower federal courts have asserted that authority to consent to a search depends in part upon a showing that the person consenting enjoyed not only access to and control over, but also mutual use of the property searched. (See, e.g., United States v. Whitfield (D.C.Cir.1991) 291 App. D.C. 243, 939 F.2d 1071, 1074 [mother lacked apparent authority to consent to search of adult son's bedroom without evidence that she enjoyed common use of the room and closet in which contraband was found]; see also United States v. Welch (9th Cir.1993) 4 F.3d 761, 764 [third party who jointly had rented vehicle with defendant *437 had authority to consent to a search of the vehicle but lacked actual or apparent authority to consent to a search of the defendant's purse located in the trunk of the vehicle, because there was no evidence of joint access or control or use of the purse]; United States v. Salinas-Cano, supra, 959 F.2d at p. 863 [girlfriend lacked apparent authority to consent to search of defendant's suitcase left in her home, when he slept in the home several nights a week and maintained control over the suitcase, and there was no evidence his girlfriend used the suitcase].)
The cases cited rely upon a footnote appearing in United States v. Matlock: "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610 [81 S.Ct. 776, 5 L.Ed.2d 828] (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483 [84 S.Ct. 889, 11 L.Ed.2d 856] (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (United States v. Matlock, supra, 415 U.S. at p. 171, fn. 7, 94 S.Ct. 988, italics added.)
This language, read in conjunction with the cases cited, however, addresses the problem of the authority of an owner, manager, or co-occupant of premises to consent to a search of those premises. In such a case, mutual use of the premises would be significant in establishing a third party's authority to consent to a search of the premises, because it certainly is not the case that every owner of property may consent to a search of his or her tenant's home. We do not believe, however, that the United States Supreme Court intended to require that in every circumstance in which a third party occupant of premises consents to the search of personal property of another located on the premises, authority to consent to search depends upon the third party's actual mutual use of the personal property, in addition to access to and control over the property. As we have explained, "objects left in an area of common use or control may be within the scope of the consent given by a third party for a search of the common area." (People v. Clark, supra, 5 Cal.4th at p. 979, 22 Cal.Rptr.2d 689, 857 P.2d 1099.)
We believe that when the person who consents to the search enjoys a possessory interest that the defendant does not share in the premises searched and also enjoys apparent joint or exclusive access to and control over the personal property searched, the privacy interest of the owner of the closed container or other personal property is far reduced and the authority of a third party to consent to a search may be established. (See United States v. Falcon, supra, 766 F.2d at p. 1474; United States v. Miroff supra, 606 F.2d at pp. 778-779; see also People v. McPeters, supra, 2 Cal.4th at p. 1172, 9 Cal.Rptr.2d 834, 832 P.2d 146 [defendant retained no expectation of privacy when he rid himself of a crime weapon by giving it to the occupant of the premises searched].) It can hardly be the case, for example, that the police would be unreasonable in acceding to the request of the sole occupant of a home to search luggage under the occupant's control but belonging to another in order to exonerate the occupant or protect him or her from hazard. (See, e.g., Commonwealth v. Latshaw (1978) 481 Pa. 298, 392 A.2d 1301, 1306-1307 [owner of barn, who suspected that containers found therein belonging to another contained contraband, was authorized to consent to a police search of the containers].) The high *438 court has made clear that one basis for the consent exception to the warrant requirement is to serve the community's interest in producing "`necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongly charged with a criminal offense.'" (Florida v. Jimeno, supra, 500 U.S. at p. 252, 111 S.Ct. 1801.)
Accordingly, although the searching officer had little reason to suppose that Diane Jenkins herself was using defendant's briefcase, this circumstance does not require us to conclude the officer lacked a reasonable basis for believing she had authority to consent to a search of the briefcase, when the facts known to him indicated she had exercised control over the briefcase in the manner shown by the testimony at the hearing on the motion to suppress.
Defendant asserts that it is never reasonable for a police officer to conclude that a third party has authority to consent to a search when the personal property searched is identified as belonging to another person, but this claim is without merit. Although a third party who is the subject of a search and admonishes an officer that a bag belongs to someone else may be understood to deny joint access and control over the property (see United States v. Jaras (5th Cir.1996) 86 F.3d 383, 389), or to limit the scope of his or her consent (see United States v. Infante-Ruiz, supra, 13 F.3d at pp. 504-505), a third party who responds to a search focused upon the defendant by handing over the defendant's belongings that are in the third party's exclusive possession and control may create a reasonable belief on the part of the searching officer that the third party has authority to consent to the search. (United States v. Falcon, supra, 766 F.2d at p. 1474 [rejecting the claim that it necessarily is unreasonable to search property identified as belonging to another]; United States v. Carter (4th Cir. 1977) 569 F.2d 801, 804-805 [same]; United States v. Buckles (8th Cir.1974) 495 F.2d 1377, 1382 [same]; Johnson v. State, supra, 519 So.2d at p. 714 [same].)
We conclude the trial court properly denied the motion to suppress and that no violation of the Fourth Amendment occurred.[12]

10. Claim of denial of representative jury

In providing jury panels from which defendant's jury would be selected, the trial court ordered the Jury Commissioner of Los Angeles County to select jurors from within a 20-mile radius of the Van Nuys courthouse, where the trial was held. Prospective jurors were selected on October 13, 14, and 15, 1987, but only on October 14 did the jury commissioner's office employ the method of selection ordered by the court. On October 13 and 15, prospective jurors were selected by the so-called bull's-eye method.[13] Under this countywide method, the jury commissioner explained: "[T]he computer is asked to randomly select jurors from this pool of qualified prospective jurors.... [¶] Let's assume that we have out of the possible 32 court locations, Los Angeles County where jurors can be assigned, that we have 10 court locations [needing jurors]. A juror will be by computer randomly selected, ... and then [the computer] asks of these are any of these courts within 20 miles of this person's residence? And then if the answer is yes, then assign that juror to the closest court of those courts that are within 20 miles."
*439 The defendant made a motion to quash the venire on the ground it did not constitute a representative cross-section of the community. In a hearing on the motion, the jury commissioner testified that 9.9 percent of the population living within a 20-mile radius of the Van Nuys courthouse and presumptively eligible for jury service was African-American. A defense expert testified, on the other hand, that the percentage of African-American persons living within that radius was 10.18 percent. On October 13, the percentage of African-American persons called for service in defendant's case was 1.87 percent, and on October 15, it was 2.07 percent. On October 14, 6.43 percent of the persons called for service in defendant's case were African-American. Accordingly, as the trial court stated and defendant concedes, 4.5 percent of the total number of prospective jurors available to serve in panels from which defendant was to select his jury were African-American.
Defendant's expert testified that the bull's-eye method described above produced an underrepresentation of African-American persons compared with their presence in the 20-mile radius of the Van Nuys courthouse, and the expert outlined an alternative method of selecting the jury venire based upon census tracts that would readily produce a representative venire.
The trial court denied the motion to quash, determining that the difference between the percentage of African-American prospective jurors (4.5 percent) in defendant's case, and the percentage of African-American persons eligible for jury duty in the 20-mile area served by the Van Nuys courthouse (9.9 percent) was not statistically significant. In addition, the trial court determined that defendant had failed to establish systematic exclusion of a cognizable class, because the county's use of Department of Motor Vehicles and voter registration lists indicated that the county was doing all that reasonably could be expected to achieve a fair cross-section.
Defendant renews his claim that his federal constitutional right to a jury drawn from a representative cross-section of the community was violated. (U.S. Const., 6th Amend.; Duren v. Missouri (1979) 439 U.S. 357, 358-367, 99 S.Ct. 664, 58 L.Ed.2d 579.) That right guarantees "that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. [Citation.] `In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' [Citations.] The relevant `community' for cross-section purposes is the judicial district in which the case is tried." (People v. Horton (1995) 11 Cal.4th 1068, 1087-1088, 47 Cal. Rptr.2d 516, 906 P.2d 478, italics added, quoting Duren v. Missouri supra, 439 U.S. at p. 364, 99 S.Ct. 664.) Defendant contends the method employed to select the venire from which his panels were drawn systematically caused underrepresentation of African-American persons.
Defendant failed to establish a prima facie case of systematic underrepresentation of a cognizable class, because he failed to refer to the appropriate community in attempting to prove the denial of a representative jury venire. He attempted to meet the second prong of the Duren test by demonstrating a disparity between the percentage of African-American persons in the venire and the percentage of African-American persons eligible for jury service who lived within 20 miles of the Van Nuys courthouse. As noted, the appropriate community with which to establish such a comparison was the judicial district in which the Van Nuys courthouse is situated. (People v. Horton, supra, 11 *440 Cal.4th at pp. 1087-1088, 47 Cal.Rptr.2d 516, 906 P.2d 478; People v. Mattson (1990) 50 Cal.3d 826, 844, 268 Cal.Rptr. 802, 789 P.2d 983; Williams v. Superior Court (1989) 49 Cal.3d 736, 745, 263 Cal. Rptr. 503, 781 P.2d 537.)[14] In any event, as the trial court found, there was insufficient showing that any underrepresentation was due to a systematic exclusion. For these reasons, defendant failed to make the prima facie showing required by Duren, and his claim accordingly is rejected. (People v. Horton, supra, 11 Cal.4th at pp. 1088-1090, 47 Cal.Rptr.2d 516, 906 P.2d 478; People v. Mattson, supra, 50 Cal.3d at p. 844, 268 Cal.Rptr. 802, 789 P.2d 983.)

11. Claim of juror contamination

Defendant contends that he was deprived of his constitutional right to a fair trial by an impartial jury because during jury selection, when evidence came to light suggesting that jurors were in fear of him, the trial court failed to question the jurors adequately regarding their fears and erroneously denied his motion for mistrial.
The record reflects that Prospective Juror Hw., who ultimately was excused for cause, stated to the court outside the presence of other prospective jurors that on the preceding night she had received a telephone call from Ms. Hv., a prospective juror on the panel who was not selected to serve on defendant's jury, in which Hv. informed her that the judge presiding in defendant's case had received death threats and was being protected by a bodyguard at all times. After Prospective Juror Hw. had left the courtroom, the prosecutor informed the court that there had been threats against him and another deputy district attorney in this case, though none were traced to defendant, but that with defendant's history of attacking witnesses and shooting people who "tell against him," it was inevitable that jurors would be fearful. The prosecutor warned: "[I]f we are going to be excusing jurors because they are frightened, we are not going to have a jury because they are going to be frightened." The trial court then informed Hw. that it had not received any threats and did not have a bodyguard. Hw. then volunteered that Hv. also had informed her that an acquaintance had taken the trial judge to the crime scene, that the judge did not want to be involved with this case because it involved gangs and cocaine, and that Hv. noted that some witnesses were in the witness protection program. Hw. said she did not recall Hv. saying anything in the presence of other prospective jurors about the case, but noted Hv. did have some contact with another prospective juror, Ms. Mh. Hw. stated she had been very frightened after the conversation with Hv. The trial court assured her the rumors she had heard were false.
The trial court, outside the presence of the jury, stated it would be necessary to question Hv., to warn her not to contact anyone else, and to question the remainder of the jurors to be certain they had not had any contact with Hv.
Upon questioning, Hv. admitted telephoning Hw. and telling her the judge was under 24-hour protection due to threats. Hv. stated she had heard this information from her employer, and also from another prospective juror who made the assertion in her presence and that of other prospective jurors. On one or two occasions she heard prospective jurors state they were afraid to serve in this case. She also recalled other jurors stating that defendant was paying for his own attorney and that defense counsel was driving a new Jaguar. She asserted she had not telephoned any prospective juror other than Hw. The court ordered her not to contact anyone involved in the case.
*441 The trial court initially denied defendant's motion to excuse for cause, but the following day determined that Juror Hw. would be excused.
The trial court also examined Prospective Juror Mh., who also had been excused. She stated that Hv. had told her that the court had been threatened and had 24hour security. She recounted hearing Hv. make this statement in a hallway where a group of 10 to 12 prospective jurors could have heard it. She heard this rumor from no other source, and heard no discussion about the case among other prospective jurors. Some prospective jurors did seem uneasy, simply because of the nature of the case. The suggestion that the trial court was in need of additional security made Mh. uneasy.
The trial court concluded that Hv. was not worthy of belief and suggested that she had been disingenuous in attempting to exonerate herself for her misconduct in telephoning Hw. to discuss the case. The court stated that "in an abundance of caution" it would ask each juror if he or she had heard the statement Mh. alleged Hv. had made in the hallway in the hearing of other prospective jurors.
The trial court stated it would inquire of the remaining jurors whether they had heard Hv. say anything about the case or had heard other prospective jurors talk about the case other than in the most general terms. Eleven of the jurors who served on the case indicated they had not heard other prospective jurors discuss the case and were not present when a prospective juror who was excused mentioned something related to the case in the hearing of other prospective jurors. (The remaining jurors and alternates had been selected after Ms. Hv. had been excused.) The trial court rejected defense counsel's request that the jurors be questioned regarding rumors of threats against the court and other grounds for fearing defendant. The trial court explained that in its view, such questions would prejudice otherwise untainted jurors by giving rise to fears and speculation that otherwise would not exist.
Defendant made a motion for mistrial on the grounds that the prospective jurors may have been contaminated by rumors about threats against the court, and that the court's questioning of the jurors had not been sufficiently detailed to expose or counteract such contamination. Defendant's motion for mistrial was denied. Defendant renewed the motion for further questioning of the jury, again maintaining that the jurors should have been asked specifically whether they had heard of threats to the trial judge. The court denied the renewed motion, observing that it thought Hv. was lying about having heard about threats against the court from other persons, and that she "was lying to cover herself for having opened her mouth."
We have explained that "[a] trial court must conduct a sufficient inquiry to determine facts alleged as juror misconduct `whenever the court is put on notice that good cause to discharge a juror may exist.'" (People v. Davis (1995) 10 Cal.4th 463, 547, 41 Cal.Rptr.2d 826, 896 P.2d 119.) The trial court in the present case conducted an inquiry sufficient to determine that excused Prospective Juror Hv.'s communications to Prospective Juror Hw. required that the latter be excused for cause and to satisfy itself that the remainder of the prospective jurors had not been exposed to prejudicial rumors or heard Hv.'s comments about threats against the trial court. Contrary to defendant's assertion, the court did not confine itself to asking prospective jurors whether they had heard any discussion of the facts of the question defendant claims might have been interpreted as referring only to the circumstances of the crime. The court repeatedly asked whether jurors had heard discussion of the facts of the case or anything else relating to the case. In addition, the court asked the prospective jurors whether they had heard a prospective juror who was subsequently excused make comments in front of a group *442 of 10 to 12 jurors, and also asked the prospective jurors whether they had heard others make any personal remarks about the attorneys. The court, in asking whether jurors had heard discussion of anything relating to the case, noted that it was not referring to matters such as scheduling or delays in the trial. Under the circumstances, no juror would have understood that the court's questions were restricted to discussion of the crime itself. In addition, the court acted within its discretion in determining that more pointed questions regarding alleged threats against the court would serve to alarm the prospective jurors rather than to uncover prejudice or allay fears. (See, e.g., People v. Pinholster, supra, 1 Cal.4th at p. 928, 4 Cal. Rptr.2d 765, 824 P.2d 571 [applying abuse of discretion standard to claimed failure to conduct hearing adequate to determine whether juror should be discharged for misconduct]; see also People v. Ray (1996) 13 Cal.4th 313, 343, 52 Cal.Rptr.2d 296, 914 P.2d 846 [decision whether to investigate juror bias is within sound discretion of trial court]; People v. Beeler (1995) 9 Cal.4th 953, 989, 39 Cal.Rptr.2d 607, 891 P.2d 153 [it is within court's discretion to determine what procedure to employ or inquiry to conduct to determine whether juror should be discharged].)
A motion for mistrial is directed to the sound discretion of the trial court. We have explained that "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (People v. Haskett (1982) 30 Cal.3d 841, 854, 180 Cal.Rptr. 640, 640 P.2d 776.) The court did not abuse its discretion in denying the motion in the present case. The prospective jurors directly implicated in the rumors regarding threats against the court did not serve on defendant's jury, and the remaining jurors, when questioned, gave no indication that they had heard the rumors or that their impartiality was impaired. The court admonished each juror not to discuss the case with the others and instructed the jury to decide the case upon the facts presented at trial and not based upon any other source. The record demonstrates the absence of any incurable prejudice of the sort that would require the granting of a motion for mistrial. (See Illinois v. Somerville (1973) 410 U.S. 458, 461-462, 93 S.Ct. 1066, 35 L.Ed.2d 425 [noting trial court's broad discretion in ruling on mistrial motions].) For the same reasons, we reject defendant's contentions that the trial court erred in denying his motion for mistrial and thereby impaired his right to due process of law or to an impartial jury.

12. Claims that various alleged errors committed during jury selection violated defendant's right to a fair and impartial jury, due process, and a reliable verdict

a. Challenges for cause
Defendant contends that the court erred during jury selection in ruling on various challenges for cause. Specifically, he contends that the court erred in sustaining the prosecutor's challenges to Prospective Jurors Wt., St., and Mn.,[15] jurors whom defendant characterizes as "life-prone," and in applying an inconsistent standard in overruling defense challenges to 13 other prospective jurors whom defendant *443 characterizes as "death-prone." Defendant contends the trial court was not evenhanded in applying the standards set out in Wainurright v. Witt (1985) 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 for determining whether a prospective juror should be excused on the basis of views of capital punishment that would prevent or substantially impair the juror's ability to perform his or her duties.
Applying Wainwright v. Witt, supra, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841, we have stated that "`[i]n a capital case, a prospective juror may be excluded if the juror's views on capital punishment would "prevent or substantially impair" the performance of the juror's duties.' [Citations.] `A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" (People v. Barnett, supra, 17 Cal.4th at p. 1114, 74 Cal.Rptr.2d 121, 954 P.2d 384.) In addition, "`[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" (Ibid.)
Prospective Juror Wt. gave conflicting answers to questions regarding his attitude toward the death penalty, but ended with the observation that there were no circumstances under which he would vote to impose the death penalty. The trial court also indicated that it believed the juror was mentally impaired and "clearly was not going to be able to deal with this subject intelligently. And he was not going to be able to perform his duties as a juror." Under the circumstances, we see no error in excusing the juror.
Prospective Juror St. was excused for cause not because of his views regarding the death penalty, but because the trial court concluded he was mentally incompetent to perform the duties of a juror. The court stated: "I think he just is not competent to serve as a juror based on his answers to the questions, his answers in his questionnaire. And I'm going to exercise my discretion and excuse him.... I think he's crazy: I hate to be so blunt. I think he is mentally disturbed or mentally off and I am not going to have a mentally off juror.... This man is substantially impaired, mentally impaired serving as a juror.... My judgment is in viewing him and listening to him and observing him, there is something mentally wrong with him and I'm going to exercise my discretion and I'm going to excuse him." The indications on the face of the record that seem to have formed the basis for this conclusion are that the prospective juror believed that the most effective protection against crime was to rely upon an aura of light he believed surrounds each person. The prospective juror stated: "It's like it's their life energy. And this bubble of white light is like a healing light that helps to protect them." In addition, the trial court apparently was disturbed by the prospective juror's repeated reference to following the dictates of his "inner voice." The juror could not predict the influence of this voice or intuition upon his deliberations as a juror.[16] The trial court might have impaired the defendant's right to be tried by a competent tribunal had it not granted the challenge for cause against a juror *444 whom the court believed to be unable to deliberate rationally. (See Jordan v. Com. of Massachusetts (1912) 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038; People v. Millwee (1998) 18 Cal.4th 96, 144, 74 Cal. Rptr.2d 418, 954 P.2d 990; United States v. Hall (4th Cir.1993) 989 F.2d 711, 714; see also Code Civ. Proc. former § 198, subd. (a)(2), as amended by Stats.1986, ch. 1171, § 1, p. 4165 [defining a "competent" juror as someone "[i]n possession of his or her natural faculties and of ordinary intelligence"].)[17] This question is peculiarly one involving the trial court's ability to assess the prospective juror's demeanor (see Wainwright v. Witt, supra, 469 U.S. at p. 428, 105 S.Ct. 844), and we should uphold the trial court's ruling if it is fairly supported by the record. (See People v. Barnett, supra, 17 Cal.4th at p. 1114, 74 Cal.Rptr.2d 121, 954 P.2d 384.) In the present instance, the trial court's assessment of the prospective juror's inability to carry out the duties of a juror in a rational manner is adequately supported by the record.
Defendant objects that the trial court acted upon a prejudice against mystical religious beliefs in excusing St. rather than upon a well-founded belief that the prospective juror was mentally unbalanced or unable to perform the duties of a juror. He contends that this action on the part of the trial court is an "affront to the constitutional guarantee that freedom of religious worship will not be infringed upon by the state" and that limiting the "range of permissible religious views for jurors strikes at the heart of both the First and Sixth Amendments." We believe, however, that the record demonstrates the court was motivated not by prejudice or bias against any group to which the prospective juror belonged but by a reasonable concern that the prospective juror's mysticism and other observable characteristics would impair his ability  as an individual  to deliberate rationally. (See, e.g. United States v. Stafford (7th Cir.1998) 136 F.3d 1109, 1114 [decision of Posner, Chief Judge, stating in the context of a claim under Batson v. Kentucky (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, that "[i]t would be improper and perhaps unconstitutional to strike a juror on the basis of his being a Catholic, a Jew, a Muslim, etc. It would be proper to strike him on the basis of a belief that would prevent him from basing his decision on the evidence and instructions, even if the belief had a religious backing...."].)
The second claim  that the court erred in rejecting challenges to assertedly death-prone potential jurors  readily is rejected. No error appears on this record. Defendant's only specific objections are to Jurors Bn., Cs., Vn., and Dn. As to each juror, the trial court appropriately could determine that the prospective juror's views regarding the death penalty would not prevent or substantially impair the performance of the person's duties as a juror. (Bn. [would listen to the evidence before determining appropriate penalty, even if special circumstances found true; expressed neutrality with respect to penalty; expressed an open mind; would not hesitate to impose punishment of life in prison, especially if evidence showed "something good to salvage" or some circumstance in mitigation]; Cs. [would have to hear penalty phase evidence before determining penalty; believed defendant's background was relevant to penalty; would not impose punishment of death simply because of special circumstance of murder of police officer; would consider voting for life term; would need to hear penalty phase evidence before determining penalty]; Vn. [would not impose death penalty simply because of guilt determination or because of special circumstance of murder of police officer; expressed neutrality on death penalty; not automatic supporter of death penalty, including for persons *445 who murder police officers; could be swayed by mitigating circumstances]; Dn. [would not automatically vote for the death penalty after finding special circumstances true; would take evidence in mitigation into account in determining penalty; no fixed opinion with respect to death penalty; mitigating evidence could warrant life term even if brutal slaying proved; would seriously consider evidence in mitigation].)
Defendant contends the court was not evenhanded in ruling on motions to exclude for cause. He contends the court excused "death-doubtful" jurors who gave ambiguous answers but refused to excuse "death-favorable" jurors who gave equally ambiguous answers. The record, however, demonstrates that the death-favorable jurors of whom defendant complains clearly indicated their ability to consider circumstances in mitigation, to withhold judgment upon the question of penalty until the evidence was before them, and seriously to entertain the option of imposing a sentence of life without possibility of parole. The one death-doubtful juror who was excluded in part because of views regarding the death penalty, on the other hand, demonstrated an inability to put aside preconceptions and opinions regarding the death penalty and to consider all of the sentencing options. The other death-doubtful juror who defendant claims was excluded improperly was excused for another reason, that is, that the court observed in him evidence of mental impairment or instability. The record does not support defendant's claim that the trial court failed to apply the standard enunciated in Wainwright v. Witt, supra, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, in an evenhanded manner.[18]

b. Restriction on voir dire
Defendant also contends the trial court erred in restricting his ability to ask probing questions during voir dire, thereby preventing him from conducting an examination such as was necessary to exercise challenges and ensure an impartial jury as guaranteed by the Fifth Amendment of the United State Constitution and article I, section 16 of the California Constitution. Specifically, he contends he should have been permitted to ask one prospective juror what factors would be relevant to his decision to vote for the death penalty; to ask another prospective juror to what extent she accepted the concept of free will; to ask a prospective juror to answer whether, after considering a rather detailed account of the facts of this case, she would impose the death penalty; and to ask a prospective juror whether it made any sense for defense counsel to ask defendant to take the stand if the juror was skeptical of his testimony, and whether the juror "wanted to hear from defendant." Defendant apparently contends it was necessary to secure answers to these questions in order to expose juror bias, lay the foundation for a challenge for cause or peremptory challenge, and explore the prospective juror's views with regard to the death penalty.
We have recognized that the trial court has "considerable discretion ... to contain voir dire within reasonable limits" (People v. Williams (1981) 29 Cal.3d 392, 408, 174 Cal.Rptr. 317, 628 P.2d 869; see also People v. Ramos (1997) 15 Cal.4th 1133, 1158, 64 Cal.Rptr.2d 892, 938 P.2d 950). This discretion extends to the process of death-qualification voir dire established by Witherspoon v. Illinois (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 and Wainwright v. Witt, supra, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. (People v. Ramos, supra, 15 Cal.4th at p. 1158, 64 Cal.Rptr.2d 892, 938 P.2d 950.) Limitations on voir dire are subject to review for abuse of discretion. (People v. Ashmus, supra, 54 Cal.3d at p. 959, 2 Cal.Rptr.2d 112, 820 P.2d 214.) Under the law in *446 effect at the time of trial,[19] the court could prevent counsel from questioning the jury with an improper purpose, such as to "`educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.'" (People v. Williams, supra, 29 Cal.3d at p. 408, 174 Cal.Rptr. 317, 628 P.2d 869; see also People v. Ashmus, supra, 54 Cal.3d at p. 959, 2 Cal.Rptr.2d 112, 820 P.2d 214.)
We observe no indication on this record that defense counsel "`was prevented from making reasonable inquiry into the fitness of any venire person to serve on the jury.'" (People v. Carpenter, supra, 15 Cal.4th at p. 354, 63 Cal.Rptr.2d 1, 935 P.2d 708, italics in original.) Each juror was asked, in various ways, whether he or she believed the death penalty should be imposed automatically upon conviction of a capital offense. (See People v. Lucas (1995) 12 Cal.4th 415, 479-480, 48 Cal.Rptr.2d 525, 907 P.2d 373.) With respect to questions directing the juror's attention to the facts of the case, we have observed that: "The Witherspoon-Witt [citations] voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract.... [Citations.] The inquiry is directed to whether, without knowing the specifics of the case, the juror has an `open mind' on the penalty determination. There was no error in ruling that questions related to the jurors' attitudes toward evidence that was to be introduced in this trial could not be asked during the sequestered Witherspoon-Witt voir dire." (People v. Clark (1990) 50 Cal.3d 583, 597, 268 Cal.Rptr. 399, 789 P.2d 127; see also People v. Sanders (1995) 11 Cal.4th 475, 539, 46 Cal. Rptr.2d 751, 905 P.2d 420.) Nor is it error to preclude counsel from seeking to compel a prospective juror to commit to vote in a particular way (People v. Rich (1988) 45 Cal.3d 1036, 1105, 248 Cal.Rptr. 510, 755 P.2d 960), or to preclude counsel from indoctrinating the jury as to a particular view of the facts. (People v. Sanders, supra, 11 Cal.4th at pp. 538-539, 46 Cal. Rptr.2d 751, 905 P.2d 420.) Thus it was not error to refuse to permit counsel to ask questions based upon an account of the facts of this case, or to ask a juror to consider particular facts that would cause him or her to impose the death penalty. Because any question concerning a prospective juror's attitude toward the concept of free will is highly philosophical, it was within the trial court's discretion to conclude such a question would not be fruitful for the purpose of death-qualification voir dire.
With respect to defense counsel's question in the general voir dire regarding whether the prospective jurors thought it "made any sense" to present defendant's testimony if jurors would view his credibility differently from that of other witnesses, the question arguably sought to influence the jurors' attitude toward the facts of the case and to indoctrinate the jurors in case defendant should fail to testify. In any event, the court permitted the question whether jurors would "hold it against" defendant should he fail to testify, and defense counsel was permitted to pose a series of questions regarding the prospective jurors' attitude toward the exercise of the privilege against self-incrimination. No abuse of discretion appears.

c. Wheeler error
Defendant contends the trial court erred in determining he had failed to establish a prima facie case under People v. Wheeler (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (Wheeler) that the prosecutor excused Prospective Juror Rt. because of racial bias. He contends that this error constituted a violation of his right to trial *447 by a fair and impartial jury under the Sixth and Fourteenth Amendments of the federal Constitution.
At trial, the prosecutor exercised a peremptory challenge against Prospective Juror Rt., an African-American man. Defendant objected to the challenge, claiming it was based purely upon the prospective juror's race, and made a motion for mistrial based upon Wheeler, supra, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748, and Batson v. Kentucky, supra, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. He contended that no circumstance but race could have motivated the challenge, because Prospective Juror Rt. did not express skepticism concerning the death penalty and his father had been a deputy sheriff for 20 years. Defendant asserted the prosecutor had established a practice of exercising peremptory challenges against African-American prospective jurors, contending that there had been no justification except race for the prosecutor's earlier peremptory challenge of Prospective Juror Sp., an African-American man.
The court responded: "[W]ithout finding a prima facie case has been made I would ask if the prosecution would care to respond?"
The prosecutor explained that he had excused Prospective Juror Rt. because he believed his employment as a reporter for a local newspaper would threaten the prospective juror's impartiality and ability to decide the case purely upon the facts presented at the trial, and because it appeared the prospective juror would face a risk of losing his employment if asked to serve as a juror. The prosecutor believed the prospective juror would be torn between his employment and his duty as a juror.
The court denied the defense motion, stating: "I think the record needs to be clear that there were potentially four African-American jurors called to the jury box: Mr. [S], Mrs. [H], Mr. [Rt.] and Mr. [L]. I think the record does need to reflect that yesterday Mr. [S] was excused, but there were reasons stated prior to that. That Mrs. [H], an African American woman, was excused by the defense.
"I also felt that Mr. [Rt.] was in distress yesterday. Was in emotional distress. He looked pained yesterday sitting up in the seat.
"I also received a phone call from his employer. Apparently, their policy is only to pay for 10 days or 15 days or something. And I was going to have to make a special phone call or write a letter which, you know, I'm always willing to do to get him to stay.
"I was troubled by his employment situation. I was troubled by the fact we were going to have to have special precautions taken for him if he went to work on Fridays or over the holidays or when we were not in session that someone would have to screen the newspaper for him and people would have to not talk about it in front of him.
"We all know that the Daily News has covered this case extensively. It will cover the case extensively when it starts again.
"I had my own qualms about it. The fact the people exercised a peremptory does not seem to me to be racially based. So I would find that it was not, and I would deny the Wheeler motion."
This court established in Wheeler, supra, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748, "that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds. [Citations.]" (People v. Johnson (1989) 47 Cal.3d 1194, 1215, 255 Cal.Rptr. 569, 767 P.2d 1047.)
A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima *448 facie showing that one or more jurors has been excluded on the basis of group or racial identity. The high court has explained that the defendant is required to "raise an inference" that the exclusion was based on group or race bias. (Batson v. Kentucky, supra, 476 U.S. at p. 96, 106 S.Ct. 1712.) Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue. (People v. Montiel (1993) 5 Cal.4th 877, 909, 21 Cal.Rptr.2d 705, 855 P.2d 1277.)
The trial court's determination that no prima facie showing of group bias has been made is subject to review to determine whether it is supported by substantial evidence. (People v. Alvarez, supra, 14 Cal.4th at pp. 196-197, 58 Cal. Rptr.2d 385, 926 P.2d 365.)[20] We examine the record of the voir dire and accord particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand. (People v. Howard, supra, 1 Cal.4th at p. 1155, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)
The record supports the trial court's determination that defendant failed to make a prima facie showing that the prosecutor challenged Prospective Juror Rt. on the basis of his race. The record of Prospective Juror Rt.'s voir dire amply supports the conclusion the prosecutor did not challenge him because of group bias. Prospective Juror Rt. anticipated some difficulty in the course of trial shielding himself from outside information concerning the case because of his employment as a reporter with a local newspaper. In addition, the prospective juror noted that he had received a poor performance review at work because of his participation in voir dire proceedings, and that jury service would "cause an emotional hardship because of the stress involved with my job." It appears the prospective juror risked losing his employment or suffering detriment to his career if he were required to serve on a lengthy trial.
The prosecutor referred to these circumstances in justifying his challenge of Prospective Juror Rt., and explained that he feared the juror would be too torn by conflicting loyalties  to his employment and to the court  to fulfill his function. (See People v. Mayfield (1997) 14 Cal.4th 668, 723-724, 60 Cal.Rptr.2d 1, 928 P.2d 485 [relying in part upon justifications offered by prosecutor in support of trial court's determination that no prima facie case had been made under Wheeler].) The prosecutor pointed out that he also had peremptorily challenged a prospective juror who was not African-American out of a similar concern that the prospective juror's divided loyalties would impair her ability to function.
Defendant's contention that the prosecutor's action in excusing two African-American jurors itself constituted a pattern of group bias did not suffice under the circumstances to make out a prima facie case under Wheeler, particularly in light of an African-American juror's having served on the jury. (See People v. Turner (1994) 8 Cal.4th 137, 167-168, 32 Cal.Rptr.2d 762, 878 P.2d 521.) As for the contention that the prosecutor's challenge to Prospective Juror S. supported an inference that the prosecutor was motivated by group bias in challenging Prospective Juror Rt., the record belies the claim. That juror was a death penalty skeptic who barely survived a challenge for cause because of his views regarding the death penalty, and the prosecutor explained that he had excused him because of the juror's reluctance to consider imposing the death penalty and because *449 the juror had been sleeping as he sat in the jury box during general voir dire. In denying defendant's separate Wheeler motion based upon the challenge to Prospective Juror S., the trial court confirmed that the juror had been sleeping, despite warning gestures from the court.
More than adequate evidence supports the trial court's determination that no prima facie case of group bias was shown. We find no error in the denial of defendant's Wheeler motion.

13. Claims regarding excessive security measures

a. Metal detector
Defendant contends his due process right to a fair trial was impaired when the trial court caused to be installed a metal detector through which the public was required to pass while entering the courtroom. He objected at trial, and at a hearing on the objection, evidence was presented regarding a letter and a poster traceable to defendant that the prosecutor alleged constituted veiled threats against prosecution witnesses. In addition, it was pointed out that the charges alleged that the murder was undertaken with the purpose of silencing a witness in another criminal proceeding against defendant. Finally, a news reporter testified that he had received anonymous phone calls in which a shootout in the courtroom was threatened. At a later hearing requesting reconsideration of the court's ruling denying the motion, evidence was presented regarding threats against the prosecutor and the trial court made by persons other than defendant.
We have recognized that certain security measures may burden the right to a fair trial. In particular, to require the defendant to appear before the jury under physical restraint may impair that right, for example by leading the jury to infer he is a violent person and by tending to dispel the presumption of innocence. (People v. Duran (1976) 16 Cal.3d 282, 290, 127 Cal.Rptr. 618, 545 P.2d 1322.) Visible physical restraints should not be ordered in the absence of "evident necessity" or "manifest need," and indeed, "[t]he imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (Id., at pp. 289, 290-291, 127 Cal.Rptr. 618, 545 P.2d 1322.)
Other security measures, however, may not require such justification, and reside within the sound discretion of the trial court. We explained, for example, that the presence of armed guards in the courtroom would not require justification on the record "[u]nless they are present in unreasonable numbers." (People v. Duran, supra, 16 Cal.3d at p. 291, fn. 8, 127 Cal. Rptr. 618, 545 P.2d 1322; see also People v. Ainsworth (1988) 45 Cal.3d 984, 1003-1004, 248 Cal.Rptr. 568, 755 P.2d 1017 [trial court did not err in determining that unusual number of guards was not unreasonable].) The United States Supreme Court also distinguishes between security measures, such as shackling, that reflect on defendant's culpability or violent propensities, and other, more neutral precautions. (Holbrook v. Flynn (1986) 475 U.S. 560, 567-568, 106 S.Ct. 1340, 89 L.Ed.2d 525.) Measures such as shackling or the appearance of the defendant in jail garb are inherently prejudicial and are subject to exacting scrutiny (id. at p. 568, 106 S.Ct. 1340), but precautions such as the use of additional armed security forces are not, because of "the wider range of inferences that a juror might reasonably draw from the officers' presence." (Id. at p. 569, 106 S.Ct. 1340.) The court explained: "While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that [defendant] is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions *450 emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citation.]" (Ibid.) Accordingly, the court concluded, the presence of such guards is not inherently prejudicial, and their appearance at the defendant's trial will be reviewed on a case-by-case basis to determine whether the defendant actually was prejudiced. (Ibid.; see also People v. Miranda (1987) 44 Cal.3d 57, 115, 241 Cal. Rptr. 594, 744 P.2d 1127.)
We believe that the use of a metal detector outside a courtroom, like the use of additional security forces within the courtroom, is not a measure that is inherently prejudicial. Just as in Holbrook, in which the high court held that the presence of four additional uniformed police officers at trial was not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial" (Holbrook v. Flynn, supra, 475 U.S. at pp. 568-569, 106 S.Ct. 1340), the use of a metal detector at the entrance to the courtroom in which the case is to be tried is not inherently prejudicial. Unlike shackling and the display of the defendant in jail garb, the use of a metal detector does not identify the defendant as a person apart or as worthy of fear and suspicion. In addition, the jury in the present case did not pass through the metal detector and may not have been aware of it. Even if the jury was aware of the metal detector, the jury may well have considered it a routine security device, as the trial court predicted, or at most a device necessary to maintain order among the spectators. The public is inured to the use of metal detectors in public places such as courthouses, and many reviewing courts have found their use nonprejudicial. (Jenner v. Class (8th Cir.1996) 79 F.3d 736, 742-743; Helium v. Warden (8th Cir.1994) 28 F.3d 903, 906-909; United States v. Scarfo (3rd Cir.1988) 850 F.2d 1015, 1024-1025; United States v. Carter (8th Cir. 1987) 815 F.2d 1230, 1231; United States v. Heck (9th Cir.1974) 499 F.2d 778, 788; State v. Aguilar (Minn.1984) 352 N.W.2d 395, 396-397.) No reflection upon defendant's guilt or innocence need be inferred from the use of a metal detector.
Defendant contends that use of a metal detector in front of the courtroom in which a case is to be tried is justified or permissible only if there is compelling evidence of imminent threats to the security of the courtroom attributable to the defendant, citing People v. Duran, supra, 16 Cal.3d 282, 127 Cal.Rptr. 618, 545 P.2d 1322; State v. Hartzog (1981) 96 Wash.2d 383, 635 P.2d 694; and United States v. Carter, supra, 815 F.2d 1230. He contends no such compelling evidence was presented in this case. The cases he cites do not support his contention. Compelling justification was required in Duran because the defendant was shackled, an inherently prejudicial measure. The court in United States v. Carter, supra, 815 F.2d 1230, did not apply the standard urged by defendant but instead applied the abuse of discretion standard (id. at p. 1231), and in State v. Hartzog, supra, 96 Wash.2d 383, 635 P.2d 694, the court found magnetometer searches of jurors to be harmless error. (Id. at pp. 705-706.)
Security measures that are not inherently prejudicial need not be justified by compelling evidence of imminent threats to the security of the court. (See Holbrook v. Flynn, supra, 475 U.S. at pp. 568-569, 106 S.Ct. 1340; People v. Duran, supra, 16 Cal.3d at p. 291, fn. 8, 127 Cal. Rptr. 618, 545 P.2d 1322; Morgan v. Aispuro *451 (9th Cir.1991) 946 F.2d 1462, 1465.) Nor does defendant identify any actual prejudice arising from the trial court's decision to employ a metal detector at the entrance to the courtroom. (Holbrook v. Flynn, supra, 475 U.S. at p. 572, 106 S.Ct. 1340; see also People v. Miranda, supra, 44 Cal.3d at p. 115, 241 Cal.Rptr. 594, 744 P.2d 1127.) We conclude the trial court did not abuse its discretion in maintaining a metal detector at the entrance to the courtroom in which defendant's case was being tried.

b. Numerous bailiffs
Defendant contends that the court violated his right to due process of law by permitting, in addition to the bailiffs normally assigned to the courtroom, the presence of additional armed bailiffs during the testimony of witness Jeffrey Bryant.
At trial defendant objected to the appearance of three additional bailiffs in the courtroom during the in limine testimony of Jeffrey Bryant.
The court conferred with one of the bailiffs, who explained that some silent communication between the witness and defendant's brother, who sat in the courtroom, caused him to order the additional security. The court noted that although it did not wish to provide excessive security, if the bailiff was of the opinion that additional security was necessary, the court would defer to the bailiffs decision. The court directed defense counsel to confer with the bailiff to resolve the difficulty.
The following day, defense counsel objected that there had been extra bailiffs in the courtroom when witness Jeffrey Bryant testified, and asked that the number of bailiffs be reduced. Counsel noted that only a few of defendant's friends and relatives were attending the trial, and that because they had passed through the metal detector, they posed no danger. The court observed that the number of bailiffs fluctuated between three and four, that three was the bare minimum at a joint trial of two incarcerated defendants, that sometimes it was the presence of certain spectators rather than the identity of the witness that prompted additional security, that some of the bailiffs were not visible to the jury, that the presence of an additional bailiff was "innocuous," and that there was no "armed camp" atmosphere, but on the contrary a low-key atmosphere had been preserved.
Contrary to defendant's contentions, no abuse of discretion or abrogation of judicial authority over courtroom security appears. We have explained that pursuant to United States Supreme Court authority, "the use of identifiable security guards in the courtroom during a criminal trial is not inherently prejudicial," in large part because such a presence is seen by jurors as ordinary and expected and because of the many nonprejudicial inferences to be drawn from the presence of such security personnel. (People v. Miranda, supra, 44 Cal.3d at pp. 114-115, 241 Cal.Rptr. 594, 744 P.2d 1127.) We examine on a case-by-case basis the question whether a defendant actually has been prejudiced by the presence of security officers. (Id. at p. 115, 241 Cal.Rptr. 594, 744 P.2d 1127.)
No prejudice appears in the present case. The record reflects that at least three officers were the minimum number sufficient to provide security in a joint trial of two incarcerated defendants, particularly when one officer was needed to attend to the metal detector. Some of the officers were not visible to the jury, and the court noted for the record that the atmosphere in the courtroom was not one of an armed camp, but on the contrary was relatively relaxed. There is no indication that defendant was prejudiced by the occasional presence of one or two uniformed bailiffs beyond the number constituting the bare minimum necessary to provide security. The court's extended comments on the record indicate that it did not abrogate its authority over the matter of security. Based on the record, we conclude the trial *452 court did not abuse its discretion or deprive the defendant of due process of law in regulating the number of security personnel present in the courtroom.

14. Conditions of confinement

Defendant contends that numerous adverse conditions of confinement before and during the guilt phase of the trial cumulated to impair his ability to assist in his defense and to defend himself in violation of the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 15, of the California Constitution. He asserts that these violations included his right to due process of law, to assist in his own defense, to the effective assistance of counsel, to be present both physically and mentally at all proceedings against him, and "not to be compelled to stand trial except when able to meaningfully assist his counsel." He refers to periodic difficulties he experienced in obtaining access to the jail law library, to allegedly disruptive searches of his cell and legal materials, to periods in which he was deprived of appetizing food and kept in solitary confinement as punishment for disciplinary infractions in jail that he claims were not his fault, to transportation schedules that from time to time deprived counsel of the opportunity to confer with him in court after the daily proceedings had concluded and that deprived him of adequate sleep and the opportunity to work on his case, to being kept shackled while waiting to appear in court, and to the failure of jail authorities to protect him from the violence of other inmates. He contends that these adverse circumstances were imposed on him with the purpose of "grinding him down" and that they cumulated to undermine his constitutional rights by so damaging his physical and mental condition that he was unable to assist counsel. He apparently contends that his condition was affected so adversely that he was, in effect, not "present" at trial.
We question whether the issue properly is before us on direct appeal. Although defendant repeatedly complained to the trial court regarding the conditions of his confinement, and on more than one occasion contended that he was  or soon would be  unable to assist in his defense as a consequence of adverse conditions of confinement, defendant does not assert on appeal that he made a motion for mistrial or other motion in which he asked the trial court to consider and rule on the contention that he asks this court to consider: that as a cumulative matter, adverse conditions of confinement before and during the trial deprived him of rights protected by the Sixth and Fourteenth Amendments, including, as he now asserts, the right to counsel, to assist in his own defense, to be present mentally as well as physically for the proceedings, and to fundamental due process. Indeed, defense counsel indicated near the conclusion of the guilt phase that he thought defendant should be satisfied with the assistance provided by the court in mitigating the adverse conditions of confinement of which defendant had complained. Nor does defendant offer any reason for us to deviate from the general rule that "`[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings [in connection with relief sought or defenses asserted], where an objection could have been, but was not presented to the lower court by some appropriate method.'" (In re Marriage of Hinman (1997) 55 Cal.App.4th 988, 1002, 64 Cal.Rptr.2d 383, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, p. 444; see also People v. Alvarez, supra, 14 Cal.4th at p. 192, fn. 7, 58 Cal.Rptr.2d 385, 926 P.2d 365 [claim of improper physical restraints not preserved for appeal when the defendant failed to object to the restraints at trial after securing a ruling from the trial court limiting the character of the restraints]; People v. Mattson, supra, 50 Cal.3d at pp. 853-854, 268 Cal. Rptr. 802, 789 P.2d 983 [rulings on evidentiary questions, including admissibility of confession under federal Constitution, will not be basis for reversal on appeal unless an objection below gave clear notice of the *453 specific ground for the objection]; 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible Error, § 3289, p. 4068 [on appeal from a criminal conviction, a defendant may be precluded from raising error on appeal if he or she "fail[ed] to object in the lower court in some appropriate manner"].)
In any event, defendant's claims are unpersuasive.
In support of the claim that his right to assist in his own defense was violated, defendant relies primarily upon a federal case, Milton v. Morris (9th Cir. 1985) 767 F.2d 1443 (Milton), establishing that a defendant who has asserted the right to represent himself cannot be deprived of a meaningful opportunity to prepare a defense. In that case, the defendant had no counsel and no access to a law library, to a legal assistant, to an investigator, or to a runner, and had extremely limited access even to the telephone. The court determined that this complete denial of any means to mount a defense infringed the defendant's right under Faretta to represent himself. (Milton, supra, 767 F.2d at pp. 1445-1446.) Even in those circumstances, the defendant had no right to dictate what means would be made available to him to prepare his defense. The Milton case and later cases have acknowledged that the institutional and security concerns of pretrial detention facilities may be considered in determining what means will be accorded to a defendant to prepare his or her defense. (Id. at p. 1446; United States v. Nash (9th Cir.1995) 73 F.3d 1470, 1491; United States v. Robinson (9th Cir. 1990) 913 F.2d 712, 717; State v. Drobel (Utah App.1991) 815 P.2d 724, 736, fn. 23.) Affording a defendant a lawyer to act as advisory counsel adequately protects the right identified in the Milton case. (See Milton, supra, 767 F.2d at p. 1446; United States v. Wilson (9th Cir.1982) 690 F.2d 1267, 1271-1272; State v. Henry (1993) 176 Ariz. 569, 863 P.2d 861, 876.)
Defendant's case obviously is entirely distinguishable from Milton, because he was not representing himself at the guilt phase but had appointed counsel who had resources for investigation and the means to present a defense. Even taking defendant's various complaints at face value, he was not deprived of all means of preparing his defense, but merely suffered circumstances he found disagreeable and disruptive. Searches of his cell were limited, by order of the court, to those necessitated by security concerns, and the court ordered that the contents of defendant's legal file not be divulged to the prosecution. (See People v. Hardy (1992) 2 Cal.4th 86, 181, 5 Cal.Rptr.2d 796, 825 P.2d 781 [legitimate security concerns may outweigh pretrial detainee's privacy rights].) Defendant had frequent access to the law library.[21] The record indicates that defendant confirmed he had consulted with counsel on a daily basis during trial. The record also indicates defendant was exceptionally well prepared for trial, for counsel asserted as much in urging the court to grant the Faretta motion made by defendant on the eve of trial. Defendant, *454 too, asserted at the hearing on the Faretta motion that he was well prepared and as knowledgeable about the case as defense counsel, stating: "I've been up in the pro. per. module for the last 18 months. I'm aware of the case. I know the case just as good as anyone...."
Defendant also contends that the circumstances of confinement violated his asserted right "not to be compelled to stand trial except when able to meaningfully assist counsel." Of course, due process of law prohibits the trial of an incompetent defendant who is so mentally impaired as to be unable to consult rationally with counsel (Dusky v. United States (1960) 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824) or, under the California standard, so impaired as to be unable to "assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) Defendant, however, makes no attempt to establish that he was incompetent to stand trial pursuant to the above standards, nor does he assert that counsel moved for an examination of his competency, or that the trial court should have doubted his competency and ordered a hearing on the issue. (See § 1368; People v. Davis, supra, 10 Cal.4th at p. 527, 41 Cal.Rptr.2d 826, 896 P.2d 119; People v. Price, supra, 1 Cal.4th at pp. 396-397, 3 Cal.Rptr.2d 106, 821 P.2d 610.)
Some courts have recognized, in the context of civil rights actions brought by pretrial detainees, that certain conditions of confinement may so impair the defendant's ability to communicate with counsel or otherwise participate in the defense that a due process violation or an infringement of the right to effective assistance of counsel results. (See Johnson-El v. Schoemehl (8th Cir.1989) 878 F.2d 1043, 1051 [observing that pretrial detainees have a substantial due process interest in effective communication with counsel and that if this interest is respected inadequately, the fairness of trial may be compromised]; Campbell v. McGruder (D.C.Cir.1978) 188 App. D.C. 258, 580 F.2d 521, 531-532 [stating that conditions of confinement, apart from the fact of confinement itself, that impede a defendant's ability to prepare a defense or damage the defendant's mental alertness at trial are "constitutionally suspect" and must be justified by compelling necessity]; Jones v. City and County of San Francisco (N.D.Cal.1997) 976 F.Supp. 896, 913 [lack of privacy for pretrial detainee's consultation with counsel may implicate Fourteenth and Sixth Amendments if attorney's ability adequately to prepare a defense is impaired]; Dillard v. Pitchess (C.D.Cal.1975) 399 F.Supp. 1225, 1236 [sleep deprivation due to transportation schedule between jail and courthouse may violate due process of law by affecting defendant's ability to assist counsel].) On the other hand, conditions of confinement that have not actually affected the defendant adversely are not grounds for reversal of a conviction; as we have determined, a defendant who was representing himself has no right to a continuance on the ground he had not received eight hours of sleep the night before the proceeding, when notwithstanding this adverse condition of confinement, the record indicated the defendant was awake and capable of participating in the proceedings. (People v. Smith (1985) 38 Cal.3d 945, 953, 216 Cal.Rptr. 98, 702 P.2d 180; see also People v. Davis (1987) 189 Cal.App.3d 1177, 1197, 234 Cal.Rptr. 859 [no indication defendant's performance as pro se counsel was affected adversely by sleep deprivation], disapproved on another point in People v. Snow (1987) 44 Cal.3d 216, 225, 242 Cal. Rptr. 477, 746 P.2d 452.)
The record in the present case does not indicate that the conditions of defendant's confinement so interfered with his ability to communicate with counsel or assist in the defense as to constitute a violation of defendant's rights to due process or the effective assistance of counsel. We are persuaded that the circumstances described by defendant had no prejudicial effect on his ability to assist in his defense or on counsel's ability to defend him. *455 With respect to the conditions of defendant's confinement before the evidentiary portion of the guilt phase of the trial commenced, it is evident counsel had conferred closely with defendant throughout the proceedings. The court was solicitous regarding defendant's complaints, frequently contacting jail authorities and holding hearings to attempt to resolve problems, and ordering that no searches of defendant's cell be conducted except for security reasons. As respondent observes, no material observed by sheriffs deputies during a search of defendant's cell was introduced at trial or used by the prosecution to develop its case against him, and defendant's ability to aid in his defense was not impaired by the loss of any critical legal materials in his possession. (See People v. Stansbury (1993) 4 Cal.4th 1017, 1047-1048, 17 Cal.Rptr.2d 174, 846 P.2d 756, revd. on other grounds in Stansbury v. California (1994) 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293.) Defendant incurred disciplinary sanctions in jail, but even defense counsel conceded that defendant needed to improve his behavior in order to avoid such sanctions in the future. Injuries inflicted by other inmates were minor according to a physician who testified at a hearing on the matter, and defense counsel conceded as much.
Most significantly, as noted, the comments of defense counsel and of defendant himself on the eve of the evidentiary portion of the trial establish clearly that defendant was not prejudiced by adverse circumstances of confinement but on the contrary, had been able to take advantage of adequate opportunities to assist in his own defense. When defendant made his second Faretta motion, counsel asserted that defendant was well prepared and in a good position to defend himself without any continuance, because of his excellent knowledge of the case and intimate familiarity with the legal issues involved. Counsel characterized defendant as "eminently qualified ... to handle this case," noting defendant's prior assistance to counsel and concluding that defendant knew the case as well as or perhaps better than counsel. Counsel stated he had given defendant the entire case file, and "he has worked the case, and he knows the case very very well. He probably knows this case better than many many lawyers would know it if they were representing him. The defendant has ... been given pro. per. privileges, took the most of them and made the most of them." Counsel referred admiringly to an analysis defendant had prepared of a witness's testimony, with citations to the record and footnotes, and observed that defendant had learned from counsel's and the prosecutor's motions how to express himself in a lawyerly style. Defendant, too, stated at this hearing that he was ready to proceed as his own counsel on the very day of his motion, without any continuance. Defendant asserted that he was well prepared and as knowledgeable about the case as counsel, and counsel asserted that defendant had been very helpful in assisting to prepare the defense. These statements are quite inconsistent with the contention that the conditions of defendant's confinement substantially had impaired his ability to assist in his defense or his ability to communicate with counsel.
With respect to subsequent proceedings during the guilt phase of the trial, the record also does not support the contention that the conditions of confinement caused defendant to be unable to communicate adequately with counsel or participate in the defense. On the contrary, defense counsel stated at various points in the trial that defendant had done a tremendous amount of work on the case and had been of vital assistance to counsel, and that defendant and counsel were in close communication. The court commented that the attorney-client relationship had been working well and that defendant and counsel conferred regularly. The trial court intervened with jail authorities to ensure that defendant would have access to his legal materials, and also contacted jail authorities to arrange, to the extent *456 possible, that discipline for defendant's jail infractions would not interfere with defendant's ability to participate in the proceedings by leaving him too hungry or tired. The court recessed early to accommodate defendant's need to consult his files, and invited counsel to recall a witness concerning whom defendant claimed to have been unprepared to assist formulating cross-examination. The court commented, however, that its ability to intervene was limited in part because defendant brought restrictive discipline on himself through combative behavior in jail.
Difficulties with respect to defendant's transportation schedule and with shackling in the holding cell prior to court proceedings recurred periodically, and the court responded to each of defendant's complaints by contacting the responsible sheriffs department personnel or bailiff in an effort to ameliorate the situation by securing defendant a place on an earlier bus or ensuring that his writing hand remained unshackled in the holding cell. Although these efforts were not always successful, we note that even defense counsel grew weary of defendant's complaints and chastised defendant for failing to recognize that the court had done everything in its power to ameliorate the conditions of his confinement. The court stated it had contacted the jail on every occasion when defendant complained of returning late to his cell from court, and near the conclusion of the proceedings defense counsel stated that defendant's transportation problems had been attended to and that problems relating to conditions of confinement were being taken care of as they came up.
Concerns regarding private space for attorney-client interviews were resolved speedily, and substantial attorney-client contact was ensured. The court noted that defendant and counsel conferred regularly in the courtroom in the morning and at recess, and defendant stated he had been conferring with counsel two or three times a day since the trial began. Defendant's statements to the court regarding conditions of confinement were coherent and even incisive, demonstrating no sign of mental confusion. Defendant and counsel agreed that defendant had been able to prepare a daily analysis of the proceedings with suggested questions for counsel to use in examining witnesses.
As noted, counsel made no claim during this period that the cumulative burden of adverse conditions of confinement constituted a Sixth or Fourteenth Amendment violation, nor did he make a motion for mistrial on this basis. No abuse of discretion appears in the trial court's handling of defendant's complaints, nor does the record on appeal demonstrate that defendant was unable to participate in the proceedings or confer appropriately with counsel, or that his ability to assist in his defense was impaired unconstitutionally.
With respect to defendant's contention that he suffered a violation of his right to be present at trial, we observe that except when he chose to absent himself from the trial and remain in the holding tank, defendant was present at trial proceedings that lasted for many months and in which he clearly was able to assist counsel in mounting a vigorous defense. Further, defendant does not refer to any authority establishing in what respect a mentally competent defendant has a further right to be mentally present at the proceedings. We note that trial counsel did not assert that defendant was incompetent to stand trial. Defendant was not in the position of a person whose physical disability, such as deafness, is such as to impose upon the court the duty to make reasonable provisions to aid the defendant so as to ensure that his or her presence at trial is meaningful. (See, e.g., People v. Freeman (1994) 8 Cal.4th 450, 478-479, 34 Cal.Rptr.2d 558, 882 P.2d 249 [noting duty of court to provide reasonable facilities for a hearing impaired defendant].) As we have observed, "[e]ven total physical absence from a hearing is not reversible unless the defendant's presence bears a reasonably substantial relation to the fullness *457 of the defendant's opportunity to defend against the charges." (Id. at p. 479, 34 Cal.Rptr.2d 558, 882 P.2d 249; see also People v. Medina (1990) 51 Cal.3d 870, 902-903, 274 Cal.Rptr. 849, 799 P.2d 1282, affd. sub nom. Medina v. California (1992) 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 [noting many cases in which the defendant's absence from certain proceedings was deemed nonprejudicial in light of the defendant's overall ability to defend against the charge].) In any event, as we have demonstrated, the record does not support defendant's contention that he was not "mentally present" at his trial.[22]

15. Testimony of Arvie Carroll

Defendant contends Arvie Carroll's testimony recounting defendant's jailhouse admission that he murdered Detective Williams was admitted in violation of defendant's Sixth Amendment right to counsel. (See Massiah v. United States (1964) 377 U.S. 201, 205, 84 S.Ct. 1199, 12 L.Ed.2d 246.) In addition, defendant contends the testimony was too unreliable to satisfy minimum demands of due process of law, that it was more prejudicial than probative and thereby properly subject to exclusion under Evidence Code section 352, and that it was the product of "a state-orchestrated informant scheme which, prosecutors knew, was likely to generate perjury and violate defendant's Sixth Amendment rights." Finally, defendant contends the trial court erred by denying him an evidentiary hearing on his motion to exclude the testimony of this witness.
Contrary to defendant's contention, the trial court did not deny defendant an evidentiary hearing on his motion to exclude the testimony of Arvie Carroll. The record establishes that defendant filed a motion to exclude the testimony of all jailhouse informants and for an evidentiary hearing, but that when the court called the motion for hearing, counsel submitted the matter on the pleadings. There is no suggestion that counsel still desired an evidentiary hearing or that the court rejected a demand for such a hearing.
In addition, the motion did not contend primarily that the testimony of the informants should be excluded because of any violation of defendant's Sixth Amendment right to counsel. Indeed, the motion referred to such a claim only in a footnote that states: "There is some indication that certain informers may have acted as an agent of the police at the time of the defendant's alleged statements. If at the evidentiary hearing it is determined that this is the case, defendant will move to dismiss for violation of the defendant's Sixth Amendment right to counsel." Rather, the motion contended that testimony of jailhouse informants should be excluded on the ground that such informant testimony "is so inherently unreliable that it cannot constitutionally support a capital murder verdict or death sentence; and that such informer testimony is so prejudicial that under Evidence Code [section] 352 any probative value is substantially *458 outweighed by its prejudicial impact."
In addition to referring to the asserted inherent unreliability of informant testimony, the motion stated, without reference to testimonial or documentary evidence, that the facts contained in the informants' statements were public knowledge, and "these informers have a history of selling testimony to the police in order to evade prosecution on their own criminal charges or to obtain a better deal. Some of the informers have a reputation for untruthfulness. Some of the informers' information has been refuted by other jailhouse inmates." In conclusion, the motion stated that at the evidentiary hearing, particular circumstances showing the unreliability of the informers in the present case would be shown. At the hearing, however, defendant presented no evidence and did not contend that any Sixth Amendment violation had occurred.
Assuming, without deciding, that this Sixth Amendment issue may nonetheless be raised on appeal, we find it obvious that defendant failed to carry his burden of demonstrating such a violation at the hearing on the motion. In order to make out the Sixth Amendment claim, defendant had the burden of "demonstrat[ing] that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (Kuhlmann v. Wilson (1986) 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364.) Defendant made no attempt to meet this burden in the trial court. Defendant's references on appeal to the transcript of the grand jury report regarding the use of inmates to secure incriminating statements from persons represented by counsel are unavailing. This record was not before the trial court, and we have declined defendant's request that we take judicial notice of it. The record before the trial court did not support defendant's contention that his statement to Arvie Carroll was taken in violation of his Sixth Amendment right to counsel, and we reject his contention that the trial court erred in denying the motion on that ground.[23]
Defendant's contention that Arvie Carroll's testimony was so unreliable that the trial court should have determined that its admission would constitute a violation of due process of law also is rejected. Defendant's contention that Carroll's testimony was unreliable and subject to exclusion on due process grounds for the same reason that courts exclude evidence produced by tainted identification procedures (see, e.g., Manson v. Brathwaite (1977) 432 U.S. 98, 113-114, 97 S.Ct. 2243, 53 L.Ed.2d 140) is unpersuasive, because it depends upon an unsubstantiated factual assertion that Carroll's testimony was tainted by improper procedures for securing jailhouse informant testimony. Claims that the testimony must have been unreliable or perjurious because of the informant system in the Los Angeles County jail are speculative on this record. The record before the trial court did not demonstrate that Carroll's testimony was, in fact, unreliable. In addition, we consistently have rejected the contention, made in connection with capital appeals, that informant *459 testimony is inherently unreliable. (See People v. Ramos, supra, 15 Cal.4th at p. 1165, 64 Cal.Rptr.2d 892, 938 P.2d 950; People v. Turner, supra, 8 Cal.4th at pp. 201-202, 32 Cal.Rptr.2d 762, 878 P.2d 521.) Defendant had ample opportunity to cross-examine Carroll to expose to the jury any unreliability in his testimony, an opportunity he exploited fully.
Finally, with respect to the contention that the evidence should have been excluded pursuant to Evidence Code section 352, "[w]hen an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers `substantially outweigh' probative value, the objection must be overruled. [Citation.] On appeal, the ruling is reviewed for abuse of discretion." (People v. Cudjo (1993) 6 Cal.4th 585, 609, 25 Cal. Rptr.2d 390, 863 P.2d 635.) The probative force of the evidence relating defendant's admission that he killed Detective Williams is obvious. There was no danger of undue consumption of time or of confusion of the issues. The evidence was not of a sort likely to provoke emotional bias against a party or to cause the jury to prejudge the issues upon the basis of extraneous factors. (See People v. Minifie (1996) 13 Cal.4th 1055, 1070-1071, 56 Cal.Rptr.2d 133, 920 P.2d 1337 [in the context of Evidence Code section 352, unduly prejudicial evidence is evidence that would evoke an emotional bias against one party]; People v. Zapien (1993) 4 Cal.4th 929, 958, 17 Cal.Rptr.2d 122, 846 P.2d 704 ["prejudice" as used in Evidence Code section 352 refers to the harm of prejudging on the basis of extraneous factors].) Defendant's claim that the evidence was unduly prejudicial or lacking in probative value was based upon his assumption that it was unreliable; that assumption was speculative, and the trial court was entitled to reject it. (See People v. Cudjo, supra, 6 Cal.4th at p. 610, 25 Cal.Rptr.2d 390, 863 P.2d 635 [doubts regarding the credibility of a witness do not amount to prejudice under Evidence Code section 352; credibility of witnesses is the province of the jury]; see also People v. Ramos, supra, 15 Cal.4th at p. 1165, 64 Cal.Rptr.2d 892, 938 P.2d 950 [informant testimony is not inherently unreliable].) The court was well within its discretion in-denying the motion to exclude this evidence pursuant to Evidence Code section 352, considering the facts before it at the time of the motion.

16. Accomplice testimony

Defendant contends the trial court erred in denying his motion to exclude the testimony of four accomplices who testified for the prosecution: Aladron Hunter, Jeffrey Bryant, Tyrone Hicks, and David Bentley. He urges that their testimony was so unreliable that its admission violated his right to due process of law.
At trial, defendant moved to exclude the testimony of Hunter, Bryant, Hicks, and Bentley on the ground that each "accomplice/informer will improperly skew his testimony against the defendant in order to obtain the benefit of an unconsummated plea bargain." In the alternative, defendant requested that the trial be stayed until each accomplice had been sentenced pursuant to his plea agreement. In support, he maintained that the testimony of an accomplice is inherently unreliable when it results from a plea agreement, and contended that such testimony should not be permitted in a capital case because it undermines the reliability of the factfinding process. He relied upon out-of-state authority holding that, as a matter of due process of law, accomplice testimony should be excluded not only when immunity expressly is conditioned upon specific testimony, but also when the circumstances of the plea agreement reasonably would cause the alleged accomplice to believe he must testify in a particular fashion. Defendant relies, for example upon Franklin v. State (1978) 94 Nev. 220, 577 P.2d 860, 862, which has been overruled. *460 (Sheriff, Humboldt County v. Acuna (1991) 107 Nev. 664, 819 P.2d 197,198-200, & fn. 4.)
Defendant's motion contended that the four witnesses had been afforded immunity in return for their testimony, as well as leniency in pending cases and probation violation matters. He concluded that in a capital trial, an accomplice/informer must be sentenced prior to testifying in order to eliminate the compulsion to testify falsely in a fashion favorable to the prosecution. The court denied the motion.
Defendant appears to renew the claim that with respect to the four accomplices, the existence of immunity agreements and promises of favorable treatment on unrelated pending cases  treatment that was dependent upon the accomplices' trial testimony  were circumstances that rendered the accomplices' trial testimony unreliable.
We have rejected the contention that the testimony of an immunized accomplice necessarily is unreliable and subject to exclusion. (People v. Allen (1986) 42 Cal.3d 1222, 1251-1252 & fn. 5, 232 Cal.Rptr. 849, 729 P.2d 115; see also United States v. Singleton (10th Cir.1999) 165 F.3d 1297, 1301 ["`[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence'"].) Similarly, we have rejected the contention that the testimony of an accomplice who has received a favorable plea agreement in return for his or her testimony is inherently unreliable. (People v. Andrews (1989) 49 Cal.3d 200, 231, 260 Cal.Rptr. 583, 776 P.2d 285; see also People v. Pinholster, supra, 1 Cal.4th at p. 939, 4 Cal.Rptr.2d 765, 824 P.2d 571.) We decline defendant's invitation to reconsider these points.
Immunity or plea agreements may not properly place the accomplice under a strong compulsion to testify in a particular manner  a requirement that he or she testify in conformity with an earlier statement to the police, for example, or that the testimony result in defendant's conviction, would place the witness under compulsion inconsistent with the defendant's right to fair trial. (People v. Allen, supra, 42 Cal.3d 1222, 1251-1252, 232 Cal.Rptr. 849, 729 P.2d 115.) Although we have recognized that there is some compulsion inherent in any plea agreement or grant of immunity, we have concluded that "it is clear that an agreement requiring only that the witness testify fully and truthfully is valid." (Id. at p. 1252, 232 Cal.Rptr. 849, 729 P.2d 115; see also People v. Pinholster, supra, 1 Cal.4th at p. 939, 4 Cal.Rptr.2d 765, 824 P.2d 571, People v. Sully (1991) 53 Cal.3d 1195, 1217, 283 Cal.Rptr. 144, 812 P.2d 163.) Such a plea agreement, even if it is clear the prosecutor believes the witness's prior statement to the police is the truth, and deviation from that statement in testimony may result in the withdrawal of the plea offer, does not place such compulsion upon the witness as to violate the defendant's right to a fair trial. (People v. Allen, supra, 42 Cal.3d at p. 1252, 232 Cal.Rptr. 849, 729 P.2d 115.) In addition, the testimony of persons who may be subject to prosecution as accessories unless they "cooperate" with the police is not inadmissible as coerced unless something more than the threat of prosecution is shown. (People v. Daniels, supra, 52 Cal.3d at pp. 862-863, 277 Cal.Rptr. 122, 802 P.2d 906.)
Our cases require that we review the record and reach an independent judgment whether the agreement under which the witnesses testified was coercive and whether defendant was deprived of a fair trial by the introduction of the testimony, keeping in mind that generally we resolve factual conflicts in favor of the judgment below. (People v. Badgett, supra, 10 Cal.4th at pp. 350, 352, 41 Cal.Rptr.2d 635, 895 P.2d 877.) Upon this record, we cannot conclude that any of the four accomplices *461 was under strong compulsion to testify consistently with earlier statements or in a particular manner, such that the introduction of their testimony constituted a violation of defendant's right to a fair trial.
The record indicates that before the evidentiary portion of the guilt phase began, the prosecutor disclosed which prosecution witnesses had been provided with immunity or plea agreements in return for their testimony, and the nature of the inducement each received for testifying. Witness Bentley had been promised dismissal of the charges again him in the present case and immunity for his testimony. Because of charges filed against him in the present case, Bentley also was facing a probation violation that the prosecution indicated "remains hanging in the balance until and when he testifies." Witness Hicks received immunity for his testimony in the present case and was offered "no deals" in connection with a pending probation violation or with sentencing on another conviction. Witness Hunter received immunity for his testimony in the present case and had a pending misdemeanor matter in which the prosecutor arranged for the sentence to be served in protective custody. Jeffrey Bryant received immunity as to both the Carpenter shooting and the murder of Detective Williams. Bryant received benefits such as the striking of an arming enhancement in two separate robbery cases and a sentence to county jail rather than prison. In one of these cases, the sentencing court indicated it would resentence Bryant to prison if he failed to testify in the present case. The prosecution proposed asking the court in a pending probation matter not to sentence Bryant to additional imprisonment. Bryant informed the prosecution of a number of his other offenses, but no prosecution was planned.
Contrary to defendant's contention that the witnesses received immunity upon condition they follow a prosecution script of their testimony, the trial testimony of each of the four accomplices indicates that their immunity and plea agreements were not based upon the condition that they testify in a particular manner at trial or that they testify consistently with prior statements to the police. In fact, defendant was able to impeach the witnesses with inconsistencies between their trial testimony and their pretrial statements, a circumstance that indicates that no script was followed. In addition, the testimony of the immunized witnesses was corroborated by the testimony of other witnesses such as George Carpenter, Ali Woodson, Elihue Broomfield, and Arvie Carroll, and by other evidence such as telephone and motel business records, defendant's papers displaying accomplice names and telephone numbers, and the testimony of a ballistics expert. (See People v. Sully, supra, 53 Cal.3d at pp. 1217-1218, 283 Cal.Rptr. 144, 812 P.2d 163.)
Defendant contends it can be seen that the testimony of each accomplice was unreliable because it was internally inconsistent and inconsistent with other evidence presented in the case. The defense, however, had a full and fair opportunity for cross-examination of the accomplice witnesses, whom they questioned for several days. (See People v. Sully, supra, 53 Cal.3d at pp. 1217-1218, 283 Cal.Rptr. 144, 812 P.2d 163; see also People v. DeSantis (1992) 2 Cal.4th 1198, 1220, 9 Cal.Rptr.2d 628, 831 P.2d 1210.) The jury thus was able to evaluate their credibility. We conclude that the record does not establish that defendant was denied a fair trial.
Defendant's contention that the prosecution paid the witnesses a fee for their testimony mischaracterizes the record. The witnesses had been placed in witness protection programs, and the prosecution expended the referenced sums for protective housing and food for the witnesses pending their testimony. Defendant suggests that the prosecution failed to disclose the benefits the witnesses received under the witness protection program, and that the trial court prevented the defense from cross-examining them on this point. *462 These suggestions are belied by the record, which indicates that the court determined that the total sums expended on witnesses in the witness protection program would be disclosed to the defense, and also reveals that defense counsel considered cross-examining the witnesses on this point but faced the unwelcome prospect of opening the door to prosecution evidence explaining that the witnesses were in the witness protection program not because their testimony was being purchased but in order to protect them from defendant's retributive violence. Defendant's contention that the court erred in failing to permit impeachment of Bryant with evidence of benefits he received in connection with a bail forfeiture and an additional drug offense are unavailing; the court determined the bail matter was collateral, and in any event the jury was well aware that the prosecution had promised Bryant immunity for serious uncharged violent offenses in return for his testimony against defendant.
Defendant's contention that the "witnesses followed a script to support Officer Otis Marlow's version of the case written during his interview with Aladron Hunter" is typical of the bald accusations, unsupported by record citation, that are contained in defendant's brief. Defendant's efforts to support this contention are based on speculation and innuendo. Defendant's contention that the jailhouse informant system in the Los Angeles County jail somehow affected the witnesses' testimony and should have been disclosed to the defense is equally devoid of support in the record. His contention that the trial court should have held an evidentiary hearing in which the prosecution would have the burden of proving that the witnesses' testimony would be reliable is inconsistent with settled law placing upon the defendant the obligation of raising the issue of the reliability of the testimony of immunized witnesses and carrying the burden of proof at the trial level. (People v. Badgett, supra, 10 Cal.4th at p. 348, 41 Cal.Rptr.2d 635, 895 P.2d 877; People v. Morris (1991) 53 Cal.3d 152, 190, 279 Cal.Rptr. 720, 807 P.2d 949.)
We reject the contention that the testimony of the accomplices should have been excluded pursuant to Evidence Code section 352, because no abuse of discretion is apparent. (People v. Cudjo, supra, 6 Cal.4th at p. 609, 25 Cal.Rptr.2d 390, 863 P.2d 635.) This testimony was probative; there was no danger of undue consumption of time or of confusion of the issues, and the testimony was not likely to provoke emotional bias against a party or to cause the jury to prejudge the issues on the basis of extraneous factors. (See People v. Minifie, supra, 13 Cal.4th at pp. 1070-1071, 56 Cal.Rptr.2d 133, 920 P.2d 1337; People v. Zapien, supra, 4 Cal.4th at p. 958, 17 Cal.Rptr.2d 122, 846 P.2d 704.) Defendant's claim that the evidence was prejudicial or lacked probative value was based upon his assumption that it was unreliable; that assumption was speculative, and the trial court was entitled to reject it. (See People v. Cudjo, supra, 6 Cal.4th at p. 610, 25 Cal.Rptr.2d 390, 863 P.2d 635 [doubts regarding credibility of a witness do not amount to prejudice under Evidence Code section 352; credibility of witnesses is within the province of the jury]; see also People v. Ramos, supra, 15 Cal.4th at p. 1165, 64 Cal.Rptr.2d 892, 938 P.2d 950 [informant testimony is not inherently unreliable].)
To the extent defendant contends that the trial court should have excluded the testimony of the accomplices because it was unreliable due to drug or alcohol abuse, that contention was not preserved for appeal (People v. Morris, supra, 53 Cal.3d at p. 190, 279 Cal.Rptr. 720, 807 P.2d 949), and in any event, through searching cross-examination, the jury was made aware of this potential deficiency in the witnesses' ability to observe and recollect.

*463 17. Internal affairs investigation

Defendant contends that the court erred in preventing him from presenting evidence relating to the circumstances under which a police officer secured a statement from jailhouse informant Sutton  a person who did not testify at defendant's trial and whose statement to the police was not introduced against defendant. According to the preliminary hearing testimony of Sergeant Pesante of the Los Angeles Police Department, Sutton gave a statement to Pesante indicating that defendant planned to kill a robbery victim who was to testify against him in the robbery prosecution. By the time of the preliminary hearing, Sutton had recanted, testifying at that hearing that he had not given such a statement to Pesante. That Sutton had, in fact, made such a statement to Pesante, was corroborated by Detective Slack, who testified that Pesante had relayed Sutton's statement to him, and that Slack had relayed the statement to Detective Riscens, of the Los Angeles Police Department. (Riscens, however, denied receiving this communication from Slack.) Pesante's account also was corroborated by Sutton's statements to other officers after the Carpenter shooting, in which Sutton confirmed knowing of defendant's plan to murder Carpenter and having made a statement to that effect to Pesante, and in which Sutton stated that he would not testify against defendant because he feared him. A police department internal affairs inquiry had been conducted regarding whether Sutton's statement had been conveyed by Slack to Riscens. In the context of the internal affairs investigation, Riscens denied receiving Slack's communication. At stake in the internal affairs investigation was the question whether the police had failed to warn Carpenter of the planned shooting or protect him against it, not whether Pesante had attempted to manufacture evidence against defendant by concocting a statement and falsely attributing it to Sutton.
At trial, the prosecution made a motion to exclude evidence that the police had received advance warning of the threat to Carpenter's safety but failed to warn him. Defendant contended at trial that this evidence was relevant to demonstrate that the police had manufactured evidence against him. His theory was that Pesante had lied about receiving a statement from Sutton, that the other officers colluded in this lie, and that therefore much of the evidence collected by the police could have been manufactured by them.
Some of the disputed evidence regarding the circumstances under which Sutton's statement was obtained might have been relevant to impeach Pesante's testimony, had he testified. He did not. Sutton did not testify either. None of the evidence that formed the basis for the internal affairs investigation was relevant to the present case. It did not demonstrate or even suggest that the police had manufactured evidence that was admitted against defendant; rather it demonstrated that police communications had failed, resulting in a failure to warn or protect defendant's victim, Carpenter. The internal affairs investigation indicated that one of the police officers may have lied during the investigation about whether notification of Sutton's statement had been issued or received by the police, but this circumstance did not indicate that the police had fabricated any evidence against defendant. Such questions as whether Pesante or other officers took or kept notes of relevant interviews regarding the Sutton tip, or the precise dates when the interviews took place, were collateral to any issue at trial. The trial court was within its broad discretion in determining that the evidence would consume an undue amount of time in relation to its probative value and that it therefore should be excluded. (Evid.Code, § 352; see People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125, 36 Cal.Rptr.2d 235, 885 P.2d 1.) Because the evidence had so little probative value, we also reject *464 defendant's claim that the exclusion of this evidence violated his state or federal constitutional right to present a defense (see Crane v. Kentucky (1986) 476 U.S. 683, 690-691, 106 S.Ct. 2142, 90 L.Ed.2d 636; In re Martin (1987) 44 Cal.3d 1, 30, 241 Cal.Rptr. 263, 744 P.2d 374), or the provision of the California Constitution that "relevant evidence shall not be excluded in any criminal prosecution." (Cal. Const., art. I, § 28, subd. (d).)

18. Introduction of Bentley's testimony regarding Cooper's statement

The prosecution introduced evidence intended to demonstrate that Bentley, a prosecution witness, and Cooper, who was jointly charged but tried separately from defendant and did not testify at defendant's trial, had been recruited by defendant to carry out the murder of Detective Williams, and that they and others made an abortive effort to carry out the murder shortly before that crime was committed. In the course of his testimony explaining the details of the arrangements made on the day of the abortive attempt, Bentley expressed some uncertainty whether Cooper had been in the vehicle Bentley saw depart en route to the planned shooting. Bentley later testified that he believed Cooper had been in the vehicle. Defendant sought, through cross-examination of Bentley, to establish that the reason Bentley had testified that Cooper had been present was only to make Bentley's testimony consistent with that of Hicks and to keep secure his own immunity arrangement. On redirect examination, the prosecutor sought to rehabilitate Bentley's credibility by showing how Bentley had become certain that Cooper had been in the vehicle. Over defendant's hearsay objection and objection based upon the confrontation clause of the Sixth Amendment of the United States Constitution, the court permitted Bentley to testify that he became certain that Cooper had been in the vehicle when Cooper told him, while the two men were incarcerated together: "basically that he was there in the car and that he was at the house. That was basically it." When asked whether Cooper had said why he was there, Bentley testified: "he said he was supposed to be the shooter ... [t]hat he was kind of scared. He was  you know, he really didn't want to do it." The court determined that these out-of-court statements were admissible as statements against penal interest. (See Evid.Code, § 1230.)
Defendant contends the admission of this evidence violated state law with respect to the admission of hearsay evidence, and also that its admission constituted a violation of the confrontation clause of the Sixth Amendment of the United States Constitution. It is not necessary to examine the complex constitutional question in the present case, because whether or not Bentley's testimony recounting Cooper's statements properly was admitted, it is certain under even the exacting Chapman (Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705) standard of review that any error in admitting this testimony was harmless beyond a reasonable doubt. (See Lilly v. Virginia (1999) 527 U.S. 116, 139-140, 119 S.Ct. 1887, 1901, 144 L.Ed.2d 117 [Chapman standard applicable when nontestifying accomplice's out-of-court confession erroneously is admitted at a defendant's trial].) The statements were admitted merely to rehabilitate the credibility of a witness on a tangential point. Nothing in the statements directly inculpated defendant or even mentioned him. To the extent the jury may have considered the statements as evidence of an abortive attempt to murder Detective Williams, the same evidence came before the jury in far greater detail through the testimony of Hicks and Bentley, and evidence from other witnesses also established defendant's other early efforts to arrange for the killing of Detective Williams. To the extent the evidence may have been used to bolster the credibility of Bentley, that evidence was of tangential importance as far *465 as establishing the guilt of defendant is concerned  it was Bentley's confused recollection regarding the presence of Cooper in the automobile that defendant used to impeach Bentley's credibility. Hicks, however, already had testified that Cooper had been present on that occasion, and in any event the Cooper statement was not very effective in dispelling the impression that Bentley himself lacked a good independent recollection of the events of that day. In sum, the challenged evidence was cumulative, and any error in its admission was harmless beyond a reasonable doubt.

19. Testimony of Michael T.

Defendant contends the trial court erred in admitting into evidence certain testimony of prosecution witness Michael T., a child who observed the murder of Detective Williams. Defendant contends Michael T. testified falsely when he stated he observed blood running from the lip of Detective Williams's son after the shooting. Defendant contends that the testimony was irrelevant and inflammatory, that it was elicited in bad faith by the prosecution, and that its admission constituted a violation of his right to due process of law.
Defendant objected on relevance grounds after the prosecutor already had asked the witness several questions concerning his observation that the victim's son appeared to have been injured in the shooting. The objection was sustained. It later was stipulated that Detective Williams's widow had not observed any injury to her son after the murder and that the child had received no medical treatment. When defendant made a motion for mistrial two weeks after Michael T.'s testimony on the ground the prosecutor knowingly elicited false testimony from Michael T. regarding an apparent injury to the victim's son, the court noted that defense counsel had not objected when the witness first volunteered that Detective Williams's son appeared to have been injured, and that it was too late to tell the jury to disregard the evidence. The prosecutor explained that he had not expected the witness to testify as he did and that it was not clear that this testimony was mistaken until Mrs. Williams later confirmed that she had observed no injury. The court determined that the prosecutor had not knowingly elicited false testimony, but that probably the witness simply had been mistaken  a circumstance that could be exploited by the defendant. The court instructed the prosecutor not to use the evidence in argument to the jury.
It appears defendant did not make a timely objection to the admission of the evidence at the time Michael T. first stated he had seen blood on the victim's son, so the claim may be deemed waived. (See People v. Mickey, supra, 54 Cal.3d at p. 669, 286 Cal.Rptr. 801, 818 P.2d 84.) Even if the issue has been preserved by defendant's tardy objection and his subsequent motion for mistrial on the ground that the admission of the evidence was the result of prosecutorial misconduct, and even assuming the doubtful proposition that it was an abuse of discretion to admit the evidence or to fail to instruct the jury to disregard it, any error obviously was harmless. The jury had before it the stipulation that the child's mother would testify he was not injured, so the probative value of Michael T.'s contrary testimony was minimal. Defendant apparently believes the evidence was prejudicial in that it would elicit sympathy for the victim's son and give rise to the inflammatory inference that defendant endangered the son's safety; other evidence that defendant gunned down the father in a spray of bullets as father and son approached their vehicle would give rise to the same sympathy and support the same inference. The contention that the prosecutor intentionally presented or failed to correct misleading evidence or encouraged the giving of mistaken and inflammatory testimony is without merit; there is substantial evidence supporting the trial court's determination *466 that the prosecutor did not know the witness would testify as he did, and the prosecutor did not exploit the testimony which he later concluded was probably mistaken. As the trial court observed, it is not unheard of that a witness may be mistaken in his or her testimony; it is the purpose of cross-examination to elicit the truth for the jury.
Defendant also contends the court improperly overruled his objection to the admission of evidence showing that some of the bullets fired by defendant during the fusillade on Detective Williams lodged in the wall of a classroom in the Faith Baptist Church School. Defendant contends this evidence was irrelevant and unduly prejudicial, but it was not; the number of shots fired and the circumstance that the shots sprayed over a relatively broad area were relevant to demonstrate defendant's determination to kill Detective Williams  in essence, that he mowed the officer down. This was relevant to prove malice aforethought. The evidence was not unduly prejudicial, nor was it presented in an inflammatory manner. Although defendant contends that this evidence was irrelevant and unduly prejudicial if considered by the jury at the penalty phase of the trial, it obviously was relevant as a circumstance of the crime of which defendant was convicted. (§ 190.3, factor (a).)

20. Applicability of section 190.2, subdivision (a) (10)
Defendant contends the court should have granted his motion to strike the special circumstance allegation that defendant killed Detective Williams in retaliation for his testimony in a criminal proceeding. (§ 190.2, subd. (a)(10).) He contends that this special circumstance applies only when the victim was a percipient witness of the crime to which his testimony relates. We have rejected defendant's contention. (People v. Jones (1996) 13 Cal.4th 535, 550, 54 Cal.Rptr.2d 42, 917 P.2d 1165.)
Defendant also apparently contends that the special circumstance defined in section 190.2, subdivision (a)(10), was inapplicable in his case because the plot to kill Detective Williams commenced before Williams testified at the Carpenter robbery trial, and at a time when it was not clear he ever would testify against defendant at that trial. In addition, defendant contends Detective Williams was not an important witness in the criminal proceeding. This claim is without merit. There was evidence to demonstrate that the plot to kill Detective Williams was undertaken with the purpose of preventing his testimony, thus falling within the ambit of the special circumstance as defined by section 190.2, subdivision (a)(10). (See People v. Weidert (1985) 39 Cal.3d 836, 853-854, 218 Cal.Rptr. 57, 705 P.2d 380 [section 190.2, subd. (a)(10) is applicable if defendant believes the victim will be a witness in a criminal prosecution, whether or not such a proceeding is pending or about to be initiated].) It is no defense to the special circumstance allegation that the victim was not an important witness in the criminal proceeding, so long as one of the defendant's purposes was to prevent the witness from testifying. (See People v. Stanley (1995) 10 Cal.4th 764, 800-801, 42 Cal.Rptr.2d 543, 897 P.2d 481 [special circumstance applies when multiple purposes motivated defendant, as long as one of them was to prevent the witness's testimony].) Moreover, even assuming error, the jury found this special circumstance allegation not true, and defendant's claim that he was prejudiced by an improper "inflation" of the number of special circumstance allegations is not persuasive. (See, e.g., People v. Clark, supra, 3 Cal.4th at pp. 167-168, 10 Cal.Rptr.2d 554, 833 P.2d 561.)

21. Section 190.2, subdivision (a)(7)
Defendant raises several contentions regarding the special circumstance finding that he killed Detective Williams in retaliation for that officer's exercise of his official duties. He contends first that the *467 trial court misinstructed the jury regarding the elements of the special circumstance. He contends the court misled the jury by conveying the impression that defendant's subjective view regarding the lawfulness of Detective Williams's conduct was irrelevant.
Section 190.2, subdivision (a)(7), defines the applicable special circumstance as follows: "The victim was a peace officer as defined ... who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or her duties; or the victim was a peace officer as defined ... and was intentionally killed in retaliation for the performance of his or her official duties."
It was alleged that defendant intentionally killed Detective Williams in retaliation for the officer's performance of his official duties within the meaning of section 190.2, subdivision (a)(7). The court instructed the jury as follows: "To find that the special circumstance referred to in these instructions as murder of a peace officer is true each of the following facts must be proved: [¶] One, that the person murdered was a peace officer. [¶] And, two, that he was intentionally killed in retaliation for the performance of his official duties, [¶] And, three, that the defendant knew or reasonably should have known that the person killed was a peace officer engaged in the performance of his duties." (See CALJIC No. 8.81.7.) In addition, the court instructed the jury: "For the purpose of these instructions, a Los Angeles Police Detective is a peace officer. [¶] The phrase in the performance of his duties as used in these instructions means any lawful act or conduct while engaged in the maintenance of the peace and security of the community or in the investigation or prevention of crime." (See CALJIC No. 8.81.8.)
Defendant contends the court failed to instruct the jury that in order to find the allegation true, it must find that defendant retaliated against the officer with the subjective intent to exact revenge for the officer's lawful performance of his duties. He contends that, in fact, the "knew or should have known" language describing the third factual issue presented by the instruction actively misled the jury on this point. An intent to retaliate for the officer's conduct that the defendant subjectively believed was unlawful would not, according to defendant, constitute the intent necessary to support this special circumstance finding. Defendant contends that this alleged misinstruction  or at least the court's failure to clarify it  was prejudicial, because there was substantial evidence that defendant killed Detective Williams in retaliation for what defendant believed was the officer's unlawful conduct in framing him for the Carpenter robbery. In addition, he apparently contends that even if an objective standard were applicable, the court failed to define adequately what constituted an officer's lawful performance of his or her duties. In defendant's view, the jury should have been instructed that the officer would not be performing his official duties if he were manufacturing a case against defendant in the robbery prosecution.
Specifically, defendant contends on appeal that the trial court should have instructed the jury sua sponte: "In determining whether the victim was killed in retaliation for the performance of his official duties, you must view the retaliated-against conduct as it was understood by the defendant. If the defendant believed the victim manufactured evidence against him, and retaliated for that perceived conduct, the victim was not killed in retaliation for the performance of his official duties." Defendant contends the court's faulty or incomplete instruction violated his right to due process of law, to fair notice, to trial by jury, and to a fair and reliable determination of his guilt of capital murder.
*468 To the extent defendant's claim is that the court failed to give clarifying or amplifying instructions, the claim is waived because defendant did not request such clarification below. (People v. Sully, supra, 53 Cal.3d at p. 1218, 283 Cal.Rptr. 144, 812 P.2d 163.) To the extent his claim is that the court misled the jury regarding the special circumstance allegation, or failed to instruct on a defense supported by the evidence, the claim is rejected, as we shall explain.
In making his claim, defendant relies upon the well-established rule that when a statute makes it a crime to commit any act against a peace officer engaged in the performance of his or her duties, part of the corpus delicti of the offense is that the officer was acting lawfully at the time the offense was committed. (In re Manuel G. (1997) 16 Cal.4th 805, 815, 66 Cal.Rptr.2d 701, 941 P.2d 880; People v. Gonzalez (1990) 51 Cal.3d 1179, 1217, 275 Cal.Rptr. 729, 800 P.2d 1159 [applying rule to section 190.2, subdivision (a)(7)].) Disputed facts relating to the question whether the officer was acting lawfully are for the jury to determine when such an offense is charged. (People v. Gonzalez, supra, 51 Cal.3d at p. 1217, 275 Cal.Rptr. 729, 800 P.2d 1159.)
The rule defendant relies upon requires that the officer's lawful conduct be established as an objective fact; it does not establish any requirement with respect to the defendant's mens rea. Rather, the rule is based upon the statutory definition of the crime, and "flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in `duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful...." (People v. Gonzalez, supra, 51 Cal.3d at p. 1217, 275 Cal.Rptr. 729, 800 P.2d 1159.) Accordingly, the defendant's subjective understanding that the officer's conduct was lawful is not an element of proof. Defendant is unable to point to any language in section 190.2, subdivision (a)(7) that would support a contrary conclusion. We observe that in the first part of the subdivision defining the special circumstance of killing a peace officer engaged in the performance of his or her duties, the statute does contain a knowledge component requiring that the defendant know the identity of the victim as a peace officer.[24] In the second part, no knowledge requirement appears. This omission presumably occurred because the defendant's knowledge of the victim's identity as a peace officer is established by the jury's determination that the defendant acted with the purpose of retaliating for the officer's conduct of his or her official duties. Certainly there is no basis for interpreting the portion of the special circumstance relating to retaliation to require that the defendant have a subjective belief that the officer was acting lawfully when he or she performed the duties for which defendant sought to retaliate. Such an interpretation would be inconsistent with the purpose of the special circumstance to afford special protection to officers who risk their lives to protect the community, and obviously would undermine the deterrent effect of the special circumstance. (See People v. Rodriguez (1986) 42 Cal.3d 730, 781, 230 Cal.Rptr. 667, 726 P.2d 113.)
Defendant relies upon People v. Weidert, supra, 39 Cal.3d 836, 218 Cal.Rptr. 57, 705 P.2d 380, in support of a contrary conclusion. In that case we held that when it is alleged that the defendant killed a witness to prevent his or her testimony, it is the defendant's subjective purpose to prevent the witness from testifying that must be proved. It is not critical, we said, whether the witness ever had been called upon to testify. (Id. at p. 853, 218 Cal.Rptr. 57, 705 P.2d 380.) This case is not helpful to defendant. Although the special circumstance at issue in the present case requires a subjective purpose to retaliate for performance *469 of official duties  and that performance must in fact have been lawful  the special circumstance does not require a subjective awareness on the part of the defendant that the officer had acted lawfully in performing those official duties.
Defendant's additional contention that the court should have expanded upon the definition of "performance of official duties" by explaining to the jury that an officer who attempts to frame a defendant for a crime is not performing his or her official duties is waived, because defendant did not request such a clarification below. (People v. Sully, supra, 53 Cal.3d at p. 1218, 283 Cal.Rptr. 144, 812 P.2d 163.) Further, even if we were to reach the merits, we believe it would be obvious to the jury under the definition supplied by the court that such egregious misconduct on the part of an officer would not constitute "any lawful act or conduct while engaged in the maintenance of the peace and security of the community or in the investigation or prevention of crime." (CALJIC No. 8.81.8, italics added; see People v. Hardy, supra, 2 Cal.4th at p. 153, 5 Cal.Rptr.2d 796, 825 P.2d 781 [jurors are presumed to possess ordinary intelligence and to be able to understand the meaning of words in their common and ordinary application].)
There is no merit in defendant's contention that trial counsel was incompetent in failing to request special instructions suggesting that defendant may have killed Detective Williams under the impression that the detective had framed him for the Carpenter robbery. (See Strickland v. Washington (1984) 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.) Counsel could not possibly have been incompetent in this respect, because defendant's subjective awareness of the legality of the detective's conduct in pursuing his duties was not at issue. With respect to counsel's failure to request instructions informing the jury that if Detective Williams had framed defendant for the Carpenter robbery, the detective had not lawfully performed his official duties, the record sheds no light on why counsel failed to request clarifying or amplifying instructions. Counsel was not asked for an explanation, nor is it the case that there could be no satisfactory explanation for counsel's performance. The point was obvious under the instructions given, and in any event counsel may have had a tactical reason not to emphasize defendant's possible motive for killing the detective since the defense theory was that defendant had not committed the crime. Counsel may have preferred to contend that the acts and omissions of the police throughout the investigation of all the charged crimes demonstrated that the police were intent upon securing defendant's conviction through fair means or foul, thus attempting to throw doubt on all of the prosecution's evidence. In view of the state of the record, we reject this claim on appeal. (People v. Smithey (1999) 20 Cal.4th 936, 986, 86 Cal.Rptr.2d 243, 978 P.2d 1171.)
There also is no merit in defendant's final contention that insufficient evidence supported the jury's finding that defendant killed Detective Williams in retaliation for his lawful performance of his official duties. Substantial evidence supported this finding. (See People v. Mayfield, supra, 14 Cal.4th at pp. 790-791, 60 Cal.Rptr.2d 1, 928 P.2d 485 [applying substantial evidence test to proof of this special circumstance].) There was substantial evidence that the officer was engaged in the lawful performance of his duties in investigating and assisting in the prosecution of defendant for the Carpenter robbery, since the victim gave the police a vehicle license number of the vehicle used in the robbery, which was traced to defendant, and there was evidence the victim positively identified defendant at the preliminary hearing as one of the robbers. There was substantial evidence that defendant killed Detective Williams in retaliation for the detective's part in the Carpenter prosecution, because there *470 was evidence that defendant told Arvie Carroll and Elihue Broomfield as much.

22. Prosecutorial misconduct

Defendant contends the prosecutor committed misconduct requiring reversal in failing to inform the defense, before the preliminary hearing, of Arvie Carroll's statement to the police, and in failing to inform the defense of the system used in the Los Angeles County jail to employ inmates to secure unreliable statements from notorious defendants. These contentions are restatements of arguments rejected above and are no more persuasive in this new format. The delay in providing the defense with Arvie Carroll's statement was not prejudicial, and there is no evidence in the appellate record supporting the second contention. It adds nothing of substance to defendant's claim to refer to Carroll's trial testimony that Carroll was well versed "in the intricacies of living inside jails," that Carroll knew other inmates who were informants, that he was a trusty who spent substantial time with defendant and acted as defendant's contact with the outside world, and that Carroll offered information to the authorities, and offered to inform them of any recollections that occurred to him regarding defendant's statement to him.
Defendant also contends the prosecutor committed misconduct in stating in closing argument that "the prosecution has given [Arvie Carroll] nothing and he asked for nothing." Defendant also complains that the prosecutor informed the jury that Carroll's testimony constituted corroboration of the testimony of defendant's accomplices. No objection appears in the record, however, and thus the claim is waived. (See People v. Millwee, supra, 18 Cal.4th at p. 149, 74 Cal.Rptr.2d 418, 954 P.2d 990; People v. Benson (1990) 52 Cal.3d 754, 794, 276 Cal.Rptr. 827, 802 P.2d 330.) We reject defendant's contention that his failure to object should be excused because he had been precluded at trial from establishing the existence of the jailhouse informant system, because this claim is not supported by the record. In any event no misconduct appears, because the prosecutor's statements are consistent with testimony offered at trial. Defendant's contention that the cumulative effect of various instances of prosecutorial misconduct deprived him of due process of law fails, because he has not established that prosecutorial misconduct occurred or (in the case of the claim of delayed discovery) that any misconduct was prejudicial.

23. Jury instructions

a. Instruction on liability as an aider and abettor
Defendant contends the court erred in instructing the jury that defendant could be found guilty of murder either as a direct perpetrator or as an aider and abettor, because the prosecutor had contended throughout the proceedings that defendant was the person who shot Detective Williams. Although defendant does not contend that there was insufficient evidence upon which the jury could have found him guilty as an aider and abettor, he contends the instruction violated his right to notice of the defenses he should present, in violation of the constitutional guarantee of due process of law.
As we have explained in earlier cases, "an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely." (People v. Diaz (1992) 3 Cal.4th 495, 557, 11 Cal. Rptr.2d 353, 834 P.2d 1171, and cases cited.) Normally, "the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing...." (Ibid.) In the present case, we believe that defendant was put on actual notice through the conspiracy charge that he could be subject to accomplice liability for the murder of Detective Williams. (See People v. Garceau (1993) 6 Cal.4th 140, 183, 24 Cal. Rptr.2d 664, 862 P.2d 664 [an accomplice is *471 one who either aids and abets in the commission of the offense or conspires to commit the offense]; 1 Witkin & Epstein, Cal.Criminal Law, (2d ed. 1988) Introduction to Crimes, § 85, pp. 100-101 [aiding and abetting liability may be based upon evidence of conspiracy].)

b. Unanimity instruction
Defendant also contends that because the jury was instructed on accomplice liability as well as on premeditated murder, state and federal constitutional principles of due process of law and the right to a unanimous jury verdict required the trial court to instruct the jury on the need for unanimity as to the facts upon which any conviction for the crime of murder was based. He acknowledges we have held that there is no requirement that the jury unanimously agree upon the theory of the defendant's culpability, and that this rule has been applied to theories of guilt premised upon aiding and abetting and direct culpability. Nonetheless, he contends that in the unusual circumstances of his case, jurors who found him guilty as an aider and abettor would have to find a set of facts to be established entirely different from the facts that jurors would rely upon to find him guilty as a direct perpetrator. Under these circumstances, he claims, the choice between aiding and abetting and direct culpability was essentially factual. Jurors are required, he contends, to reach a unanimous verdict as to the factual basis for their verdict. Under the peculiar circumstances of his case, he concludes, the unanimity instruction should have been given.
We disagree. We have stated: "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator.... [¶] ... [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (People v. Santamaria (1994) 8 Cal.4th 903, 918-919, 35 Cal.Rptr.2d 624, 884 P.2d 81; see also People v. Beardslee (1991) 53 Cal.3d 68, 92, 279 Cal.Rptr. 276, 806 P.2d 1311.) Defendant contends that different facts would support aiding and abetting liability and liability as a direct perpetrator, but, as we have explained, the jury need not unanimously agree "on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder." (People v. Pride, supra, 3 Cal.4th at p. 250, 10 Cal.Rptr.2d 636, 833 P.2d 643.) Naturally, in order to return a guilty verdict, the jury must agree unanimously that each element of the charged crime has been proved, but the factors that establish aiding and abetting liability are not included as elements of the crime of murder. (People v. Prettyman (1996) 14 Cal.4th 248, 271, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)
The United States Supreme Court also has explained that the jury need not agree on the means by which a crime has been committed, stating that it is appropriate that "`different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" (Schad v. Arizona (1991) 501 U.S. 624, 631-632, 111 S.Ct. 2491, 115 L.Ed.2d 555.)
Defendant contends that the circumstances in support of his potential accomplice *472 liability  that he was far from the scene when the murder occurred but had aided and abetted in it  were so distinct from the circumstances in support of his potential direct liability  that he had been at the scene and had pulled the trigger  as to constitute two "discrete criminal events" requiring the unanimity instruction. He relies upon authority indicating that the unanimity instruction is required if there are multiple acts shown that could have been charged as separate offenses. (See People v. Beardslee, supra, 53 Cal.3d at p. 92, 279 Cal.Rptr. 276, 806 P.2d 1311 ["A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses"].) In the present case, defendant's conduct as an aider and abettor or as a direct perpetrator could result only in one criminal act and one charge. Under these circumstances, "[j]urors need not unanimously agree on whether the defendant is an aider and abettor or a principal even when different evidence and facts support each conclusion." (People v. Davis (1992) 8 Cal.App.4th 28, 45, 10 Cal.Rptr.2d 381; see also People v. Santamaria, supra, 8 Cal.4th at p. 919, 35 Cal.Rptr.2d 624, 884 P.2d 81.)

24. Deliberations  reading of transcripts to the jury

Defendant contends the trial court erred in permitting certain testimony to be read to the jury during its deliberations without notifying counsel of the jury's request for the reading of this testimony. Although defendant notes that this omission occurred on more than one occasion, he contends the court erred prejudicially in reading the testimony of prosecution witnesses Broomfield and Bentley.
Section 1138 provides that a deliberating jury experiencing disagreement regarding testimony or desiring to be informed on any point of law may pose questions to the court, and "[u]pon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."
In the present case, during guilt phase deliberations, and in the stipulated absence of counsel, the jury requested to have read back to it the testimony of Broomfield and Bentley from particular dates of the trial, and this request was granted. When defense counsel learned of this occurrence two days later, he objected to the reading of testimony without notice to him and moved for a mistrial. He noted that the testimony requested included only direct examination, and contended that the jury may have wanted to hear direct examination and cross-examination as to a particular point, but not the entire direct examination for an entire day. He urged that when direct testimony is read to a jury, cross-examination normally should be read as well. He also contended that the reporter might have read sidebar discussions by mistake in counsel's absence. At a hearing on the motion for mistrial held one week after the testimony was read to the jury, it appeared that the court and defense counsel had widely differing interpretations of an earlier sidebar discussion at which it was agreed that counsel and the court would not be present during the reporter's reading of testimony to the jury. The court apparently thought counsel had waived notification of jury requests for the reading of testimony, while counsel believed he had waived only his presence in the courtroom while agreed-upon testimony was read. The court conceded that counsel had received no notification of the jury's request with respect to the reading of the testimony of Broomfield and Bentley. Although it denied the motion for mistrial, it sent an inquiry to the jury to determine whether the reading of additional portions of the testimony of Bentley and Broomfield, including cross-examination, would be useful to it. It also inquired whether the jury wished to have read to it additional testimony of any other witness whose testimony previously had been read *473 back to it. The jury declined both offers. The court also offered to counsel to have Bentley's and Broomfield's testimony read to the jury again in counsel's presence, so he could be certain the reporter did not unduly emphasize certain testimony or read the sidebar discussions. This offer was declined by counsel.
It does not appear on this record that trial counsel waived the statutory right to be notified of jury requests for the reading of testimony (See § 1138; see also People v. Jennings, supra, 53 Cal.3d at p. 391, 279 Cal.Rptr. 780, 807 P.2d 1009), so we have no occasion to consider whether such notification may be waived under these circumstances. Nonetheless, "[a] conviction will not be reversed for a violation of section 1138 unless prejudice is shown." (People v. Frye (1998) 18 Cal.4th 894, 1007, 77 Cal.Rptr.2d 25, 959 P.2d 183.) The court's error in failing to notify counsel that the jury had requested the reading of certain testimony of Bentley and Broomfield, thereby depriving counsel of an opportunity to object or be present, was harmless. (See id. at pp. 1007-1008, 77 Cal.Rptr.2d 25, 959 P.2d 183 [noting that cases have applied varying standards of review to claims of error under section 1138, some applying the standard of review for federal constitutional error involving denial of counsel at a critical stage, and some a lower standard for nonconstitutional error]; see also People v. Jennings, supra, 53 Cal.3d at p. 384, 279 Cal.Rptr. 780, 807 P.2d 1009.) Counsel should be notified in order to ensure that counsel has an opportunity to object to the course of action undertaken by the court or suggest an alternative course (see People v. Wright (1990) 52 Cal.3d 367, 402, 276 Cal.Rptr. 731, 802 P.2d 221), but the primary goal served by section 1138 is to provide the jury with the evidence it needs for its deliberations. (People v. Frye, supra, 18 Cal.4th at p. 1007, 77 Cal.Rptr.2d 25, 959 P.2d 183.)
In the present case, the jury made it clear in its original request that it was interested in hearing only the testimony of Broomfield and Bentley from specified dates; when given an opportunity to hear the cross-examination of these witnesses, it declined the court's invitation. The trial court observed that the court reporter customarily does not read sidebar commentary when reading back testimony to a jury. (See People v. Wader (1993) 5 Cal.4th 610, 661, 20 Cal.Rptr.2d 788, 854 P.2d 80 [applying presumption that official duty has been regularly performed to court reporter's reading of testimony as requested by jury].) We note that the jury asked for the reading of testimony on multiple occasions throughout its lengthy deliberations, and appears to have been very meticulous in requesting that only specific portions of testimony  sometimes including cross-examination  be read. The court's inquiry whether the reading of additional testimony was needed occurred when the jury had not yet concluded its deliberations and thus at a time when clarification still would have been useful, had the jury felt it was needed. (See People v. Jennings, supra, 53 Cal.3d at p. 385, 279 Cal.Rptr. 780, 807 P.2d 1009 [court's ex parte communication with jury found harmless in part because the court offered to give the jury additional curative admonitions].) In light of the court's specific inquiry whether the jury wished to hear additional portions of the testimony of Bentley and Broomfield and the jury's response, and the circumstance that the testimony that was read to the jury clearly was admissible and met the jury's precise request, the tardy notification of counsel and counsel's absence from the reading of the testimony cannot have had any effect upon the verdict.

B. Penalty Phase Issues

1. Notice of evidence in aggravation

Defendant contends that he received inadequate notice of evidence the prosecution was permitted to present in aggravation, in violation of section 190.3. He also contends the trial court erred in failing to *474 grant him a continuance to prepare to meet this evidence.
Before trial, the prosecution filed notice of the evidence it intended to present in aggravation at the penalty phase. The notice stated that the People would present "oral testimony, documentary evidence, and any other conceivable evidence with respect to ... acts, arrests, incidents, and circumstances surrounding" listed incidents, including several uncharged robberies and a 1978 conviction for assault with a deadly weapon committed against Horace Monroe, Jr. At a pretrial hearing on a defense motion to strike the notice on the ground it was untimely and vague, the prosecution agreed to delete the uncharged robberies from the list of incidents, and the court denied the motion to strike.
After entry of the guilt phase verdict, the prosecution proposed to call witnesses who would testify not only as to the circumstances of the assault upon Horace Monroe, Jr., as to which defendant had pleaded guilty, but also as to the circumstances of a related assault on Horace Monroe, Sr., the following day. Both assaults had been charged in the same information, but the second charge was dropped (along with another charge) pursuant to a plea agreement. Defendant (through counsel) objected that he had received no notice that evidence of the second incident would be presented, and that he was not prepared to respond to the prosecution's evidence regarding the second assault. Counsel contended he would have interviewed witnesses and investigated the matter had he received timely notice. After considering the matter for several days, the court determined that the evidence fell within the notice given, because the dismissed count constituted an "arrest[ ], incident[ or] circumstance[ ] surrounding" the conviction that the prosecution gave notice it would use in aggravation. No continuance was granted.
The trial court did not abuse its discretion. Notice pursuant to section 190.3 that the prosecution will present evidence relating to a prior crime or conviction is sufficient to alert the defense that evidence regarding uncharged crimes or other misconduct committed as part of the same incident or course of conduct as the prior crime or conviction may be offered. (People v. Arias, supra, 13 Cal.4th at p. 166, 51 Cal.Rptr.2d 770, 913 P.2d 980 [reference to circumstances underlying crime described in police report gave adequate notice of the defendant's threat after his arrest]; People v. Visciotti (1992) 2 Cal.4th 1, 70, 5 Cal.Rptr.2d 495, 825 P.2d 388 [notice regarding a specific prior crime puts counsel on notice regarding crimes committed as part of the same course of conduct].) In the present case, the two assaults were interrelated and involved defendant's attempt, over a two-day period, to intimidate or retaliate against members of the same family after one family member had interfered with defendant's automobile. Defendant had pretrial notice that the prosecution intended to present evidence of acts, arrests, incidents, or circumstances surrounding the 1978 assault conviction, and the second assault clearly constituted a circumstance surrounding the conviction.
In addition, "[a]ctual notice may be provided not only by the statutory notice, but by supplemental information such as police reports." (People v. Bradford, supra, 15 Cal.4th at p. 1359, 65 Cal. Rptr.2d 145, 939 P.2d 259.) As the prosecutor noted, defendant received the police report relating to the second assault long before trial.
In any event, no reasonable possibility of prejudice appears from the asserted defect in the notice or the denial of continuance. (See People v. Bradford, supra, 15 Cal.4th at p. 1360, 65 Cal.Rptr.2d 145, 939 P.2d 259 [examining record for reasonable possibility of prejudice arising from asserted defective notice].) As noted, defendant received the police report regarding both assaults during pretrial *475 discovery, thus affording him an opportunity to perform any necessary investigation, and the police officer who prepared the crime report regarding the second incident was present in court and available for examination. In addition, defendant (who by this time was representing himself) was able to examine the witnesses to the second assault quite effectively. His examination demonstrated detailed familiarity with the witnesses' statements to the police at the time of the crime and with their testimony at the trial of an accomplice. He successfully impeached them by pointing out gross inconsistencies between their current testimony and both their testimony in the previous proceeding and the police report.
Defendant's contention that with earlier notice, he could have contacted the other suspects described in the police report is unavailing. The report contained no names or clues as to the identity of other suspects, and indeed their supposed presence was contradicted by the witnesses at the penalty phase, who stated that only defendant and his accomplice Ali Bryant had been involved. Nor could late notice of the second assault have affected the defense strategy adversely, because this strategy already would have taken into account the closely related assault conviction. In fact, counsel stated that the defense team had been careful in constructing the penalty phase defense not to elicit evidence of defendant's peaceable nature or lack of hostility, in order to avoid opening the door to further evidence of prior misconduct. (See § 190.3.)

2. Allegation that the penalty phase was a "sham"

Defendant contends that for several reasons the penalty phase of the trial was a "sham" and that the penalty verdict should be reversed. He asserts that the trial court not only abused its discretion in various respects, but also that the proceedings violated his right to due process of law, his Sixth Amendment rights to represent himself, to counsel, and to present a defense, and his Eighth Amendment right to a fair and reliable penalty determination.
Defendant notes that the penalty phase of a capital trial necessarily requires time for preparation. He observes that in his case, the trial court itself assured him at the commencement of the trial that there would be time for penalty phase preparation between the guilt phase and the penalty phase, and noted that the normal period between the two phases was two weeks. Defendant represented himself at the penalty phase and contends that although he concededly impeded his counsel's penalty phase preparation during the guilt phase, he diligently prepared for the penalty phase as soon as he achieved cocounsel status. He complains that counsel effectively withdrew at this point, leaving him completely on his own to prepare. He contends that the court treated him more harshly than it would have treated any counsel or any other pro se defendant, particularly in denying requests for short continuances to prepare his defense and to prepare to meet unexpected evidence presented by the prosecution. He also contends that after he was granted full pro se status, the courtroom bailiff informed him that he would not be permitted to speak with any potential witness in the courthouse. He was unable, he claims, to contact witnesses from the jail after court sessions, because his transport was so delayed that he arrived at the jail after the attorney visiting room was closed and the telephone was off limits. He contends that he was not permitted to meet with his sentencing consultant in court, and that he was cut off from any contact with his investigator. He also alleges he was forced to make telephone calls at his own expense, that he was forced to proceed with the case while ill, and that he was not allowed to place exhibits on the blackboard or approach the jury during closing argument. He alleges that the trial court delegated to the sheriffs department its authority over security at the penalty phase, *476 and abandoned its duty to preside over an impartial proceeding. He further alleges that prosecutorial misconduct occurred during closing argument, and that the court improperly limited his own closing argument. These constraints and violations, he contends, impaired or destroyed his ability to present a defense.
Defendant paints a picture of a court that ran roughshod over him, forcing him to proceed pro se to the penalty phase immediately after the guilt verdict, although he was completely unprepared. He asserts that the court refused to allow him any time for preparation and countenanced security measures that made it impossible for him to contact his witnesses, prepare them to testify, or, indeed, determine what they would say. Our careful examination of the record leads us to conclude that many of defendant's contentions are not supported by the record, and that the trial court did not abuse its discretion or violate defendant's constitutional rights in ruling on defendant's motions or in its conduct of the penalty phase. In the limited instances in which the procedures followed by the trial court appear questionable, no prejudice appears.

a. Factual background
The record discloses that jury selection commenced in October 1987, and that the jury returned a verdict of guilt on July 27, 1988. On the latter date, the parties agreed that the penalty phase of the trial would commence on August 8, 1988. This afforded defendant, who still was represented by counsel, 12 days for further preparation.
On August 1, 1988, defendant requested to proceed pro se. Counsel informed the court that early in counsel's preparation for defendant's trial, defendant had instructed family and friends not to speak to counsel or the defense investigator regarding penalty phase issues, and that defendant refused to call such persons as witnesses at the penalty phase unless he represented himself. Defendant himself explained that although in the early stages of the case he had spoken repeatedly to witnesses who would be useful to him at the penalty phase, these persons wished only to speak to him and were extremely reluctant to speak to his attorney or to his investigator, both of whom they found intimidating. He explained that the witnesses would perform better under his direct examination than under counsel's. Counsel explained that these witnesses, of whose identity and potential testimony counsel seemed well aware, would touch on family matters and emotional issues, and would perform best under defendant's examination. The court suggested that defendant should act as cocounsel and conduct the direct examination of his witnesses. The matter was not resolved.
On August 4, 1988, defendant proposed to accept the court's compromise arrangement with respect to his status as cocounsel, but counsel moved for a two-week continuance to contact witnesses and conduct investigation. In connection with the request for a continuance, the court heard the testimony of Dr. Balkan, who had acted as defendant's penalty phase consultant since late in 1986. She stated that it was her duty to obtain a full history of defendant, to interview family, friends, employers, coworkers, and individuals who had known defendant in school, but that defendant had not cooperated with her. When earlier in the proceedings she attempted to contact family and friends on her own, they refused to discuss defendant's history, stating they were acting on his instructions. Defendant confirmed that he had instructed his family and friends not to speak to counsel, the defense investigator, or the penalty phase consultant. Defendant recently had changed his mind and produced a list of 11 or 12 friends and relatives who should be interviewed, including two brothers, a friend who had observed his efforts to save the life of a stranger, and his aunt. He had changed his mind because the court proposed to permit him to conduct direct examination *477 of his witnesses. He explained that he had known all along that if there were a penalty phase, he would present his own case.
The court denied the motion for a two-week continuance, observing that the case in mitigation would not take a great deal of preparation because of defendant's familiarity with what his witnesses would testify to concerning his background. The court stated: "He admits he knows the witnesses and the aspects of his character and history that they would testify to." The court acknowledged that the case was a very serious one, but observed that jury selection had commenced the previous October, that defendant had failed to cooperate in preparing for the penalty phase, that a continuance would be an inconvenience for the People's witnesses who were already under subpoena pursuant to counsel's earlier agreement that the penalty phase would commence on August 8, 1988, and that a continuance would present a great inconvenience to the jurors. The court concluded that these considerations outweighed the benefit to be gained by a continuance and the need defendant had attempted to establish in support of his motion. The court pointed out that the People's case would take time, and that defendant could commence with his local witnesses, giving time for out-of-town witnesses to fly in. Counsel objected, stating that interviews with existing witnesses might produce other evidence that would necessitate further investigation. He reiterated his request for a two-week continuance and then asked for one week. The court refused, suggesting the defense start with local witnesses, then make an offer of proof as to when other witnesses could be made available. Counsel complained again, stating that his investigator was out of town, that counsel was occupied with another case on the following day, and that they needed time to interview witnesses and follow up leads. The court instructed counsel that if he needed breaks in the presentation of evidence to obtain the presence of witnesses, he should inform the court.
On August 8, 1988, counsel explained that there had been an irremediable breakdown in the attorney-client relationship, and that defendant insisted on relitigating guilt phase issues and had told counsel that if defendant were not permitted to conduct the case his own way, he would not participate and would direct his witnesses not to honor any subpoenas. Defendant requested to proceed pro se, stating that counsel had tricked him. He said: "I am prepared and I know the issues of what to ask the witnesses, my witnesses that I will call. I am prepared for that. I worked all weekend on this.... [T]o hear [counsel] tell me that I am not prepared to do the direct examination on my own witnesses ... that is absurd."
Counsel renewed the motion for continuance, stating there was compelling mitigating evidence that was not readily available. He produced the consultant, Dr. Balkan, who said that she had been unable to reach crucial witnesses and that family witnesses should be produced to testify regarding defendant's background and their love for him, his mother's mental health problems, and his experience in foster care. She stated defendant had two brothers in Kansas City who were stable and law abiding and should be called as witnesses. Counsel listed 13 key witnesses  most of whom actually testified at the penalty phase, as it turned out. The court pointed out that many of the witnesses lived locally, and that the prosecutor's case and the local witnesses' testimony would take long enough to provide time to contact and secure the presence of out-of-town witnesses. The court assured counsel that the penalty phase would proceed at a leisurely pace, pointed out days on which the court would not be in session, and said there was no deadline by which defendant would have to complete the defense case. It commented that difficulties defendant might experience in interviewing the witnesses were part of the dilemma of proceeding *478 pro se. It also pointed out that if granting defendant's motion to proceed pro se required a continuance, that would be one ground not to grant the motion.
The court then examined defendant, who acknowledged that he would receive no additional time or services beyond what were afforded to counsel, and granted the motion to proceed pro se. Counsel remained as advisory counsel, stating that he was willing to handle legal matters such as jury instructions, but that he would be unable to handle evidentiary matters.[25] Counsel again asked for a continuance, stating that defendant was not prepared to proceed. The court reiterated that defendant would not need to produce a witness until August 15, and that defendant had known who his penalty phase witnesses would be all along.
The prosecution presented its evidence in aggravation on August 8 and 9, 1988. On August 9, 1988, defense counsel, still serving in an advisory capacity, requested that the court allow Dr. Balkan to make a statement. She stated that she was unable to perform her duties without the involvement of a lawyer and without more time to prepare. The court reminded her that defendant had elected to proceed without counsel. Dr. Balkan complained that she was unable to confer with defendant while court was in session because no facilities existed in the courthouse to permit this, and the court advised her to consult with him at the county jail the following day. She replied she was busy on another matter the following day. The court stated she could confer with him briefly in the courtroom. She stated she needed to speak with him for many hours, that there were 25-40 witnesses to cover, that she had to interview these persons, and that defendant needed to know what to ask them. Advisory counsel agreed that there had been insufficient time to prepare.
When the prosecution rested on August 9, 1988, the court inquired whether defendant had witnesses ready for Thursday, August 11, 1988. Defendant stated he needed to consult advisory counsel, but counsel objected that he did not know what was going on and had no responsibility for securing witnesses.
On Thursday, August 11, 1988, defendant requested a continuance to locate other suspects who a police report indicated might have been involved in one of the prior criminal acts relied upon by the prosecution in aggravation. The court denied the motion, stating that the police officer who had prepared the report was present and available to testify, and pointing out that defendant had received the police report in discovery a year before. Defendant then stated his expert witness from Florida would not come unless counsel contacted him, which counsel agreed to do. The court stated that defendant was not required to complete the defense case by early the following week, but instead that there was "absolutely no time limit on your evidence in mitigation." Counsel stated he would not help contact witnesses, apart from the recalcitrant expert, but that the defense investigator, Rohman, would do so. The court advised defendant to make use of the defense investigator in contacting and interviewing witnesses, and pointed out that defendant himself would be able to contact witnesses over the weekend. The court ordered that defendant be given access to the telephone at the jail. The bailiff announced that defendant would be unable to interview witnesses at the courthouse, and would have to interview them at the jail.
Counsel then announced that Dr. Balkan was withdrawing from her duties. He filed a motion for a continuance based upon Balkan's declaration that she needed more time for investigation of existing witnesses and potential other witnesses. Counsel stated the consultant was unable to speak to defendant at the jail because the attorney visiting room was closed on *479 the weekend, defendant returned to the jail so late on court days that visiting hours were over, and she was not permitted to speak with defendant at the courthouse. When the prosecutor pointed out that there had been no court session the day before and that there would be none the following day, a Friday, it appeared that the consultant was not available on either of those days. The court observed that the consultant had not stated how much more time was needed, that defendant had agreed at the time of the guilt verdict that the penalty phase would commence on August 8, that defendant then asked for continuance until August 22, or at least August 15, and that now that defendant could commence the main part of his case on August 15, he stated that he needed unspecified additional time in order to prepare. The court ordered that defendant be afforded unlimited visiting time at the jail and that the attorney visiting room be made available to the consultant, including during weekend hours.
Defendant then proceeded with the defense case, calling two witnesses. The matter was adjourned until the following Monday, August 15, 1988.
On August 15, 1988, Dr. Balkan testified further in support of the motion for continuance, stating that she had had her first significant interview with defendant over the weekend, that defendant was completely unprepared, that she needed to spend extended periods of time with potential witnesses, follow up investigative leads, and develop an elaborate social profile of defendant's life. She stated defendant was ignorant regarding aspects of his own history, including the identity of his father. She stated that defendant's family and friends should not be permitted to testify until she had developed a cohesive theme for the penalty phase, and that defendant would be unable to examine them without further consultation with her. She stated finally that if she were not given another two weeks to prepare, she would resign as defendant's consultant.
The court requested that the members of the jury write down their schedules for the next few weeks, and after reviewing these schedules announced that the court would lose between two and four jurors if it continued the matter for two weeks. The court stated its belief that the defense was engaging in a tactic to attempt to change the composition of the jury or to make it impossible for the matter to proceed before the jury that had rendered the guilt verdict. The court pointed out that defendant had brought his difficulties on himself by failing to cooperate with the defense's penalty phase investigation at an earlier stage. It refused to grant a two-week continuance, but offered to continue the matter for two days. Dr. Balkan announced that two days was not enough and that she would resign. She had other obligations during the next two days. The court asked defendant whether he desired a two-day continuance, and he responded that without Balkan's assistance, there was no point in it. Defendant proceeded to call his next witness.
On Tuesday, August 16, 1988, defendant complained that he had been accorded only 10 minutes on the telephone, that this was insufficient to contact all his witnesses, and that Dr. Balkan, counsel, and investigator Rohman were not assisting him. The court stated that Rohman was supposed to assist him, and directed Rohman to do so. Defendant claimed he needed to contact witnesses himself, as they were reluctant to speak to Rohman, but the court observed defendant had chosen to proceed pro se. Defendant proceeded to call and examine several witnesses.
On Wednesday, August 17, 1988, the county jail transport did not bring defendant to court until late in the day, and he complained that he had been shackled and unable to work for hours. The jail authorities had told him in the morning that he was not going to court, so he called off his witnesses. The court informed him that his witnesses had been contacted and told to appear, and that one was waiting. Defendant *480 asked for a few moments to complete his notes and speak with the witness, with whom he had not previously spoken. The court gave him five minutes to review his notes but refused to permit him to speak to his witness. A sergeant stated defendant had been offered as much telephone time as he wanted but had declined the offer. Defendant called his witness, but the witness's testimony was excluded as irrelevant after repeated conferences between defendant and his advisory counsel. Defendant had no further witnesses in court and was uncertain whether the witnesses he had called off could be present the following day. The court informed him that if he had no witnesses and was unable to inform the court when they would be available, he would have to rest the defense case.
On Thursday, August 18, 1988, defendant stated he had called his brother and his cousin in Kansas City, but neither would be available until the week of August 29, 1988. He alleged they would provide crucial evidence regarding his mother's condition when defendant was placed in a foster home as a child, and regarding his experience in foster care. He stated that investigator Rohman had spoken with a psychiatrist who had treated defendant's mother, and that it would take a week to subpoena her file and analyze it. Thereafter it would be necessary, defendant claimed, to contact those psychiatrists noted in the file who previously had treated his mother.
The court stated that other witnesses had testified regarding defendant's mother's condition, and that a brother and sister who resided locally could provide the same information regarding defendant's background as could be derived from the out-of-town witnesses. The court stated its belief that defendant was attempting to manipulate the system, knowing that jurors would be unable to continue their service on the case. Defendant then rested his case.

b. Motions for continuance
With respect to defendant's contention that the court erred in denying his various requests for continuance, the trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. (§ 1050, subd. (e); People v. Frye, supra, 18 Cal.4th at p. 1012, 77 Cal.Rptr.2d 25, 959 P.2d 183.) A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence. (People v. Mickey, supra, 54 Cal.3d at p. 660, 286 Cal.Rptr. 801, 818 P.2d 84; People v. Grant (1988) 45 Cal.3d 829, 844, 248 Cal.Rptr. 444, 755 P.2d 894.) When a continuance is sought to secure the attendance of a witness, the defendant must establish "he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven." (People v. Howard, supra, 1 Cal.4th at p. 1171, 5 Cal.Rptr.2d 268, 824 P.2d 1315.) The court considers "`not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'" (People v. Zapien, supra, 4 Cal.4th at p. 972, 17 Cal.Rptr.2d 122, 846 P.2d 704.) The trial court's denial of a motion for continuance is reviewed for abuse of discretion. (People v. Mickey, supra, 54 Cal.3d at p. 660, 286 Cal.Rptr. 801, 818 P.2d 84.)
The trial court did not abuse its discretion in denying defendant's requests for continuance. When, as in the present case, the asserted need for continuance is caused by the defendant's persistent failure in the period leading up to the penalty phase to cooperate with counsel and his "deliberate obstruction of his own counsel's reasonable attempts to determine *481 the nature of the proposed witnesses' testimony, the denial of a continuance [is] neither arbitrary nor a violation of due process." (People v. Grant, supra, 45 Cal.3d at p. 844, 248 Cal.Rptr. 444, 755 P.2d 894.) In addition, to the extent defendant contends a continuance should have been granted to permit his penalty phase consultant to undertake an open-ended investigation of his character and background, the court was within its discretion in refusing to grant a continuance, because defendant had not demonstrated that a continuance would be useful in producing specific relevant mitigating evidence within a reasonable time. (See People v. Peeler, supra, 9 Cal.4th at pp. 1003-1004, 39 Cal.Rptr.2d 607, 891 P.2d 153 [a continuance properly was denied when the defendant's request was based upon new evidence of speculative value].) Although it appeared that the consultant was determined to investigate defendant's case at a pace suited to her other commitments, despite the late stage of the proceedings, the court properly could consider the burden such a pace would place upon witnesses, jurors, and the court.
In addition, the trial court properly could find that defendant had not credibly shown a need for a continuance, because defendant had stated he was prepared for the penalty phase and had consulted with his prospective witnesses. Indeed, when defendant sought pro se status, he angrily rejected counsel's claim that he was unprepared. Further, the court warned defendant that a request for a continuance would constitute a basis for denying his motion to represent himself, and defendant accepted pro se status on the understanding that no additional time would be granted.
Further, as the court observed, although counsel stated defendant needed more time to contact and interview witnesses, the witnesses listed by counsel at the time of the first motion for continuance were friends and family whose knowledge of defendant's character and background were familiar to defendant. As noted, most of the witnesses who were on the list alluded to by counsel before the commencement of the penalty phase actually did testify. The court was justified in believing that the missing witnesses, including potential psychiatric experts who might be able to describe defendant's mother's condition, would provide testimony that was largely cumulative to similar available testimony.
Finally, the court was within its discretion in denying the requested continuances on the ground the court reasonably believed the requests were based upon a desire to delay the proceedings in an effort to affect the composition of the jury or to cause a mistrial. (See People v. Pride, supra, 3 Cal.4th at p. 255, 10 Cal.Rptr.2d 636, 833 P.2d 643.)
Defendant contends that once the court granted his motion to proceed pro se, the denial of a reasonable continuance for preparation deprived him of due process of law.
In People v. Bigelow (1984) 37 Cal.3d 731, 209 Cal.Rptr. 328, 691 P.2d 994, this court in dictum stated that the defendant "could not reasonably be expected to proceed to trial without any time for preparation, and that if the trial court did not intend to deny the motion for self-representation as untimely ... it should have considered granting a continuance." (Id. at p. 741, fn. 3, 209 Cal.Rptr. 328, 691 P.2d 994.) We cited an earlier Court of Appeal opinion characterizing failure to provide an adequate continuance in these circumstances as a denial of due process of law. (Ibid.) We observed in People v. Clark, supra, 3 Cal.4th 41, 10 Cal.Rptr.2d 554, 833 P.2d 561, that "a necessary continuance must be granted if a motion for self-representation is granted." (Id. at p. 110, 10 Cal.Rptr.2d 554, 833 P.2d 561.) On the other hand, in the Clark case we also stated that "it also is established that a midtrial Faretta motion may be denied on the ground that delay or a continuance would be required," and sanctioned the *482 trial court's decision to condition the granting of the right of self-representation on defendant's waiver of a continuance. (Ibid.)
In the present case, in ruling on defendant's midtrial motion to represent himself, the court correctly noted that it had authority to deny the motion if self-representation required a continuance, and in advising the defendant of the perils of self-representation, it asked defendant whether he understood, among other things, that he would receive "no extra time for preparation." Defendant indicated he understood. In addition, when defendant secured permission to proceed pro se, the court already had denied counsel's request for a continuance for further investigation and preparation for the penalty phase of the trial. Defendant was no more entitled to a continuance when he became his own counsel than he was entitled to a continuance at former counsel's request. This was especially true when, as in the present case, defendant "had been afforded research facilities for many months, so that he had a full opportunity to prepare independently for trial even while he was represented by counsel." (People v. Clark, supra, 3 Cal.4th at pp. 110-111, 10 Cal. Rptr.2d 554, 833 P.2d 561.) Indeed, defendant not only had access to research facilities, but asserted that he had known all along that if there were a penalty phase of the trial, he would conduct it, and that he had contacted his witnesses and was ready to proceed.
No denial of due process appears in the court's refusal to grant defendant's motions for continuance. "[I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." (Ungar v. Sarafite (1964) 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921.) Instead, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge...." (Ibid.) Even in a capital case, if the defendant cannot show he or she has been diligent in securing the attendance of witnesses, or that specific witnesses exist who would present material evidence, "[g]iven the deference necessarily due a state trial judge in regard to the denial or granting of continuances," the court's ruling denying a continuance does not support a claim of error under the federal Constitution. (Id. at p. 591, 84 S.Ct. 841; see People v. Howard, supra, 1 Cal.4th at p. 1172, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)

c. Limitation on resources available to defendant
Defendant next contends that he was left bereft of all assistance and unable to contact and interview witnesses due to restrictive conditions of confinement at the county jail and restrictive security measures in the courtroom, pointing to federal cases establishing that it is a violation of the constitutional right of self-representation to deprive a defendant of all means of presenting a defense. It is certainly true that a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense (Milton, supra, 767 F.2d at pp. 1445-1446), but this general proposition does not dictate the resources that must be available to defendants. Institutional and security concerns of pretrial detention facilities may be considered in determining what means will be accorded to the defendant to prepare his or her defense. (Id. at p. 1446; United States v. Nash, supra, 73 F.3d at p. 1491; United States v. Robinson, supra, 913 F.2d at p. 717; State v. Drobel, supra, 815 P.2d at p. 736, fn. 23.) When the defendant has a lawyer acting as advisory counsel, his or her rights are adequately protected. (Milton, supra, 767 F.2d at p. 1446; United States v. Wilson, supra, 690 F.2d at pp. 1271-1272; State v. Henry, supra, 863 P.2d at p. 876.)
*483 The record demonstrates that defendant's investigator and his sentencing consultant sometimes had difficulty in securing adequate opportunities to speak with defendant, that the courtroom bailiff prohibited defendant from speaking to his assistants or his witnesses at the courthouse, and that defendant returned to the county jail too late on some court days to telephone witnesses or meet with his investigator or his consultant. We do not believe defendant was deprived of the ability to act as his own counsel and to present a defense. The court ordered that defendant be given unlimited access to the telephone once defendant's difficulties were brought to the court's attention, and similarly ordered that the county jail make the attorney visiting room available to defendant over the weekend to permit further consultation with his assistants. The record also establishes that defendant worked assiduously in the county jail law library and worked closely with counsel during the extended guilt phase of the trial, and that counsel asserted that defendant knew the facts and issues in the case better than most attorneys would. The adequacy of the resources made available to defendant also is demonstrated by the circumstance that before undertaking pro se status, defendant stated he had contacted his prospective penalty phase witnesses repeatedly during the guilt phase. When he sought pro se status, he reiterated that he had contacted his witnesses, knew what they would say, and was prepared to go forward. He thereafter was able  perhaps on a limited basis  to meet with his investigator and his consultant, and it appears that counsel and the investigator did contact some witnesses. It also appears that defendant preferred to speak to witnesses himself and had access to a telephone in the county jail, that several of the days between the time he assumed pro se status and rested the defense case were not court days, affording defendant additional time and opportunity to prepare free from the limitations imposed upon him while he was in court, and finally that defendant refused the two-day continuance offered him on August 18, 1988  22 days after the entry of the guilt verdict  that would have afforded him additional time to telephone witnesses.
Defendant's contention that he was deprived of the ability to present a defense also is belied by the defense case he actually presented at the penalty phase. Defendant called 13 witnesses, examined them at length over a period of three days, and introduced 26 exhibits. He performed remarkably well in examining his witnesses and in performing redirect examination. He elicited testimony regarding his mother's chronic mental illness, his placement in a foster home, his merit as a father, his love of children, his lack of racial prejudice, and his acts of kindness to his family and in his community and also to strangers. We do view with concern the court's refusal to permit defendant to interview an out-of-state expert witness with whom defendant never had spoken  and whom counsel refused to interview  before defendant called him to testify. Assuming error, however, no prejudice appears, because the witness's testimony was excluded as irrelevant after extended colloquy between defendant, advisory counsel, and the court, and defendant does not contend that an opportunity to interview the witness before his testimony would have altered the court's decision to exclude the evidence as irrelevant. Accordingly, we reject defendant's contention that he was deprived of the ability act as his own counsel and to put on a defense.

d. Waiver of the right to counsel
Defendant apparently contends that he did not knowingly and intelligently waive his right to counsel, because the court did not warn him of the restrictions *484 that would be imposed on his ability to meet with his investigator and his consultant and to contact and interview witnesses, before it accepted his waiver of the right to counsel. After an extended period of pretrial incarceration in which he was accorded advisory counsel status, however, defendant would have known when he secured full pro se status what sort of access to the telephone he could expect, that he often returned to the county jail late at night on court days, and that normally the attorney interview room in the county jail was not open on weekends. The court did advise him that he would not receive any additional pro se privileges. Defendant does not cite any authority establishing that the court must advise a defendant seeking pro se status of each limitation upon his ability to act effectively as counsel that will flow from security concerns and facility limitations, and we have stated, to the contrary, that "[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required." (People v. Pinholster, supra, 1 Cal.4th at pp. 928-929, 4 Cal. Rptr.2d 765, 824 P.2d 571.) Finally, when defendant sought pro se status, he asserted that he already had contacted his witnesses, knew what they would say, and was prepared to present his case, so it seems highly unlikely that any misapprehension about his ability to conduct further investigation entered into his decision to waive his right to counsel. The record as a whole indicates that defendant understood the disadvantages of self-representation and knowingly and voluntarily waived his right to be represented by counsel. (See Godinez v. Moran (1993) 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321; People v. Bloom (1989) 48 Cal.3d 1194, 1224-1225, 259 Cal.Rptr. 669, 774 P.2d 698.)

e. Courtroom security
Defendant contends that the trial court abdicated its responsibility over courtroom security to the bailiffs serving in the courtroom, and that the security measures imposed upon defendant were excessive and unnecessary. In addition to the circumstances, reviewed above, that he was not permitted to interview witnesses or speak to his investigator or penalty consultant at the courthouse, or to use the telephone at the courthouse, defendant complains that he was not permitted to approach witnesses or to approach the jury during closing argument or to move about the courtroom as he wished to set up exhibits on a blackboard that was located near a door.
We find no abuse of discretion. (See People v. Hill (1998) 17 Cal.4th 800, 841, 72 Cal.Rptr.2d 656, 952 P.2d 673 [abuse of discretion standard applies to court's decision to shackle the defendant]; see also United States v. Carter, supra, 815 F.2d at p. 1231 [courtroom security within trial court's discretion].) The court was within its discretion in accepting the bailiffs statement that the courthouse did not have secure facilities  such as obviously would be necessary for an in-custody defendant convicted of special circumstance murder  for the interviews defendant wished to undertake. (See People v. Hill, supra, 17 Cal.4th at p. 841, fn. 7, 72 Cal. Rptr.2d 656, 952 P.2d 673.) The court did arrange for the attorney visiting room at the county jail to be made available to defendant for extended hours.
For the same obvious security reasons, the court was within its discretion in agreeing with the bailiffs reasonable admonition that defendant should not be permitted to move about the courtroom during the penalty phase of the trial. As for defendant's use of exhibits on the blackboard, the court observed that advisory counsel could place the exhibits on the blackboard, if defendant wished.

f. Defendant's illness during the penalty phase
Defendant contends that he was forced to proceed at the penalty phase although *485 he was seriously ill, but the record does not support this contention. The record reflects that the court noticed on August 11, 1988, that defendant had laryngitis. At defendant's request, the court ordered that defendant receive medical attention. Apparently, defendant received treatment, and he appeared the following day and continued to represent himself without any indication that he was too ill to proceed.

g. Prosecutorial misconduct
Defendant also contends that the prosecutor committed misconduct in closing argument, but this claim is waived because defendant did not object below to any of the three asserted instances of prosecutorial misconduct. (See People v. Millwee, supra, 18 Cal.4th at p. 149, 74 Cal.Rptr.2d 418, 954 P.2d 990.) In any event, no error appears. In the first comment, the prosecutor suggested that defendant had destroyed several lives, including those of the codefendants, that he now wanted forgiveness, but that he never had admitted he had done anything terrible and that "[h]e has no compassion and he has no soul...." Lack of evidence of remorse, however, is a proper subject for consideration at the penalty phase. (See People v. Ervin (2000) 22 Cal.4th 48, 103, 91 Cal.Rptr.2d 623, 990 P.2d 506; People v. Carrera (1989) 49 Cal.3d 291, 339, 261 Cal.Rptr. 348, 777 P.2d 121.) The prosecutor's comment that defendant had children by different women, none of whom he had married, was based upon the evidence and was a proper response to defendant's evidence in mitigation that he was a good family man and excellent father. Finally, the prosecutor's comment that he had heard someone talking about the present case and saying that "they used a machine gun in the shadow of a cross," while perhaps unduly melodramatic, properly referred to evidence establishing that the murder of Detective Williams occurred in front of a church daycare center.

h. Limitations on closing argument
Defendant contends the court improperly limited his closing argument to the jury when it sustained the prosecutor's objection to his statement that the police and the district attorney had conferred and determined that they were not pleased with Tyrone Hicks's statements to the police. In sustaining the objection, the court stated "I would ask you to please not characterize. Just summarize the evidence."
It was proper to sustain the prosecutor's objection when defendant began commenting on matters not within the evidence, such as the motivation of the prosecutor and the police during interviews of Tyrone Hicks. Although defendant certainly was entitled to urge his interpretation of the evidence, he was not entitled to assert as fact matters as to which no evidence had been presented. In the context of defendant's argument, the court's admonition adequately conveyed this point, and it certainly did not prevent defendant from continuing to urge his interpretation of events upon the jury.

i. Alleged Eighth Amendment violation
Defendant has failed to demonstrate that the circumstances under which the penalty phase was conducted violated his right under the Eighth Amendment to a fair and reliable penalty determination. As we have explained: "`the required reliability is' attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements.'" (People v. Clark, supra, *486 3 Cal.4th at p. 109, 10 Cal.Rptr.2d 554, 833 P.2d 561.) Our consideration of the claims reviewed above demonstrates that defendant has failed to establish any significant violations of proper procedure at the penalty phase of the trial, and the penalty verdict conforms with the standards required by the Eighth Amendment.

3. Asserted jury misconduct during penalty phase deliberations

Defendant contends that circumstances that occurred during penalty phase deliberations require reversal both of the guilt and the penalty verdicts. He contends first that there were indications during penalty phase deliberations that one of the jurors had not reached an independent verdict at the guilt phase, and that the court committed reversible error in failing to inquire into this juror's state of mind to determine whether defendant's constitutional and statutory right to an independent decision by each juror had been violated.
Defendant also asserts that "as it now stands, the record reflects an eleven-person verdict at the guilt phase." He contends that, because there is no valid guilt judgment, and because the circumstances demonstrate the jury's unfitness to serve, the penalty verdict must be reversed.
Finally, defendant asserts that inflammatory publicity prejudicially affected the penalty phase deliberations.

a. Claims relating to the guilt verdict
Our examination of the record discloses that one morning during penalty phase deliberations, the court received a note from the jury foreperson asking whether the jury must be unanimous in order to return a verdict of life imprisonment without the possibility of parole. The court replied in the affirmative. In the afternoon of the same day, the court received another note from the foreperson stating: "One juror has informed us that he/she voted with the majority in the prior proceeding instead of reaching an independent decision of guilt or innocence. [¶] Much discussion has shown this juror does not or is not capable of understanding the requirements of the judicial process. [¶] What do we do?"
During the in camera hearing that ensued, the trial court directed that any motion to impeach the guilt verdict should be made in the context of a motion for new trial, not during penalty phase deliberations. (See § 1181 [setting out appropriate grounds for motion for new trial]; see also In re Stankemtz (1985) 40 Cal.3d 391, 393, 220 Cal.Rptr. 382, 708 P.2d 1260 [motion for new trial is the usual method for raising the issue of misconduct by a juror during deliberations].) After hearing extended argument from counsel, the court examined the foreperson at some length, limiting its inquiry to the jury's penalty phase deliberations, in order to determine the basis for his assertion that the unidentified juror was incapable of deliberation. The foreperson provided vague answers regarding the basis for his opinion that the juror was unable to understand the judicial process; it appeared that the foreperson largely was concerned that the unidentified juror recalled the evidence differently from the rest of the jury. After that examination, defense counsel[26] concluded the unidentified juror was the sole hold-out in favor of a sentence less than death. In response to the prosecutor's contention that the juror should be excused, defense counsel argued that there was no evidence indicating the juror was refusing to obey the law, and in heated terms accused the court and the prosecutor of attempting to ensure a verdict of death by removing the juror. The juror was not excused.
Defense counsel stated that he was not attempting to impeach the guilt verdict *487 during the mid-penalty deliberation hearing held to consider the jury foreperson's note. We note that although defense counsel did request further inquiry into the unidentified juror's conduct during the guilt phase deliberations, he stated he was not making a motion to impeach the guilt verdict but wished to secure a better understanding of the juror's ability to serve during the penalty phase deliberations. Counsel theorized that the juror was the "holdout juror" who was "merely voting his conscience" and opined that this juror had lingering doubts with respect to the guilt verdict.
Defendant thereafter made a motion for new trial based in part upon the assertion that the guilt verdict did not represent the opinion of each juror "as indicated by the foreman's note stating that one juror did not vote his/her own independent mind concerning guilt or innocence, but merely went along with the majority." His motion was not supported by any affidavits. The trial court denied the motion, stating that no evidence had been introduced demonstrating improper conduct on the part of the jury.
It was at the time of the motion for new trial, and not at the mid-penalty deliberation hearing, that the court determined that no basis existed to impeach the guilt verdict. Defendant does not contend on appeal that the trial court erred in denying his motion for new trial.
There is no merit in defendant's contention that the trial court erred with respect to the guilt verdict in failing to examine the foreperson regarding his opinion that one juror had failed to deliberate, because the court determined and counsel conceded that any effort to impeach the guilt verdict was to be conducted by way of a motion for new trial. In bringing such a motion, it was defendant's responsibility to present admissible evidence to impeach the verdict. (See People v. Von Villas (1992) 10 Cal.App.4th 201, 251, 13 Cal.Rptr.2d 62 [party seeking to impeach the verdict must present admissible evidence in support of motion]; see also People v. Peavey (1981) 126 Cal. App.3d 44, 50-51, 178 Cal.Rptr. 520 [juror's statement she voted for guilt only to go along with the majority was demonstrative of mental processes and considerations that influenced her verdict and thus was inadmissible to impeach the verdict].) Defendant fails to persuade us that the trial court erred in failing to provide a hearing related to the validity of the guilt verdict while penalty deliberations were under way, particularly in light of defense counsel's statement that he was not attempting to impeach the guilt verdict at that time.

b. Claims relating to the penalty verdict
i. With respect to defendant's contention that the jury's penalty phase deliberations were tainted by the same juror's inability to deliberate and follow instructions, and that the court erred in failing to examine the juror regarding his or her capacity and in permitting the juror to continue to serve, as we have noted after the court examined the jury foreperson under oath, defense counsel concluded from some of the foreperson's statements that the juror who assertedly was unable to deliberate in fact was a holdout juror who was the sole supporter of a sentence less than death. The prosecutor sought further examination and asserted the juror should be excused, but defense counsel vigorously opposed the prosecutor's request on the ground that there was no indication the juror was unable to follow the law, and that further examination could coerce the holdout juror to go along with the majority and vote for a sentence of death. Under the circumstances recited above, we agree with respondent that any claim of error is waived. (See People v. Burgener (1986) 41 Cal.3d 505, 521, 224 Cal.Rptr. 112, 714 P.2d 1251, disapproved on another point in People v. Reyes (1998) 19 Cal.4th 743, 80 Cal. Rptr.2d 734, 968 P.2d 445 [the defendant may not challenge the verdict on appeal on *488 the ground the court conducted an insufficient inquiry of a juror said to be unable to deliberate, when he objected at trial on tactical grounds to examination of the juror]; see also People v. Wisely (1990) 224 Cal.App.3d 939, 947-948, 274 Cal.Rptr. 291 [claim of jury misconduct may be waived for failure to object below].)
ii. Defendant next contends that jurors were prejudiced by inflammatory publicity regarding defendant that was disseminated during the penalty phase, that the court failed to conduct an adequate inquiry into the possibility that jurors were affected by the publicity, and that the court erred in failing to discharge Juror Ad., who had heard other jurors mention the publicity and who showed distress upon learning that those jurors had been discharged from the jury. Defendant also contends the court erred in refusing to instruct the jury as a whole that the information contained in the news reports was false.
During penalty phase deliberations, news accounts were published in the local media regarding allegations that defendant's wife possessed a list of persons whom defendant wanted killed in retaliation for their participation in the prosecution of defendant. Defendant brought these reports to the attention of the court and urged that the jury's deliberations had been tainted by them. He contended that any juror who was exposed to this publicity should be discharged. He later made a motion for mistrial on the basis of the assertedly prejudicial publicity.
The court separately examined each member of the jury under oath, including the three alternates, to determine whether the jurors had been exposed to the publicity or had heard other persons, including other jurors, mention it. The court also admonished the jurors to refrain from reading or listening to any news reports and from listening to any discussion of the case among other persons. Upon examination, it appeared that six of the jurors had heard nothing, four jurors and two alternates had heard that there had been news reports about the case but were not aware of their content, and three jurors  including one alternate  had heard something about the content of the news reports. Of these three, one juror and one alternate were discharged. The jurors who were discharged had more than passing knowledge of the content of the news reports, and one of them had lied about his exposure to the publicity. The last of the three, Juror Ad., was not discharged. He had not been exposed to news reports himself but had been exposed to them involuntarily by the two jurors who had been discharged. He had heard very little regarding the content of the news reports, had cut off the conversation in which the matter was discussed among the jurors, and stated that he could be fair to defendant and would not be affected by the publicity. The trial court commented that it found him credible and conscientious. This juror was the only one who was not specifically readmonished to avoid exposure to publicity, but during the court's inquiry he demonstrated awareness of his duty to do so. The court instructed the juror that the content of the news reports was false, and the juror appeared to accept this statement with some relief. This juror also appeared to be distressed that the other two jurors with whom he had spoken of the matter had been excused, but after inquiry by the court and a period of reflection concluded that he could be fair, nonetheless.
No error appears in the trial court's determination that only the two jurors should be discharged because of their exposure to prejudicial publicity. It is settled that it is misconduct for a juror to read or listen to news accounts relating to the case in which he or she is serving. (People v. Hernandez (1988) 47 Cal.3d 315, 338, 253 Cal.Rptr. 199, 763 P.2d 1289.) In the present case, the court examined each juror and conducted a clearly adequate inquiry into "whether and to what extent the jury as a whole may have been affected and whether *489 there was good cause to discharge any of the jurors." (Ibid.; see also People v. Burgener, supra, 41 Cal.3d at pp. 519-520, 224 Cal.Rptr. 112, 714 P.2d 1251 [once on sufficient notice that a juror may be subject to improper influence, the court is to make such inquiry as appears reasonably necessary to determine whether the juror should be discharged].) Persons with detailed knowledge of the contents of the news reports were discharged; the remaining juror who had any idea of the content of the news reports knew very little, asserted that he could be fair to defendant and that the publicity would not affect him, seemed relieved when informed that the content of the news reports was false, and appeared to the court to be particularly conscientious. "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (People v. Nesler (1997) 16 Cal.4th 561, 582, 66 Cal.Rptr.2d 454, 941 P.2d 87.) We see no substantial likelihood that Juror Ad., or any of the other jurors who became aware that publicity existed, were actually biased, that is, "unable to put aside [their] impressions or opinions based upon the extrajudicial information [they] received and render a verdict based solely upon the evidence received at trial." (Id. at p. 583, 66 Cal.Rptr.2d 454, 941 P.2d 87.) We conclude that no error appears in the court's decision not to discharge additional jurors, and that the presumption of prejudice arising from the jurors' inadvertent exposure to publicity was rebutted. (See People v. Cummings, supra, 4 Cal.4th at p. 1332, 18 Cal.Rptr.2d 796, 850 P.2d 1.) In addition, the court was under no obligation to inform the remainder of the jurors, who were unaware of the content of the news reports, that the reports were false, nor would such an instruction have benefited defendant in view of the jurors' ignorance.
Defendant asserts that shortly after the court concluded its inquiry regarding juror exposure to publicity, there was an additional news report "regarding the payment of $65,000 to counsel" under shady circumstances, and asserts that the court should have acceded to counsel's request that jurors be examined regarding their possible exposure to this report. No error appears in the court's refusal to conduct further inquiry, because there was no indication the news report had come to the jury's attention, the court was aware that the remaining jurors had obeyed the court's earlier admonition to avoid exposure to publicity, and the jury very recently had been reminded of its obligation to avoid exposure to news reports regarding the case. We may assume that the jurors paid particular attention to this admonition because two of their number had been discharged for failing to obey the admonition, even after months of service on the jury.
Finally, defendant claims cumulative prejudice arising from errors during penalty phase deliberations, but no errors have been established that demonstrate cumulative prejudice to defendant, and we reject this contention.

4. Alleged bias on the part of the trial court

Defendant contends the trial court was not impartial, and this deprived him of the state and federal constitutional guarantee of due process of law. He contends that a trial presided over by a judge who is not fair and impartial constitutes a structural defect that is reversible per se.
This claim is made pro forma. Defendant concedes that judicial bias at the guilt phase "probably" cannot be shown, and accordingly we do not consider the contention in the context of the guilt phase. His contention with respect to the penalty phase is offered without any citation to the record, in violation of rule 15(a) of the California Rules of Court. It essentially is a restatement of the contentions, discussed ante, that conditions imposed on defendant at the penalty phase rendered that proceeding a sham. We have examined the record of the penalty phase, and although it does indicate that the court *490 experienced some frustration at what it believed to be defendant's attempts to manipulate the court and to cause a risk of mistrial, nothing in the record demonstrates that the court lost its impartiality.

5. Constitutionality of California's death penalty statute

Defendant attacks the constitutionality of California's death penalty statute in a number of respects. Defendant contends that section 190.2 violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because it assertedly is overinclusive, and because by its terms and as interpreted by this court's decisions, it does not meaningfully narrow the class of persons subject to the death penalty, particularly by providing that the commission of a felony murder constitutes a special circumstance. We reject this claim in light of our decisions holding that the special circumstances set forth in that statute are not overinclusive by their number or by their terms, and that they have not been construed in an unduly expansive manner. (People v. Arias, supra, 13 Cal.4th at pp. 186-187, 51 Cal.Rptr.2d 770, 913 P.2d 980; People v. Ray, supra, 13 Cal.4th at p. 356, 52 Cal.Rptr.2d 296, 914 P.2d 846; People v. Crittenden (1994) 9 Cal.4th 83, 155, 36 Cal.Rptr.2d 474, 885 P.2d 887.)
Defendant contends section 190.3, factor (a), permitting the jury to consider the circumstances of the crime in aggravation, has been applied "in such a wanton and freakish manner," without the application of any reasonable limiting construction by this court, that it violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Defendant contends the provision is unconstitutionally vague as applied, because it has permitted prosecutors to argue that any conceivable circumstance of a charged crime should be considered in aggravation. He points out that rather contradictory circumstances may be considered in aggravation in different cases, and contends that prosecutors point to circumstances of the crime that "cover the entire spectrum of [facts] inevitably present in every homicide." He urges that the provision is applied in an arbitrary and capricious manner so as to violate the federal guarantee of due process of law.
Defendant's contention corresponds in substance to a contention found in Justice Blackmun's dissent in Tuilaepa v. California (1994) 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750. (Id. at pp. 986-988, 114 S.Ct. 2630 (dis. opn. of Blackmun, J.).) It is evident that this contention was not persuasive to a majority of the United States Supreme Court when it determined that section 190.3, factor (a), is not violative of the Eighth Amendment on the basis of vagueness or other grounds. Instead, the court's majority opinion stated that "our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty," and that "this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms." (Tuilaepa v. California, supra, 512 U.S. at p. 976, 114 S.Ct. 2630.) The court observed that "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." (Ibid.)
Defendant contends it cannot be appropriate under the Eighth Amendment or as a matter of due process to permit the jury to consider in aggravation, for example, that a murder was committed in a calculated manner, while a jury in another case may be urged to consider in aggravation that the murder was committed in a frenzy of violence. It is not inappropriate, however, that a particular circumstance of a capital crime may be considered aggravating in one case, while a contrasting circumstance may be considered aggravating in another case. The sentencer is to consider the defendant's individual culpability; *491 there is no constitutional requirement that the sentencer compare the defendant's culpability with the culpability of other defendants. (See People v. Crittenden, supra, 9 Cal.4th at pp. 156-157, 36 Cal.Rptr.2d 474, 885 P.2d 887.) The focus is upon the individual case, and the jury's discretion is broad: "In providing for individualized sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." (Tuilaepa v. California, supra, 512 U.S. at p. 974, 114 S.Ct. 2630.)
Thus, for example, in Tuilaepa the high court rejected the defendant's claim  substantially identical to defendant's claim in the present case  that section 190.3, factor (i), permitting consideration of the defendant's age, is vague, although, the defendant claimed, prosecutors typically argue in favor of the death penalty based on this factor, no matter whether the defendant is old or young. "It is neither surprising nor remarkable that the relevance of the defendant's age can pose a dilemma for the sentencer. But difficulty in application is not equivalent to vagueness. Both the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case. Competing arguments by adversary parties bring perspective to a problem...." (Tuilaepa v. California, supra, 512 U.S. at p. 977, 114 S.Ct. 2630.)
Defendant contends that the high court's discussion in the Tuilaepa case does not dispose of his claim, because there the high court examined the California statute on its face, while he asks that we examine its alleged infirmities as applied. As noted, he draws our attention to various cases in which apparently inconsistent claims were made by the prosecution with respect to the relevance of certain circumstances of the charged crimes. He also refers us to various cases in which, he alleges, prosecutors made broad use of section 190.3, factor (a) to argue to the jury that facts inevitably present in every homicide constitute circumstances in aggravation.[27] He contends that these cases demonstrate that section 190.3, factor (a), permits arbitrary and capricious imposition of the death penalty in violation of the guarantee of due process of law. He offers no relevant authority in support of his claim.
Defendant's contention is inconsistent with the rationale of the high court's decision in Tuilaepa. Defendant's claim essentially is that section 190.3, factor (a) is so vague and open-ended that it has resulted in prosecutors making inconsistent or overinclusive arguments with respect to the significance of circumstances of the charged crime. This result is not improper in view of the circumstance that factor (a) provides adequate guidance to the jury in selecting the appropriate penalty. It is not so vague as to risk "`wholly arbitrary and capricious action'" (Tuilaepa v. California, supra, 512 U.S. at p. 973, 114 S.Ct. 2630); the jury is engaged in an individualized sentencing process (id. at p. 972, 114 S.Ct. 2630), and the jury appropriately has very broad discretion in determining whether the death penalty should be imposed. (Id. at pp. 978-980, 114 S.Ct. 2630.) A jury should consider the circumstances of the crime in determining penalty (id. at p. 976, 114 S.Ct. 2630), but this is an individualized, not a comparative function. The jury may conclude that the circumstance that a murder was committed with cold premeditation is aggravating in a particular case, while in another case another jury may determine that the circumstance that a murder was committed in a murderous frenzy is an aggravating factor. The ability of prosecutors in a broad range of cases to rely upon apparently contrary circumstances of crimes in various cases does not establish that a, jury in a particular case acted arbitrarily and capriciously. As with the factor of the defendant's age, the adversary process *492 permits the defense, as well as the prosecution, to urge the significance of the facts of the charged crime. Defendant fails to persuade us that these circumstances deprive him of due process of law.
Defendant contends that the California death penalty statute violates the Eighth and Fourteenth Amendments of the United States Constitution because certain procedural safeguards are lacking: juries are not required to make written findings regarding circumstances in aggravation, or to achieve unanimity as to aggravating circumstances. Defendant also asserts that the statute is constitutionally flawed in that juries are not required to find beyond a reasonable doubt that aggravating circumstances have been proved and outweigh the mitigating circumstances, or that death is the appropriate sentence. Each of these contentions has been rejected, and we decline to reconsider them. (People v. Arias, supra, 13 Cal.4th at p. 190, 51 Cal.Rptr.2d 770, 913 P.2d 980; People v. Marshall, supra, 50 Cal.3d at pp. 935-936, 269 Cal.Rptr. 269, 790 P.2d 676; People v. Rodriguez, supra, 42 Cal.3d at p. 777, 230 Cal.Rptr. 667, 726 P.2d 113.)
Alleging the same constitutional flaws, defendant complains that the statute is defective in not requiring intercase proportionality review, and in such review not being performed. As we consistently have done in the past, we reject this contention, as we do the contention that the capital sentencing scheme denies capital defendants equal protection of the laws because other convicted felons receive some comparative sentence review under the determinate sentencing law. (People v. Arias, supra, 13 Cal.4th at pp. 192-193, 51 Cal. Rptr.2d 770, 913 P.2d 980; People v. Marshall, supra, 50 Cal.3d at p. 945, 269 Cal. Rptr. 269, 790 P.2d 676; People v. Lang (1989) 49 Cal.3d 991, 1043, 264 Cal.Rptr. 386, 782 P.2d 627; People v. Allen, supra, 42 Cal.3d at pp. 1286-1288, 232 Cal.Rptr. 849, 729 P.2d 115.) We also reject the related contention that the failure to provide the comparative sentence review provided to persons convicted of noncapital felony offenses constitutes a denial of substantive due process of law. Defendant contends, without citation to authority, that due process of law requires that significant benefits not be withheld arbitrarily from individuals or classes of defendants. It already has been determined, however, that the distinction in treatment in this regard between capital defendants and other persons convicted of felonies is not arbitrary. (People v. Allen, supra, 42 Cal.3d at pp. 1286-1287, 232 Cal.Rptr. 849, 729 P.2d 115.)
We also reject defendant's contention that the California death penalty law violates the Eighth and Fourteenth Amendments because the jury is not instructed as to any burden of proof in selecting the penalty to be imposed. As we have explained, "[u]nlike the guilt determination, `the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (People v. Hawthorne (1992) 4 Cal.4th 43, 79, 14 Cal. Rptr.2d 133, 841 P.2d 118.) The instructions as a whole adequately guide the jury in carrying out their "moral and normative" function.
Defendant contends that the use of evidence of unadjudicated criminal activity as a circumstance in aggravation pursuant to section 190.3, factor (b), renders his death sentence unreliable and violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution. He acknowledges that we have rejected such contentions in the past (People v. Barnett, supra, 17 Cal.4th at p. 1178, 74 Cal. Rptr.2d 121, 954 P.2d 384; People v. Bradford, supra, 15 Cal.4th at p. 1376, 65 Cal. Rptr.2d 145, 939 P.2d 259; People v. Melton (1988) 44 Cal.3d 713, 756, fn. 17, 244 Cal.Rptr. 867, 750 P.2d 741; People v. Gates (1987) 43 Cal.3d 1168, 1203, 240 Cal.Rptr. 666, 743 P.2d 301), but asserts that our decisions were wrongly decided. We decline to reconsider them. He also contends that the use, in aggravation, of *493 evidence of defendant's assault upon Mr. Monroe, Sr., despite the circumstance that the charge as to that assault had been dropped pursuant to a plea agreement, constituted a breach of an implied term of the agreement as well as a consequence of the guilty plea of which he was not informed when he entered the plea. The introduction of evidence, pursuant to section 190.3, factor (b), of the facts underlying charges dismissed as part of a plea agreement does not suffer the constitutional infirmities identified by defendant. (People v. Osband (1996) 13 Cal.4th 622, 711, 55 Cal.Rptr.2d 26, 919 P.2d 640 [introduction of evidence of crime as to which a charge was dismissed as part of a plea agreement does not constitute a violation of the double jeopardy clause of the Fifth Amendment]; People v. Garceau, supra, 6 Cal.4th at p. 199, 24 Cal.Rptr.2d 664, 862 P.2d 664 [same]; People v. Morris, supra, 53 Cal.3d at p. 217, 279 Cal.Rptr. 720, 807 P.2d 949 [no violation of rights in introducing assertedly stale evidence of prior criminal activity as to which the statute of limitations had run]; People v. Frank (1990) 51 Cal.3d 718, 728, 274 Cal.Rptr. 372, 798 P.2d 1215 [rejecting due process claim arising from introduction of aggravating evidence of circumstances of charge dismissed pursuant to a plea agreement]; People v. Melton, supra, 44 Cal.3d at pp. 755-756, and fn. 17, 244 Cal.Rptr. 867, 750 P.2d 741 [no unfairness in permitting capital jury to consider, in aggravation, evidence relating to charges dismissed pursuant to a plea agreement].) Moreover, as respondent points out, defendant has not offered any support in the record for the contention that he was promised that evidence of the assault against Mr. Monroe, Sr., would not be used against him in future proceedings.
Despite defendant's urging, we decline to reconsider our conclusion that "[u]se of the words `extreme' and `substantial' in section 190.3, factors (d) and (g), does not impermissibly limit consideration of mitigating factors in violation of the federal Constitution." (People v. Barnett, supra, 17 Cal.4th at pp. 1178-1179, 74 Cal.Rptr.2d 121, 954 P.2d 384.) Defendant finally contends, in two conclusory sentences, that section 190.3, factor (f), improperly limits consideration of mitigating factors. Factor (f) provides that the jury may consider "Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct." Defendant maintains the jury should be permitted to consider a defendant's unreasonable belief in the existence of some moral justification or extenuation of the crime. In his own case, he states, the jury should have been permitted to consider even his unreasonable belief that Detective Williams had set him up for prosecution in the Carpenter robbery and assault. No improper limitation on the jury's consideration of mitigating evidence occurs by virtue of the wording of factor (f); the mitigating value of defendant's unreasonable belief in moral justification for, or extenuation of, the crime may be considered pursuant to section 190.3, factor (k) and the instruction, as given in the present case, that the jury may consider "`any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.'" (People v. Lang, supra, 49 Cal.3d at p. 1037, 264 Cal.Rptr. 386, 782 P.2d 627.)

6. Alleged violation of international law

Defendant contends that the violations he has alleged of state and federal constitutional law  particularly the right to fair trial and to be free from invidious discrimination imposed by the state on the basis of race  also constitute violations of various international treaties and other embodiments of international law. We need not consider the applicability of those treaties and laws to this appeal, because defendant has failed to establish the premise that his trial involved violations of state and federal constitutional law, or that his rights to due process of law and to be free from invidious discrimination on the basis of race *494 have been violated. Although he contends that international law on the issue of racial discrimination would differ from our equal protection and Eighth Amendment jurisprudence, in that international law would permit the use of the kind of statistical evidence rejected by the United States Supreme Court in McCleskey v. Kemp (1987) 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 to demonstrate that the death penalty is imposed in a racially discriminatory manner, he provides no authority in support of this proposition. Defendant in other respects does not appear to contend that international law would condemn a criminal trial that had been conducted in a manner consistent with due process of law or other federal and California constitutional provisions, and he certainly does not set out in what manner the two bodies of law may differ. Accordingly, his claim is rejected.

7. Alleged cumulative prejudice

Defendant contends the cumulative prejudicial effect of the various errors he has raised on appeal requires reversal of the guilt and penalty judgments. We have rejected his assignments of error, with limited exceptions in which we found the error to be nonprejudicial. Considered together, any errors were nonprejudicial. Contrary to defendant's contention, his trial was not fundamentally unfair, even if we consider the cumulative impact of the few errors that occurred.

III. DISPOSITION
We affirm the judgment in its entirety.
MOSK, J., KENNARD, J., BAXTER, J., WERDEGAR, J., and CHIN, J., concur.
Concurring Opinion by BROWN, J.
I concur in the judgment to affirm defendant's conviction and penalty.
I write separately because I question the conclusion that Diane Jenkins had apparent authority to consent to a search of defendant's briefcase. (Maj. opn., ante, 95 Cal.Rptr.2d at pp. 435-438, 997 P.2d at pp. 1096-1100.)
In United States v. Matlock (1974) 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (Matlock), the United States Supreme Court allowed that "consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." (Id. at p. 170, 94 S.Ct. 988.) Accordingly, the prosecution may justify a warrantless search by showing "that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (Id. at p. 171, 94 S.Ct. 988.) "The authority which justifies the third-party consent does not rest upon the law of property ... [citations] but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (Id. at p. 172, fn. 7, 94 S.Ct. 988.) "The burden of establishing that common authority rests upon the State." (Illinois v. Rodriguez (1990) 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148.)
In Illinois v. Rodriguez, supra, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148, the high court further allowed that a third party consent search is valid even if the third party did not have actual authority as long as "`the facts available to the officer at the moment ... [would] "warrant a man of reasonable caution in the belief"' that the consenting party had authority.... [Citation.]" (Id. at p. 188, 110 S.Ct. 2793.) As several federal circuit courts have explained, in interpreting this reasonableness requirement "the Supreme Court `held only that the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of *495 fact, as distinguished from a mistake of law.' [Citation.] In other words, `Rodriguez ... applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be.' [Citation.]" (United States v. Salinas-Cano (10th Cir.1992) 959 F.2d 861, 865; see United States v. Welch (9th Cir.1993) 4 F.3d 761, 764-765; U.S. v. Whitfield (D.C.Cir.1991) 291 App.D.C. 243, 939 F.2d 1071, 1074; see also United States v. Jams (5th Cir.1996) 86 F.3d 383, 389.)
As the high court in Rodriguez cautioned, "[e]ven when the invitation [to enter the premises] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." (Illinois v. Rodriguez, supra, 497 U.S. at p. 188, 110 S.Ct. 2793.) Accordingly, the prosecution's burden "cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to `mutual use' by the person giving consent, `then warrantless entry is unlawful without further inquiry.' [Citations.]" (United States v. Whitfield, supra, 939 F.2d at p. 1075, quoting Illinois v. Rodriguez, supra, 497 U.S. at pp. 188-189, 110 S.Ct. 2793.)
Here, the record contains no evidence other than her bare possession, which she apparently obtained only one or two days prior to the searchthat Diane Jenkins "possessed common authority over or other sufficient relationship" (Matlock, supra, 415 U.S. at p. 171, 94 S.Ct. 988) to defendant's briefcase or that she made "mutual use of the property" as one "generally having joint access or control for most purposes...." (Id, at p. 171, fn. 7, 94 S.Ct. 988.) As the majority acknowledges, the evidence did not establish that defendant asked her to take possession. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 432, fn. 10, 997 P.2d at p. 1094, fn. 10.) Nor did the officer make further inquiry as to the circumstances by which she acquired it that would lead a reasonable person to conclude she had authority to consent to a search of its contents.
The majority discounts the "mutual use" requirement as limited to searches of premises. The court in Matlock made no such distinction, and its "assumption of the risk" rationale is equally applicable to personal property. In fact, the court relied on Frazier v. Cupp (1969) 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 in formulating its third party consent rationale. (Matlock, supra, 415 U.S. at pp. 170-171, 94 S.Ct. 988.) Frazier involved a duffel bag "used jointly" by the defendant and his cousin. (Matlock, supra, at p. 170, 94 S.Ct. 988.) The cousin consented to a search, which the court upheld because "joint use of the bag rendered the cousin's authority to consent to its search clear.... By allowing the cousin the use of the bag, and by leaving it in his house, Frazier was held to have assumed the risk that his cousin would allow someone else to look inside. [Citation.]" (Id. at p. 171, 94 S.Ct. 988.) If mutual use is unnecessary for a search of personal property, a court would have no basis for assessing whether the defendant assumed the risk of a third party consent. A contrary conclusion would also be inconsistent with the theory that one's reasonable expectation of privacy is diminished to the extent another has access to and authority over the property.
In the absence of any evidence defendant entrusted the briefcase to his sister, it is impossible to reasonably find he ceded any privacy interest or control over its contents. The majority's discussion as to what the officer could have inferred from the circumstances is strictly speculation. (Maj. opn., ante, 95 Cal.Rptr.2d p. 436, 997 P.2d at p. 1098.) The familial connection does not, in itself, establish the "other sufficient relationship" required under Matlock. (Matlock, supra, 415 U.S. at p. 171, 94 S.Ct. 988.) "Relationships which *496 give rise to a presumption of control of property include parent-child relationships and husband-wife relationships. [Citations.] In contrast, a simple co-tenant relationship does not create a presumption of control and actual access would have to be shown. [Citations.] The difference [is that the former relationships] raise[ ] a presumption about the parties' reasonable expectations of privacy in relation to each other in spaces typically perceived as private in a co-tenant relationship. [Citation.]" (United States v. Rith (10th Cir. 1999) 164 F.3d 1323, 1330, fn. omitted.) Adult brothers and sisters are more akin to cotenants in this regard, at least absent any contrary evidence. Moreover, from both his conduct and his subsequent testimony, the officer plainly did not draw any inference of common authority or mutual use from the fact Diane Jenkins retrieved defendant's briefcase. He simply asked whether any of defendant's belongings were at the residence and took the briefcase without further inquiry when she handed it to him. A finding of valid third party consent on these facts flies in the face of Matlock and Rodriguez as well as numerous federal court decisions applying their principles.
I would not, however, invalidate the search. The trial court articulated several grounds for finding the officer's actions proper, the most viable of which I find to be inevitable discovery. Indeed, but for the intervention of defendant's sister, the briefcase would have been seized and opened pursuant to the warrant issued the previous day. That warrant authorized a search of both defendant's residence and his vehicles, including the Jeep, for numerous items most of which could reasonably be located in such a container. Given that circumstance, the officer could have readily obtained a supplemental warrant and testified he would have done so had Diane Jenkins refused to surrender the briefcase. Efforts to locate the murder weapon and identify other possible coconspirators were ongoing. The facts already known clearly would have established probable cause. Thus, this was not a situation in which the police would have had to exploit Detective Holder's initial illegality in searching the briefcase without consent. (See generally Wong Sun v. United States (1963) 371 U.S. 471, 487-488, 83 S.Ct. 407, 9 L.Ed.2d 441.) As the Attorney General notes, "`there is not a judge in the world that would not sign a warrant with these facts.'" (People v. McDowell (1988) 46 Cal.3d 551, 564, 250 Cal.Rptr. 530, 763 P.2d 1269.)
NOTES
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] At the guilt phase of the trial, defendant was tried jointly with codefendant Moss before separate juries, but at the penalty phase, defendant was tried separately. Codefendants Moody, Cooper, and Williams were tried separately from defendant.
[3] In his reply brief, defendant contends for the first time that it was error to transfer the case, because the Van Nuys courthouse facilities were inadequate. He contends he was unable to interview witnesses because of these inadequacies. A motion for change of venue or for transfer goes to the question of the ability of the jury in the county in which the case is tried to be fair and impartial, and not to the adequacy of the courthouse facilities; the latter issue is considered separately.
[4] A motion for mistrial does not, contrary to defendant's claim, preserve the issue for review, for the obvious reason that such a motion does not seek the relief sought by the motion for change of venue.
[5] Because the crimes were committed in 1985, the analytical element of cross-admissibility is not affected by the voters' adoption of Proposition 115 in 1990. (See § 954.1; People v. Hill (1995) 34 Cal.App.4th 727, 734-735, 41 Cal.Rptr.2d 39.)
[6] We note that defendant brought an in limine motion, prior to the evidentiary portion of the trial, to exclude the testimony of jailhouse informants (including that of Carroll) and for an evidentiary hearing, at which he proposed to explore whether Carroll was operating as a government agent when he received defendant's confession. When the matter came on for hearing, however, counsel submitted the matter on the basis of the written motion alone, thereby foregoing an opportunity to examine Carroll under oath in advance of trial.
[7] Defendant's pro forma assertion that denial of this discovery deprived him of the right to "defend himself against these capital charges" is rejected because, as we have seen, the evidence was not material.
[8] A letter written by defendant to the court included statements such as: "It may take me having to pay some singing telegrammer [sic] to sit in court, and then out of nowhere, get up and read my 3 line statement in court. Or I may have to have some printing place to have 10 teenagers wait until 4 p.m. one day and put flyers on all the cars in the parking lot and within two blocks of this court stating the reason why I'm not participating. Or I may say that I do want to attend my trial, come in court, wait 30 seconds after the jury has been seated, then stand up and say what I have to say before your deputies rush me out.... [Y]ou can't stop me.... It may be a week or three months from now." Another letter explained how upset defendant was that the court had refused to tell jurors information defendant wanted them to have, how he felt unfairly treated by the court and by the prosecutor, and concluded: "Take all this into account, how do you expect a person to keep his composure or emotions out?"
[9] In passing, defendant contends that the trial court erred in rejecting the claim that Moody's arrest occurred without probable cause, in violation of the Fourth Amendment. Defendant has no standing to assert the Fourth Amendment rights of others, and his claim is rejected on that basis. (People v. Badgett, supra, 10 Cal.4th at p. 343, 41 Cal. Rptr.2d 635, 895 P.2d 877.)
[10] Respondent contends defendant failed to establish that he had a reasonable expectation of privacy in his briefcase, asserting that defendant had relinquished any expectation of privacy in the briefcase by relinquishing control over the briefcase to his sister. We conclude that the evidence introduced at the hearing does not establish that defendant actually asked his sister to take possession of the briefcase, although at the time the search was conducted, the officers involved reasonably could believe that Diane Jenkins had secured the briefcase at her brother's direction. In any event, we decide the issue on other grounds.
[11] We note that those cases limiting the ability of police officers to search containers belonging to passengers of vehicles not owned by the passenger, in the absence of valid consent by the passenger, may require reexamination after the high court's recent decision in Wyoming v. Houghton (1999) 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408, which holds that police officers with probable cause to search a vehicle ordinarily may search the belongings of passengers, when such belongings reasonably may be believed to contain the object of the search.
[12] Because we determine on the basis of third party consent that the trial court properly denied the motion to suppress, we need not consider respondent's other contentions in support of the trial court's order.
[13] On October 13, the bull's-eye method was used because it was too late to stop the computer run for the court's usual method; on October 15, the bull's-eye method was used because there had been an earthquake and the method ordered by the court was impracticable.
[14] We note that although defendant did not offer any proof regarding the percentage of African-American persons living in the judicial district, the prosecutor stated in argument that the 1980 census showed that the African-American population constituted 1.7 percent of the population of the judicial district in which defendant was tried.
[15] Defendant objects only in passing that Prospective Juror Mn., a Catholic priest who he surmised might prove a sympathetic juror, improperly was excused. When the juror was excused for hardship pursuant to Code of Civil Procedure section 204, subdivision (b), the court referred to the circumstances that his diocese proposed to transfer him out of the area and also to the hardship to his parishioners if their only Spanish-speaking priest were unavailable for an extended period of time. The court's decision to excuse the juror on the ground of hardship was within its authority. (People v. Mickey (1991) 54 Cal.3d 612, 665, 286 Cal.Rptr. 801, 818 P.2d 84.)
[16] We reject defendant's claim that the trial court erred in refusing to correct the record of St.'s statement regarding the "aura of light" he believed protected each person. The matter was within the discretion of the court, which stated that it had a personal recollection of the juror's statement and was confident the transcript was accurate. In any event, the element of the statement that defendant complains was erroneously transcribed was not referred to by the trial court in granting the motion to excuse the prospective juror for cause. Further, apart from the statement relating to the "aura," the court relied upon the prospective juror's other statements and upon the court's observations of the juror's conduct and demeanor.
[17] Jury selection occurred in 1987, shortly before Code of Civil Procedure section 198 was repealed. (Stats. 1988, ch. 1245, § 1, p. 4140.)
[18] Defendant's suggestion that it was error for the prosecutor to peremptorily challenge jurors who expressed reservations concerning the death penalty is rejected as without merit. (People v. Ashmus, supra, 54 Cal.3d at p. 967, 2 Cal.Rptr.2d 112, 820 P.2d 214.)
[19] New rules currently apply. (See People v. Carpenter (1997) 15 Cal.4th 312, 353, 63 Cal. Rptr.2d 1, 935 P.2d 708.)
[20] The trial court made it clear in its earlier ruling on defendant's Wheeler motion with respect to Prospective Juror S. that although it found no prima facie case, it nonetheless asked the prosecution to respond to the motion for the purpose of creating a complete record for the reviewing court. The court presumably followed the same practice with respect to the motion concerning Prospective Juror Rt., although the court did not explain itself as fully in this instance.
[21] Defendant suggests that intermittent interruption of his library privileges arising from disciplinary sanctions constituted a due process violation, relying upon Hewitt v. Helms (1987) 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 and Meachum v. Fano (1976) 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451. The citations are puzzling; Hewitt holds that a postconviction prison inmate was not a prevailing party for the purpose of obtaining attorney fees in a civil rights action brought under 42 United States Code section 1983, because even though the Court of Appeals may have concluded the inmate's postconviction disciplinary proceeding had violated his constitutional rights by convicting him of misconduct solely upon the basis of hearsay, no relief was afforded the inmate apart from the moral satisfaction of knowing that a federal court had concluded his rights had been violated. Meachum held that an inmate had no due process right to a hearing before transfer between prisons. We observe no due process violation in what were at most occasional interruptions of library privileges, particularly when it is evident defendant had sufficient access to be well prepared for trial.
[22] To the extent defendant contends that the conditions of his confinement constituted a denial of fundamental due process of law in that they constituted punishment in advance of judgment (see Bell v. Wolfish (1979) 441 U.S. 520, 534, 547-548, 99 S.Ct. 1861, 60 L.Ed.2d 447), we note that a trial court properly defers to a great extent to the judgment of jail authorities regarding the conditions of a pretrial detainee's confinement. (Id. at pp. 540, fn. 23, 547-548, 99 S.Ct. 1861.) The court generally defers to such authorities regarding restraints on the defendant's liberty if these restraints are reasonably related to a legitimate government purpose  such as to ensure the defendant's presence at trial or to meet institutional security needs and the need for internal order and discipline (Id. at pp. 536-540, 547-548, 99 S.Ct. 1861)  unless there is substantial evidence in the record to indicate that such conditions impose restraints that are excessive relative to the legitimate governmental purpose. (Id. at p. 548, 99 S.Ct. 1861.) The record suggests strongly that the conditions imposed upon defendant related to legitimate governmental purposes, and in any event his claim has little to do with the validity of the judgment entered against him if his right to a fair trial otherwise was observed.
[23] Defendant's reliance upon evidence presented during the evidentiary portion of the trial is unavailing. He suggests that trial references to Carroll's efforts to contact jail authorities, along with inferences drawn from the grand jury report with respect to jail authorities' knowing use of informants in the Los Angeles County jail, meet the standard established in Kuhlmann v. Wilson, supra, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364. As explained, defendant may not rely upon the grand jury report in this appeal, and the evidence received at trial fails to establish that jail authorities did anything beyond merely listening to Carroll that "was designed deliberately to elicit incriminating remarks." (Id. at p. 459, 106 S.Ct. 2616.) In addition, we note that the trial evidence relied upon by defendant was not before the trial court when it ruled on the motion to exclude Carroll's testimony. Defendant does not contend that there was any later motion to strike Carroll's testimony on Sixth Amendment grounds.
[24] The court instructed the jury pursuant to this "knew or should have known" standard in the present case; any error in doing so only can have inured to defendant's benefit.
[25] Defendant's second counsel also served in an advisory capacity.
[26] Although defendant was granted the right to represent himself at the penalty phase of the trial, his counsel still served as cocounsel and advisory counsel, and represented him on legal matters, including questions from the jury during deliberations.
[27] As noted, we have rejected the contention that section 190.2 fails to meaningfully narrow the class of persons subject to the death penalty, and we do not reconsider it here.